Exhibit 1

Hearing Date: 9/25/2024 9:30 AM
Location: Court Room 2008
Judge: Calendar, 9

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED
5/24/2024 5:27 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024CH04952
Calendar, 9
27848721

| | |
|---|---|
| GTY TECHNOLOGY HOLDINGS INC., d/b/a EUNA SOLUTIONS and CITYBASE, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| WONDERWARE, INC. (d/b/a CORE BUSINESS TECHNOLOGIES), MICHAEL DUFFY, and CHRISTOPHER LEWIS, | ) ) ) ) |
| Defendants. | ) ) ) |

**2024CH04952**

Case. No.: _____

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiffs GTY Technology Holdings Inc., d/b/a Euna Solutions ("Euna") and CityBase,
Inc. ("CityBase" and, together with Euna, "Plaintiffs"), by and through their undersigned
attorneys, file this Complaint seeking preliminary and permanent injunctive relief against all
Defendants, as well as monetary damages against certain Defendants, for misappropriation of trade
secrets, breach of fiduciary duties, civil conspiracy, breach of contract, tortious interference with
contractual relations, and concert of action liability against Michael Duffy ("Duffy"), Christopher
Lewis ("Lewis"), and Wonderware, Inc., d/b/a CORE Business Technologies ("CORE" and,
together with Duffy and Lewis, the "Defendants") and allege as follows:

**INTRODUCTION**

1.      Through this action, Plaintiffs seek to prevent the Defendants' ongoing theft and
misuse of Plaintiffs' critical trade secrets, which Defendants misappropriated in order to unfairly
compete with Plaintiffs in the marketplace for government technology services, as well as damages
and costs flowing from Defendants' intentional misconduct.

2.      The individual Defendants, Duffy and Lewis, are former top-level executives who recently abandoned Plaintiffs for a direct competitor, Defendant CORE—in Duffy's case, without providing the fair notice he had contractually promised to Plaintiffs in exchange for valuable consideration.

3.      On their way out the door, Duffy and Lewis breached their fiduciary duties to Plaintiffs and misappropriated some of Plaintiffs' most sensitive, highly confidential strategic business information—trade secrets that these senior executives stole for the benefit of their new employer, and inevitably will misuse and disclose in order to gain an unfair advantage in the marketplace and harm Plaintiffs' business. *See, e.g., PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). In fact, shortly before his abrupt departure, Defendant Lewis brazenly and covertly downloaded and extracted two of Plaintiffs' most strategically sensitive files as part of Defendants' collective scheme.

4.      These files consisted of (1) a highly sensitive and confidential internal presentation detailing CityBase's strengths and weaknesses, CityBase's core strategies, CityBase's financial position, and detailed analyses of prospective customers, including personalized pitches for individuals at those customers; and (2) a strategic planning spreadsheet laying out, in minute detail, the markets CityBase was targeting, including revenue projections for those markets and the names of specific leads in those markets generated through Euna's extensive business development efforts. The spreadsheet also includes a "One Page Plan" tab that CityBase uses for assessing market opportunities. Together, these files effectively comprise the secret formula underlying Plaintiffs' business model, and would be extremely valuable to CORE, which, like Plaintiffs, offers payment solutions technology and services to public sector clients.

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

5.      Since turning against Plaintiffs, Duffy and Lewis have continued their wrongful conduct with CORE's full knowledge, encouragement, and assistance.  In fact, Defendants have doubled down on their tortious misconduct by poaching key CityBase and Euna employees, in violation of Duffy's and Lewis's binding contractual obligations.  Defendants' collective actions (only partially summarized in this Introduction) constitute an unlawful scheme to unfairly compete with and tortiously harm Plaintiffs in clear violation of Illinois law—including through overt acts of misconduct occurring in this State.

6.      Defendants' ongoing misconduct must be enjoined on an expedited basis pursuant to the forthcoming Motion for Preliminary Injunction that Plaintiffs will file following this Complaint to avoid further irreparable harm.  Moreover, Defendants must compensate Plaintiffs for the damages and costs, including attorneys' fees, that Plaintiffs have incurred and will continue to suffer as a direct result of Defendants' conduct—damages that Plaintiffs seek both in this action, and in other respects will seek in other appropriate fora.

## THE PARTIES

7.      Plaintiff GTY Technology Holdings Inc., d/b/a Euna Solutions, is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business at 363 W. Erie St. Floor 7, Chicago, Illinois 60654.

8.      Plaintiff CityBase, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business at 363 W. Erie St. Floor 7, Chicago, Illinois 60654.  CityBase is a wholly owned subsidiary of Euna.

9.      Upon information and belief, Defendant Michael Duffy is an individual who resides at 30 N. La Salle Street, Chicago, Illinois 60602.

10.     Upon information and belief, Defendant Christopher Lewis is an individual who resides at 1525 19th Avenue NW, Calgary, AB T2M 1A9.

FILED DATE: 5/24/2024 5:27 PM 2024CH04952

11.     Defendant Wonderware, Inc., d/b/a CORE Business Technologies, is a corporation organized and existing under the laws of Rhode Island, with its principal place of business at 950 Warren Avenue, Suite 400, East Providence, Rhode Island 02914.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 735 ILCS § 5/2-209.

13.     This Court has personal jurisdiction over Duffy pursuant to 735 ILCS § 5/2-209(a) because he is a resident of Illinois, has transacted business in Illinois, has made or performed a contract with Plaintiffs substantially within Illinois, and has committed tortious acts within Illinois.

14.     This Court has personal jurisdiction over Lewis pursuant to 735 ILCS § 5/2-209(a) because Lewis has transacted business in Illinois, and committed tortious acts within Illinois. These tortious acts include, without limitation, misappropriating confidential information, breaching Lewis's fiduciary duties, and tortiously interfering with Plaintiffs' contractual relations with Duffy and aiding and abetting Duffy's fiduciary breaches occurring in Illinois, harming a business located in Illinois.

15.     This Court has personal jurisdiction over CORE pursuant to 735 ILCS § 5/2-209 because CORE has transacted business in Illinois (including, without limitation, by hiring Duffy, an Illinois resident) and committed tortious acts within Illinois (including, without limitation, by tortiously interfering with Plaintiffs' contractual relations with Duffy, thereby causing harm to a business located in Illinois).

16.     Venue is appropriate in this Court pursuant to 735 ILCS § 5/2-101(1) and (2) because Defendants transact business in Cook County, and because certain of the transactions and occurrences out of which the causes of action arise occurred in Cook County.

FILED DATE: 5/24/2024 5:27 PM  2024CH04952

## STATEMENT OF FACTS

**A.**     **Euna's Acquisition of CityBase.**

17.     Euna is a leading provider of technology services to government entities across North America.  Euna engages with government agencies in need of assistance with procurement, grants, budgeting, permitting, payments, and special education.

18.     In 2018, Euna acquired CityBase, a provider of payment solutions technology and services, which Euna sought to add to its suite of services for its public sector clients.  Duffy had been CityBase's founder and Chief Executive Officer prior to the acquisition.

19.     Euna paid Duffy and his co-owners an enormous sum for CityBase—approximately $120 million—in a transaction entered into in September 2018 and that closed the following February.

20.     In connection with the CityBase acquisition, Euna offered Duffy continued executive roles pursuant to an offer letter dated September 12, 2018 (the "Duffy Offer Letter"). Specifically, Euna offered Duffy the continued role of Chief Executive Officer of CityBase, as well as Executive Vice President at Euna, and he would work out of CityBase's principal office in Chicago, Illinois.  Serving in these roles, Duffy would receive substantial compensation from Euna, with an annual base salary of $300,000 and annual cash bonus opportunity, alongside a generous equity package.[1]

21.     As a material condition of the Duffy Offer Letter—and in recognition of the trade secrets and vital business information that Duffy would access and the central relationship role he would play with customers and employees—Duffy executed a Fair Competition Agreement with

---

[1] In consideration of this equity, Duffy entered into an award agreement with Plaintiffs that contains additional restrictive covenants (which Duffy has also breached).  The award agreement in question contains a Delaware exclusive forum provision, and is therefore not at issue in the present action.

Euna, its parents, subsidiaries, and affiliates (such affiliates necessarily including CityBase, and with all entities defined therein as the "<u>Company</u>") dated September 12, 2018 (the "<u>Fair Competition Agreement</u>," attached hereto as Exhibit A).[2]

22.     Under the Fair Competition Agreement, Duffy agreed to an important set of covenants designed to protect the Company's vital interests in maintaining continuity and preserving the Company's valuable capital in the form of its trade secrets and other confidential information, as well as its employees and customers.

23.     For example, Duffy agreed that he would "provide the Company with the following periods of prior notice [], in writing, depending on [his] title at the time of [his] resignation, of [his] intent to terminate [his] employment with the Company: President and Executive Vice Presidents – three (3) months; Senior Vice Presidents – two (2) months; and Vice Presidents and below – one (1) month." Ex. A, § 6(a).  Duffy further agreed that if he intended to or did contemplate alternative employment at the time he provided such notice, he would provide sufficient details, in writing, about such alternative employment in order to allow the Company to meaningfully exercise its rights. *Id.* § 6(b).

24.     Duffy also agreed to a perpetual obligation not to use or disclose the Company's Confidential Information and Customer Confidences (as defined in the Fair Competition Agreement) without the prior written consent of the Company, except as may be necessary in the good faith performance of his duties to the Company or as permitted by law. *See id.* § 11.

---

[2] The Fair Competition Agreement provides for the resolution of any and all disputes arising thereunder to be resolved by final and binding arbitration before JAMS in New York, NY. *See* Ex. A, § 21.  However, the Fair Competition Agreement further provides that "the dispute resolution process set forth in paragraph 21 of this Agreement in no law [sic] limits the Company's right to obtain any preliminary, provision [sic] or permanent relief as may be necessary to protect the Company's rights and interests." *Id.* § 25.  Plaintiffs bring this action against Duffy for injunctive relief, and will pursue other relief against Duffy in separate arbitral proceedings.

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

25. Acknowledging that the Company is in a "highly competitive industry" and that Duffy "leaving the Company to join a competing business would jeopardize the Company's Customer Confidences, Confidential Information, Intellectual Property and Customer relationships," Duffy agreed that, for eighteen (18) months following the termination of his employment, he would not, "directly or indirectly, work for or with, own, invest in, render any service or advice to or otherwise assist (in each case, whether or not for compensation) or act as an officer, director, employee, partner or independent contractor for any Competitor[3] in the United States or any foreign country." *Id.* § 16(a). Duffy also agreed that if he considered working for any Competitor or arguably competing business at any time during the Non-Compete Period (as defined in the Fair Competition Agreement), he would provide the Company with at least two weeks' advance written notice of his intention to do so. *Id.*

26. Duffy further acknowledged that, by virtue of his employment by the Company:

> *[He] ha[s] gained or will gain knowledge of the identity, characteristics and preferences of the Company's Customers, among other Customer Confidences and Confidential Information, and that [he] would inevitably have to draw on such information if [he] were to solicit or service the Company's Customers on behalf of a Competitor.*

*Id.* § 17 (emphasis added). Accordingly, Duffy agreed that, during his employment by the Company and for twelve (12) months following the termination of that employment for any reason, (the "Restricted Period"), he would not, "on [his] own behalf or behalf of anyone else, directly or indirectly, solicit the business of, or direct tailored advertisements to, actual or prospective Customers of the Company (a) as to which [he] performed services or had direct contact, or (b) as

---

[3] Defined in the Fair Competition Agreement as "a business enterprise that (A) engages in any activity, (B) proposes to engage in any activity or (C) owns or controls a significant interest in or is a subsidiary or affiliate of any entity, which, in either case, competes with or proposes to compete with any activity in which the Company is engaged, such as, without limitation, *developing and licensing software for federal, state and local governments and governmental agencies*." *See* Ex. A, § 6(d) (emphasis added).

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

FILED DATE: 5/24/2024 5:27 PM  2024CH04952

to which [he] had access to Customer Confidences or Confidential Information during the course of your Employment by the Company." *Id.*  Duffy further agreed that, during the Restricted Period, he would not:

> [P]rovide services that are the same as or similar to those provided by the Company or encourage or assist any person or entity in competition with the Company to solicit, service, or direct tailored advertisements to any actual or prospective Customer of the Company covered by the previous sentence of this section, or otherwise seek to encourage or induce any such Customer to cease doing business with, or reduce the extent of its business dealings with, the Company.

*Id*.

28.    Duffy also agreed that, during the Restricted Period, he would not:

> [D]irectly or indirectly, *solicit, hire or seek to hire (whether on [his] own behalf or on behalf of some other person or entity) any person who is at that time (or was during the prior six (6) months) an employee, consultant, independent contractor, representative or other agent of the Company.*

*Id*. § 18 (emphasis added).  Duffy further promised that he would not, during the Restricted Period:

> [D]irectly or indirectly, on [his] own behalf or on behalf of any other person, entity or organization, induce or encourage any employee, consultant, independent contractor, representative or other agent of the Company to terminate or reduce his or her employment or other business relationship or affiliation with the Company.

*Id*. The Fair Competition Agreement also prohibits Duffy from directly or indirectly assisting any third party in doing what he himself is prohibited from doing under § 18—e.g., from soliciting, hiring, or seeking to hire any of Plaintiffs' employees (or inducing them to terminate or reduce their relationship with Plaintiffs). *Id.*

28.    The Fair Competition Agreement also provides that, "[i]n the event [Duffy] violates any provision of this Agreement, the Company shall be entitled to recover all costs and expenses of enforcement, including reasonable attorneys' fees." *Id*. § 25.  Duffy further agreed that if he violated any of the noncompetition, non-solicitation, or confidentiality provisions of the Fair Competition Agreement, "the time periods set forth in those sections shall be extended for the period of time [Duffy] remain[s] in violation of the provisions." *Id.* § 20.

29.     CityBase currently operates as an independent (but wholly owned) subsidiary of Euna.  CityBase's clientele is comprised of approximately seventy (70) agencies, utilities, cities, and counties.  Its clients include the New York City Department of Finance, the Alabama Power Company, the City of Austin, the City & County of Denver, the City & Utilities of Springfield, Missouri, and the City of Chicago.

30.     Duffy played an integral role in all aspects of CityBase.  As the senior-most executive officer, Duffy had the greatest level of access to and insight into its daily operations and overarching strategies.

31.     In his capacity as Chief Executive Officer of CityBase and Executive Vice President of Euna, Duffy of course owed important fiduciary duties to both Euna and CityBase, including the duty of loyalty.

32.     In carrying out his responsibilities for Euna and CityBase, Duffy had access to, and regularly used, Plaintiffs' highly sensitive trade secrets and confidential business information, including but not limited to marketing and business strategies, pricing, contract terms, client relationships, competitive vulnerabilities, and other confidential, proprietary, and trade secret information.

33.     Duffy's role as founder and long-time executive at CityBase (and Euna) also conferred on him uniquely strong relationships with their employees and customers.  Even the "rank and file" members of CityBase spoke glowingly of Duffy in Slack chats, demonstrating the sway he held over much of CityBase's workforce.  Moreover, Duffy was known for his "hands-on" leadership, frequently spearheading meetings with current and prospective clients and making substantial efforts to maintain personal relationships with Euna's and CityBase's customer contacts.

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

B.      **Lewis's Employment with CityBase**

34.     Duffy identified Lewis as a candidate for CityBase in or around early 2023. Leveraging their personal relationship, Duffy spent months courting Lewis to join CityBase. Plaintiffs ultimately hired Lewis to serve as its Senior Vice President of Engagement pursuant to an offer letter dated August 2, 2023 (the "Lewis Offer Letter").

35.     Lewis primarily worked remotely but reported directly to Duffy in CityBase's Chicago office and regularly visited the Chicago office to perform his duties. In particular, he worked out of CityBase's Chicago office for approximately one week each month, and visited as well for important meetings and events.

36.     Lewis was brought to CityBase to help revolutionize its marketing strategies. He immediately set about developing new business strategies for CityBase to use in pursuit of new customers, ultimately developing a set of documents that were distributed to the Euna and CityBase sales teams for internal use only (described in greater detail below).

37.     Beyond just developing sales strategies, Lewis regularly put them to use on behalf of CityBase. Lewis was a key member of CityBase's delegations to critical client targets up through the very weeks before he left CityBase, and regularly interacted with current and prospective CityBase customers.

38.     In recognition of his significant duties and role within CityBase, Lewis received an annual base salary of $325,000 CAD and annual cash bonus opportunity, and was granted a substantial equity compensation package.[4]

---

[4] In consideration of this equity, Lewis entered into an award agreement with Plaintiffs that contains additional restrictive covenants (which Lewis has also breached). The award agreement in question contains a Delaware exclusive forum requirement for disputes, and is therefore not at issue in the present action.

39.     In carrying out his responsibilities, Lewis had access to, and regularly used, Plaintiffs' highly sensitive and confidential business information, including but not limited to marketing and business strategies, pricing, contract terms, client relationships, their competitive vulnerabilities, and other confidential, proprietary, and trade secret information. Lewis regularly discussed the foregoing with senior leadership.

40.     And, like Duffy, as Senior Vice President of Engagement, Lewis owed important fiduciary duties to CityBase, including the duty of loyalty.

41.     Under the Lewis Offer Letter, Lewis agreed that:

> All notes, data, tapes, reference items, sketches, drawings, memoranda, records, diskettes and other materials in any way relating to any of the Information or to the Company's business produced by [Lewis] or coming into [Lewis's] possession by or through [Lewis's] employment, shall belong exclusively to the Company and [Lewis] agree[s] to turn over to the Company all copies of any such materials in [Lewis's] possession or under [Lewis's] control, forthwith, at the request of the Company or, in the absence of a request, on the termination of [Lewis's] employment with the Company."

42.     Lewis's role as the de facto head of the sales function of CityBase's business caused him to develop close relationships not only with CityBase's customers, but its employees as well. For instance, he hand-picked Sara Fernandes ("Fernandes")—a former colleague from Lewis's days at Paymentus Corporation—to join CityBase as the Director of Customer and Market Strategy. Seventy-five percent (75%) of CityBase's employees ultimately reported to Lewis.

43.     Through his role, Lewis was central to the all-important sales side of the organization and its employee and customer base.

**C.      Duffy Sabotages Euna and CityBase and Plots His Exit.**

44.     In or around September 2023, Euna Chief Executive Officer Tommy Amburgey, Jr. ("Amburgey") approached Duffy about the ongoing plan to make CityBase a fully integrated part of Euna. Amburgey repeatedly told Duffy that Euna viewed Duffy as a key member of the

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

leadership team, and that Euna wanted Duffy to remain in his senior position as Euna and CityBase became more integrated. These conversations continued throughout 2023, with Amburgey offering to allow Duffy to help draft the integration plan.

45. Instead of seizing the many opportunities presented to him to help integrate and grow Plaintiffs' business and provide better services to their customers, Duffy engaged in a pattern of insubordination that violated his fiduciary duties to Plaintiffs. Despite nominally committing to the integration process in conversation, Duffy's actions demonstrated his intent to resist integration and maintain the separation of CityBase and Euna. Duffy frequently expressed a belief that CityBase and Euna were fundamentally different (they are not), and that he was worried staff would leave if the businesses became fully integrated. Amburgey and the rest of the Euna leadership team emphasized to Duffy that this concern made it all the more important that Duffy stay with CityBase to facilitate the transition to a new era of the business.

46. Instead of working to ease the concerns of staff regarding the integration, Duffy actively fomented resistance among CityBase's employees. On November 28, 2023, Duffy separately messaged Heather Gonzalez (Manager of Operations) and Lucas Bricston (Senior DevOps Engineer). In conversations with both employees—neither of whom reported to Duffy— Duffy disparaged Euna and used militaristic rhetoric to describe Euna's efforts to integrate properly integrate CityBase. To wit, he offered the following analogies to subvert and denigrate Euna's integration efforts:

- "The mass communications as dropping leaflets onto a city you intend to invade."

- "Forcing us to stare at the MS Teams announcement channels like seizing the TV and Radio stations."

- "Removing OGs as imprisoning or assassinating competition or opposition."

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

Duffy even asked Bricston, "The question is: strategically, what are the other moves we should anticipate? What would Machiavelli say?" Duffy then offered: "*Maybe the best defensive strategy is offensive.*"

47.     During this same period, Duffy continued to engage in lavish unapproved spending, which cost the Plaintiffs tens—if not hundreds—of thousands of dollars in unauthorized corporate expenses.

48.     Plaintiffs have uncovered Slack chats from December 15, 2023, wherein Duffy presented Lewis with a "messaging strategy" about the integration. Duffy sought to portray himself as an "empassioned [sic] entrepreneur, averse to change," with Lewis being an "experienced operator" and Duffy's "translator and proxy, implicitly the adult in the room." The purpose of this strategy was to advance a "[r]ationale for continued autonomy"—in other words, to advance a goal directly at odds with the strategy chosen by Euna's senior leaders.

49.     By January 2024, Amburgey felt it necessary to speak with Duffy to discuss Duffy's future with CityBase and Euna. Amburgey had for months discussed ways to collaborate to advance a more effective integration of CityBase and Euna, all the while ensuring a go-forward role for Duffy. But Duffy consistently ignored those efforts. In their January discussion, Amburgey again urged Duffy to work with him more cooperatively.

50.     By that time, it turns out, Duffy was planning his flight to a competitor, and his scheme to take with him valuable assets and employees that would help CORE—which competes head-to-head with Plaintiffs—and cripple Plaintiffs' business.

**D.     Duffy and Lewis Leave Euna and CityBase, Steal Company Trade Secrets, and Begin Working to Subvert CityBase by Joining a Direct Competitor.**

51.     On January 21, 2024, just days after his conversation with Amburgey, Duffy concocted a false narrative that Euna had "constructively" terminated him. Then, without

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

authorization from Euna leadership, Duffy took it upon himself to inform CityBase staff that he would be moving on from CityBase, and that his last day was January 19. Duffy's narrative to the employees was false; Plaintiffs had been in negotiations with Duffy about the future of the business when Duffy elected to leave and carry out his apparently long-planned scheme to raid CityBase.

52. Despite having been included in conversations regarding the integration of CityBase and Euna in the preceding months—and being actively engaged in negotiations about what his role with Euna could be following Duffy's departure, negotiations in which Lewis enthusiastically participated—Lewis soon followed Duffy, submitting his resignation on February 27, 2024.

53. Revealing Duffy's and Lewis's premeditated scheme to raid Plaintiffs' most critical and valuable business secrets and hand them to a key competitor that they were about to join, in the weeks prior to his resignation, Lewis began accessing and sending to his personal email address some of the Company's most sensitive business information.

54. Specifically, on February 4, 2024, prior to his abrupt resignation, Lewis downloaded and sent two highly sensitive files to his personal email address.

55. These files, titled "CityBase OneCity Solution Selling.xlsx" (the "<u>Confidential Spreadsheet</u>") and "GTM Draft 1.pptx" (the "<u>Confidential Presentation</u>" and, together with the Confidential Spreadsheet, the "<u>Trade Secret Files</u>") contained trade secret information about CityBase strategy and customers, including (but not limited to) detailed market analyses, growth playbooks, and a complete list of Euna's target market leads—all trade secret information that would be invaluable to a competitor.

56. Tasked with revamping CityBase's sales strategies, Lewis led the creation of the Confidential Presentation for CityBase, which was a go-to-market playbook chock full of

competitively sensitive information about the sales and marketing strategies employed by CityBase and Euna. In Plaintiffs' hands, the Confidential Presentation is extremely valuable; to a competitor, it would be priceless.

57. The stolen Confidential Spreadsheet is even more sensitive. Designed by Lewis for distribution to the Euna and CityBase sales teams, it serves as a template for assessing every one of Plaintiffs' customers or prospective customers. One of the tabs of the Confidential Spreadsheet contains the names of Euna's *existing customers* who are potential prospects of CityBase's new payments platform—that is, confidential Euna information that provides inside information about vital potential sales leads for an adjacent business like CityBase, or a CityBase competitor. Indeed, the customers listed on that tab are the *best* prospect opportunities across *all* Euna customers. Other highly sensitive information in the Confidential Spreadsheet includes (and is in no way limited to) a tab listing Euna's *potential acquisition targets*.

58. Of course, Lewis was not authorized to download and send to his personal email address the Trade Secret Files that at all times were—and remain—Plaintiffs' property. As set forth in the Lewis Offer Letter:

> [Lewis] agree[s] that the Company acquires by virtue of the employment relationship all intellectual property rights, title and interest to all writings, products, developments, ideas, concepts, trade secret information, copyrights, works of authorship, artistic works, algorithms, mask words, trademarks, inventions (including service inventions), discoveries, computer programs, designs, techniques, know-how, formulae, processes, methods, improvements, modifications and other intellectual property, in whatever form (the "Works") which you may make, conceive, discover or develop at any time while [Lewis is] employed by the Company, whether during working hours or at any other time, which relate to or are used or intended for use in connection with any business carried on by the Company.

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

59. Based on their clear conspiracy to undermine CityBase and then abruptly leave, while poaching other employees, Lewis stole the trade secrets discussed herein, and likely others, and, upon information and belief, with the full knowledge and support of Duffy.

60. The foregoing theft of trade secrets is only one example based on the short period of time Plaintiffs have had to investigate Defendants' misconduct. On information and belief, Duffy and Lewis have taken and retained other trade secrets and confidential information belonging to Plaintiffs—including by virtue of their intimate knowledge of their business, which they cannot unlearn—and intend to use these trade secrets to benefit CORE and harm Plaintiffs.

61. On or around May 6, 2024, both Duffy and Lewis updated their LinkedIn profiles to declare that they had joined CORE as the Chief Executive Officer and Chief Operating Officer, respectively. This coincided with CORE's announcement of their positions. However, according to LinkedIn, both Duffy and Lewis have in fact been working for CORE for *months*, since at least March 2024.

62. Duffy's and Lewis's concealment of their association with CORE was purposeful, designed to prevent (or at least delay) Plaintiffs from seeking immediate injunctive relief. Duffy's failure to notify Plaintiffs is particularly egregious, as the Fair Competition Agreement required him to provide at least two weeks' advance written notice of his intent to work for any competitor or arguably competing business. *See* Ex. A, § 25.

63. CORE is a direct competitor of Euna and CityBase. According to its website, CORE provides "payment processing solutions" in the government, healthcare, and higher education fields. These "solutions" include online portals, cashier software, and online payment services.

FILED DATE: 5/24/2024 5:27 PM 2024CH04952

64.     CORE, like Plaintiffs, also offers revenue management services for client use.  As Duffy and Lewis know well, Plaintiffs have spent years developing and implementing a new payments platform that presently serves as an essential element of Plaintiffs' business.  In a PowerPoint on CityBase's competitive landscape that Duffy presented to Euna leadership in March 2023, he even identified this market as one that has "[l]ong been dominated by iNovah (Harris) *and CORE*."  The fact that Duffy and Lewis are now working for—indeed, are now running—one of Plaintiffs' most significant competitors in this space has the potential to irreparably harm Plaintiffs' competitive standing and strategic planning.

65.     The nature of their overlapping product offerings causes Plaintiffs and CORE to compete for government contracts across the country.  Indeed, CORE and Plaintiffs have competed head-to-head for contracts with municipalities from Washington to North Carolina.  And Euna and CORE are currently the two finalists in a bid for work with Tallahassee, Florida.

66.     The nature of both of their senior positions at CORE—which are substantially similar (in Duffy's case, identical) to their prior positions at CityBase—renders it inevitable that Duffy and Lewis will utilize and/or disclose Plaintiffs' confidential information and trade secrets in the course of their employment with CORE.  Indeed, their covert theft of the Plaintiffs' trade secrets before their departure makes Duffy's and Lewis's wrongful intentions abundantly clear.

67.     The immediate irreparable harm to the Plaintiffs' business interests is particularly acute given that, at the time of their departures, Duffy and Lewis were actively involved in presenting to several prospective customers that, on information and belief, CORE also seeks to service.  These customers include the cities of Oakland, California; Chicago, Illinois; New York; New York; and San Francisco, California.

FILED DATE: 5/24/2024 5:27 PM  2024CH04952

68.     Indeed, Duffy and Lewis were responsible for revamping the *entirety* of CityBase's strategic approach from August 2023 up until their abrupt and unannounced departures.

69.     Their immediate side-switching to a direct competitor in the development and licensing of software for state and local governments and government agencies has the potential to cripple Plaintiffs' business.

**E.      Duffy and Lewis Have Commenced a Raid of Plaintiffs' Employees.**

70.     In the short time since Lewis and Duffy joined CORE, CORE has already solicited and hired at least three senior CityBase employees: Fernandes, former Software Technical Lead James Gates ("Gates"), and former Director of Customer Support Jennifer Hill ("Hill" and, together with Fernandes and Gates, the "Former Employees").

71.     Hill was one of CityBase's longest tenured employees, spending over eight years there prior to Lewis's and Duffy's unlawful solicitation.  She was the key contact for all customers and led efforts around customer success and support.  Gates was also a tenured, key employee, leading CityBase's software department for over five years.  His position necessitated a deep understanding of all product development.  And Fernandes had followed Lewis to CityBase shortly after he was hired, having worked together at Paymentus Corporation for nearly two years.  Notably, Fernandes had been directly involved in pitching Oakland, California on Plaintiffs' business (along with Lewis) immediately prior to her departure.

72.     The terms of the Former Employees' employment with CityBase included, as with Duffy and Lewis, restrictive covenants relating to non-competition, non-solicitation, and non-disclosure of confidential information.

73.     Given their senior roles and their existing relationships, Lewis and Duffy undoubtedly played a role in soliciting the Former Employees to join CORE, likely before their departure from CityBase.  Moreover, the no-hire provisions of the Fair Competition Agreement

18

FILED DATE: 5/24/2024 5:27 PM 2024CH04952

render Defendants liable for CORE's hiring of these individuals, particularly given that the Fair Competition Agreement prohibits Duffy from *directly or indirectly assisting any third party* in soliciting or hiring the Company's employees. *See* Ex. A, § 18 (emphasis added).

74.     Plaintiffs face the serious, continuing threat that this unlawful poaching will extend beyond the Former Employees and could decimate Plaintiffs' business if not enjoined.

75.     Indeed, after Duffy and Lewis resigned, an additional eight employees—Matt Johnson, Lucas Bricston, Greg Bunker, Heather Gonzalez, Arielle Gottlieb, Logan Tran, Michael August, and Layla Bastar—left Plaintiffs. Plaintiffs have reason to believe that Defendants induced some or all of these individuals to terminate their employment with Plaintiffs, and likely solicited them to join CORE as well.

**F.      CORE and Lewis Knowingly Participated in Duffy's Breaches of His Obligations to Plaintiffs and Tortiously Interfered with the Fair Competition Agreement.**

76.     Duffy knew full well that his obligations to Plaintiffs were still in effect at the time that he joined CORE (and remain in effect today). Duffy was also contractually required to notify CORE of those obligations. *See* Ex. A, § 22. Either Duffy failed to do so, or CORE chose to ignore Plaintiffs' rights.

77.     Plaintiffs also took it upon themselves to ensure that CORE was well aware of this unlawful conduct prior to bringing this action. Plaintiffs sent a letter to Duffy on May 8, 2024, outlining the breaches of his restrictive covenant obligations and demanding that he cease and desist from such violations. CORE was copied on this letter.

78.     Plaintiffs sent a similar letter to Lewis on May 8, 2024, outlining the breaches of his obligations to Euna, and demanding that he cease and desist from such violations. CORE was copied on this letter as well.

FILED DATE: 5/24/2024 5:27 PM  2024CH04952

79.     Plaintiffs also sent a letter directly to Stephen Davis, CORE's President, on May 8, 2024, addressing Duffy's and Lewis's clear violations of their legal obligations to Plaintiffs and CORE's potentially unlawfully involvement in such actions.  Plaintiffs demanded that CORE cease and desist such conduct.  CORE declined.

80.     Duffy's contractual obligations to Plaintiffs were still in effect at the time that he joined CORE and remain in effect today.  CORE was made aware of those continuing contractual obligations, and helped to facilitate a breach of those obligations, as outlined below.  Lewis was likewise aware of such covenants (including because his own contract included similar restrictions), and his role in soliciting and/or hiring Plaintiffs' employees with Duffy interfered with Duffy's contractual commitments.

81.     Despite Plaintiffs' efforts to convince CORE to address its employees' unlawful conduct, CORE has continued to facilitate and support these egregious acts, hiring at least three key Former Employees in the week since receiving Plaintiffs' letters.[5]  Absent intervention from the Court, Defendants will continue to unlawfully poach Plaintiffs' key employees.

82.     In all, Defendants' actions have placed Plaintiffs in an impossible position.  Former CityBase executives have taken substantially similar—if not identical—positions at a direct competitor of the Plaintiffs.  Duffy and Lewis have already stolen and will inevitably rely on Plaintiffs' confidential information and trade secrets (which, beyond being known to Duffy and Lewis, remains tangibly in Lewis's possession) to help CORE unfairly compete with Plaintiffs, which will cause substantial harm to Plaintiffs' business.  Plaintiffs have already suffered damages

---

[5] Plaintiffs' inference as to timing is drawn from the dates on which the Former Employees shared on LinkedIn that they had joined CORE; it remains possible that the Defendants' improper solicitation and hiring of the Former Employees took place even earlier.

from Defendants' ongoing employee raiding efforts, and such damages will continue to accrue. Plaintiffs now seek the relief to which they are entitled under contract and at law.

## COUNT I
### Misappropriation by Acquisition of Trade Secrets and Confidential Information under the Illinois Trade Secrets Act, 765 ILCS 1065 et. seq. (Against Duffy & Lewis)

83. Plaintiffs incorporate the foregoing allegations by reference.

84. Plaintiffs are in possession of formulas, patterns, devices, and compilations of information that are used in their business and provide Plaintiffs with actual and potential economic value as a result of not being generally known to other persons.

85. Plaintiffs have undertaken significant efforts to prevent their trade secrets and confidential information from being known outside of Plaintiffs, including but not limited to communicating confidentiality obligations to all employees in their offer letters.

86. Plaintiffs' trade secrets and confidential information are highly valuable and have been developed at great expense of time and money.

87. Plaintiffs' trade secrets are protected by the Illinois Trade Secrets Act ("the ITSA"), 765 ILCS 1065/1 et. seq.

88. At Duffy's direction and for Duffy's, Lewis's, and CORE's benefit, Duffy and Lewis improperly acquired Plaintiffs' trade secrets through Lewis's downloading copies of the trade secrets and transmitting them to his personal email.

89. As a consequence of this misappropriation by acquisition of Plaintiffs' trade secrets and confidential information, Plaintiffs have suffered substantial monetary damages and irreparable harm.

## COUNT II
### Misappropriation by Use of Trade Secrets and Confidential Information under the Illinois Trade Secrets Act, 765 ILCS 1065 et. seq. (Against All Defendants)

FILED DATE: 5/24/2024 5:27 PM 2024CH04952

FILED DATE: 5/24/2024 5:27 PM 2024CH04952

90.     Plaintiffs incorporate the foregoing allegations by reference.

91.     Plaintiffs are in possession of formulas, patterns, devices, and compilations of information that are used in their business and provide Plaintiffs with actual and potential economic value as a result of not being generally known to other persons.

92.     Plaintiffs have undertaken significant efforts to prevent their trade secrets and confidential information from being known outside of Plaintiffs, including but not limited to communicating confidentiality obligations to all employees in their offer letters.

93.     Plaintiffs' trade secrets and confidential information are highly valuable and have been developed at great expense of time and money.

94.     Plaintiffs' trade secrets are protected by the ITSA.

95.     CORE, Duffy, and Lewis are in possession of Plaintiffs' trade secrets through Duffy's and Lewis's improper and unlawful extraction thereof from Plaintiffs' systems.

96.     Duffy's and Lewis's employment with CORE, a direct competitor of Plaintiffs, places them in a position where they will inevitably use Plaintiffs' trade secrets and confidential information for their and CORE's benefit, and to Plaintiffs' detriment.

97.     Defendants acted willfully and maliciously, entitling Plaintiffs to their reasonable attorney's fees under the ITSA.

98.     As a consequence of Defendants' misappropriation by use of Plaintiffs' trade secrets and confidential information, Plaintiffs have suffered substantial monetary damages and irreparable harm.

## COUNT III
### Breach of Fiduciary Duty (Against Duffy)

99.     Plaintiffs incorporate the foregoing allegations by reference.

22

100.     As an officer of CityBase, a Delaware corporation, and Euna, a Massachusetts corporation, Duffy owed fiduciary duties to CityBase and Euna.

101.     Duffy breached his fiduciary duties to Plaintiffs by (i) actively resisting corporate strategy to integrate Euna and CityBase, and instructing others, including Lewis, to do so, (ii) misusing corporate resources, including by using Plaintiffs' funds to engage in lavish unapproved spending, (iii) planning and executing a scheme with Lewis to misappropriate Plaintiffs' trade secrets and use them in their new employment at CORE, and (iv) soliciting Plaintiffs' employees to join him at CORE.

102.     As a consequence of Duffy's breaches of his fiduciary duties to Plaintiffs, Plaintiffs have suffered substantial monetary damages and irreparable harm.

<u>**COUNT IV**</u>
**Aiding and Abetting Breach of Fiduciary Duty (Against Lewis)**

103.     Plaintiffs incorporate the foregoing allegations by reference.

104.     As an officer of CityBase, a Delaware corporation, and Euna, a Massachusetts corporation, Duffy owed fiduciary duties to CityBase and Euna.

105.     Duffy breached his fiduciary duties to Plaintiffs by (i) actively resisting corporate strategy to integrate Euna and CityBase, and instructing others, including Lewis, to do so, (ii) misusing corporate resources, including by using Plaintiffs' funds to engage in lavish unapproved spending, (iii) planning and executing a scheme with Lewis to misappropriate Plaintiffs' trade secrets and use them in their new employment at CORE, and (iv) soliciting Plaintiffs' employees to join him at CORE.

106.     Lewis knowingly participated in Duffy's breaches of fiduciary duty.  Lewis knew that it was improper and not in Plaintiffs' best interests, and was instead in Duffy's interests, to fight the directive to integrate Euna and CityBase, to plan and execute a scheme to misappropriate

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

trade secrets for Duffy's and Lewis's use at their new employer, CORE, and to solicit other of Plaintiffs' employees to leave CityBase for employment with CORE.

107.    As a consequence of Lewis's aiding and abetting of Duffy's breaches of his fiduciary duties, Plaintiffs have suffered substantial monetary damages and irreparable harm.

## COUNT V
### Breach of Fiduciary Duty (Against Lewis)

108.    Plaintiffs incorporate the foregoing allegations by reference.

109.    As an officer of CityBase, a Delaware corporation, Lewis owed fiduciary duties to CityBase.

110.    Lewis breached his fiduciary duties to Plaintiffs by (i) actively resisting corporate strategy to integrate Euna and CityBase, and instructing others to do so, (ii) planning and executing a scheme with Duffy to misappropriate Plaintiffs' trade secrets and use them in their new employment at CORE, and (iii) soliciting Plaintiffs' employees to join him at CORE.

111.    As a consequence of Lewis's breaches of his fiduciary duties to Plaintiffs, Plaintiffs have suffered substantial monetary damages and irreparable harm.

## COUNT VI
### Aiding and Abetting Breach of Fiduciary Duty (Against Duffy)

112.    Plaintiffs incorporate the foregoing allegations by reference.

113.    As an officer of CityBase, a Delaware corporation, Lewis owed fiduciary duties to CityBase.

114.    Lewis breached his fiduciary duties to Plaintiffs by (i) actively resisting corporate strategy to integrate Euna and CityBase, and instructing others to do so, (ii) planning and executing a scheme with Duffy to misappropriate Plaintiffs' trade secrets and use them in their new employment at CORE, and (iii) soliciting Plaintiffs' employees to join him at CORE.

115.    Duffy knowingly participated in Lewis's breaches of fiduciary duty. Duffy knew that it was improper and not in Plaintiffs' best interests, and was instead in Lewis's interests, to fight the directive to integrate Euna and CityBase, to plan and execute a scheme to misappropriate trade secrets for Duffy's and Lewis's use at their new employer, CORE, and to solicit other of Plaintiffs' employees to leave CityBase for employment with CORE.

116.    As a consequence of Duffy's aiding and abetting of Lewis's breaches of his fiduciary duties, Plaintiffs have suffered substantial monetary damages and irreparable harm.

**COUNT VII**
**Conspiracy (Against All Defendants)**

117.    Plaintiffs incorporate the foregoing allegations by reference.

118.    Duffy, Lewis, and CORE conspired with each other to misappropriate Plaintiffs' trade secret information and use it to give CORE an unfair competitive advantage over Plaintiffs. They also conspired to work together to unlawfully solicit and hire away Plaintiffs' employees to gain further competitive advantage over Plaintiffs.

119.    Duffy performed overt acts in furtherance of this scheme: he directed Lewis to download the Trade Secret Files, without Plaintiffs' authorization, and send them to Lewis's personal email address.  Duffy also solicited and hired Lewis to join CORE, knowing full well that Lewis's position at CORE would inevitably lead him to disclose Plaintiffs' confidential information to CORE.  Moreover, Duffy himself joined CORE knowing full well that *he* would inevitably disclose Plaintiffs' confidential information to CORE, in addition to breaching his obligations to Plaintiffs.

120.    Duffy's overt acts advanced the scheme by enabling Lewis, Duffy, and CORE to gain an unfair competitive advantage over Plaintiffs.

FILED DATE: 5/24/2024 5:27 PM  2024CH04952

121.    Lewis performed overt acts in furtherance of this scheme: he downloaded the Trade Secret Files, without Plaintiffs' authorization, and sent them to his personal email address. Lewis also joined CORE, knowing full well that his position at CORE would inevitably lead him to disclose Plaintiffs' confidential information to CORE.

122.    Lewis's overt act advanced the scheme by enabling Lewis, Duffy, and CORE to gain an unfair competitive advantage over Plaintiffs.

123.    CORE performed overt acts in furtherance of this scheme: CORE hired Duffy and Lewis, knowing full well the obligations they owed to Plaintiffs and the fact that they would inevitably disclose Plaintiffs' confidential information to CORE.  CORE also worked with Duffy and Lewis to solicit and hire additional employees from Plaintiffs.

124.    CORE's overt acts advanced the scheme by enabling Lewis, Duffy, and CORE to gain an unfair competitive advantage over Plaintiffs.

125.    As a direct consequence this conspiracy, Plaintiffs have suffered substantial monetary damages and irreparable harm.

## COUNT VIII
### Tortious Interference with Contractual Relations (Against CORE & Lewis)

126.    Plaintiffs incorporate the foregoing allegations by reference.

127.    CORE and Lewis were aware of Duffy's continuing confidentiality, noncompetition, customer non-solicitation, and employee non-solicitation and no-hire obligations to Plaintiffs under the Fair Competition Agreement.  *See* Ex. A, §§ 16–18.

128.    CORE and Lewis intentionally and unjustifiably interfered with Plaintiffs' contractual relationship with Duffy by inducing him to join a direct competitor with whom he would inevitably disclose Plaintiffs' confidential information, and CORE and further intentionally

26

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

and unjustifiably induced a breach of Duffy's employee non-solicitation and no-hire obligations by aiding and abetting him in hiring Lewis, Gates, Hill, and Fernandes.

129.    As a direct and proximate result of CORE's and Lewis's actions, Plaintiffs have suffered substantial monetary damages and irreparable harm.

**COUNT IX**
**Concert of Action Liability (Against All Defendants)**

130.    Plaintiffs incorporate the foregoing allegations by reference.

131.    Defendants committed tortious acts in concert with each other pursuant to a common design, namely, misappropriation of Plaintiffs' trade secrets, breaches of Duffy's and Lewis's fiduciary duties owed to Plaintiffs, and tortious interference with Plaintiffs' contract with Duffy.

132.    CORE and Lewis knew that Duffy's conduct constituted a breach of his contractual duties, namely his non-solicitation and non-disclosure obligations, and gave substantial assistance and encouragement to Duffy to breach such obligations by misappropriating Plaintiffs' trade secrets and participating in solicitation and hiring of Plaintiffs' employees to work for CORE.

133.    Duffy gave substantial assistance to Lewis in misappropriating Plaintiffs' trade secrets by planning with Lewis and directing him to exfiltrate Plaintiffs' Trade Secret Files, which, separately considered, breached his own contractual duties to Plaintiffs as to non-disclosure and non-use of Plaintiffs' confidential information in Section 11 of his Fair Competition Agreement.

134.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered substantial monetary damages and irreparable harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

27

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

i.      Order the preliminary relief sought in Plaintiffs' forthcoming Motion for Preliminary Injunction;

ii.     Direct all Defendants to identify and return any of Plaintiffs' confidential information and trade secrets in their possession;

iii.    Enjoin all Defendants from using or disclosing any of Plaintiffs' confidential information and trade secrets in their possession;

iv.     Enjoin Duffy and Lewis, for 12 months from judgment, from soliciting, directly or indirectly, the business of any of Plaintiffs' actual or prospective customers;

v.      Enjoin Duffy and Lewis, for 12 months from judgment, from soliciting, directly or indirectly, hiring, or seeking to hire any of Plaintiffs' employees, contractors, consultants, or agents (including anyone who served in the foregoing capacities for the past six months), or inducing such persons to terminate or reduce their employment or other business relationship with Plaintiffs;

vi.     Enjoin CORE, for 12 months from judgment, from hiring or seeking to hire any of Plaintiffs' employees, contractors, consultants, or agents (including anyone who served in the foregoing capacities for the past six months), which inevitably will tortiously interfere with Duffy's non-solicitation and no-hire obligations for that period;

vii.    Award compensatory damages in favor of Plaintiffs against Defendants CORE and Lewis in an amount to be proven at trial, including pre- and post-judgment interest thereon.

viii.   Award reasonable attorney's fees and costs incurred by Plaintiffs in enforcing their rights, as contractually agreed by Duffy in the Fair Competition Agreement and as separately provided under the ITSA.

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

      ix.     Order such further and additional relief as this Court may deem just, proper, and equitable.

Dated: May 24, 2024

                            */s/ Jeffrey J. Bushofsky*
                            Jeffrey J. Bushofsky

                            **ROPES & GRAY LLP**
                            Firm ID: 47644

                            Jeffrey J. Bushofsky
                            Timothy J. Farrell
                            191 North Wacker Drive
                            32nd Floor
                            Chicago, Illinois 60606
                            Tel: (312) 845-1200
                            Fax: (312) 845-5500
                            jeffrey.bushofsky@ropesgray.com
                            timothy.farrell@ropesgray.com

                            Gregory L. Demers (*pro hac vice forthcoming*)
                            Jane McGraw (*pro hac vice forthcoming*)
                            Daniel Murphy (*pro hac vice forthcoming*)
                            Prudential Tower, 800 Boylston Street
                            Boston, MA 02199-3600
                            Tel: (617) 951-7000
                            Fax: (617) 951-7050
                            gregory.demers@ropesgray.com
                            jane.mcgraw@ropesgray.com
                            daniel.murphy@ropesgray.com

                            Ethan M. Weinberg (*pro hac vice forthcoming*)
                            1211 Avenue of the Americas
                            New York, NY 10036
                            Tel: (212) 596-9000
                            Fax: (212) 596-9090

                            *Attorneys for Plaintiffs GTY Technology Holdings Inc. and CityBase, Inc.*

29

FILED DATE: 5/24/2024 5:27 PM    2024CH04952

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

# **Exhibit A**

EXECUTION VERSION

# FAIR COMPETITION AGREEMENT

In consideration of the commencement or continuation of your employment with GTY Technology Holdings Inc. and/or any of its current or future parents, subsidiaries, affiliates, and/or successors (collectively, the "Company"), and the compensation and other benefits you will receive from the Company (your "Employment"), you agree, intending to be legally bound, as follows:

## Acknowledgements and Representations

1.    <u>Supplemental Terms</u>.  You acknowledge that you have received a separate offer letter (the "Offer Letter") that sets forth the relevant terms concerning your compensation arrangements with the Company.  In the event of any conflict between this Fair Competition Agreement (this "Agreement") and the Offer Letter, the terms of the Offer Letter shall govern.

2.    <u>Acceptance</u>.  You acknowledge that the Company considers the protections provided by this Agreement to be necessary to safeguard its Customer Confidences, Confidential Information, Intellectual Property, Customer relationships (each as defined in this Agreement) and other business interests and is willing to commence or continue your Employment only if you agree to accept the obligations set forth herein.  In the event the transactions contemplated by the Merger Agreement are not consummated, this Agreement will be void ab initio and of no force or effect

3.    <u>No Conflicting Obligations</u>.  You represent that you do not have any contractual or other obligations that would conflict with your Employment by the Company.  In particular, you represent that you are not bound by any agreement, understanding or other obligation (including, without limitation, any non-competition or nonsolicitation agreement) with or to any person or entity that prohibits you from accepting or continuing your Employment by the Company and fully performing all your duties for the Company, except as described on Annex A attached hereto.

4.    <u>Documents and Confidential Information Belonging to Former Employers and Other Third Parties</u>.  You also represent that you have not taken or retained, and do not have in your possession, any documents, in either electronic or hard copy form, that belong to any former employer (which, for purposes of this Agreement, shall include persons, corporations, and other entities for which you have acted as an independent contractor or consultant) and that you will not use or disclose in your work for the Company any trade secrets or confidential information belonging to any former employer or other third party.

## At Will Employment and Notice Period

5.    <u>At Will Nature of Employment</u>.  You acknowledge that neither the Offer Letter nor this Agreement gives you any right to employment or continued employment with the Company and that, unless otherwise provided in another writing executed by an officer of the Company and you, your Employment with the Company shall be at the will of both the Company and you.  This means that you are free to resign at any time (subject to providing written notice pursuant to any applicable Notice Period as set forth below), for any or no reason, and, similarly, the Company is free to terminate your Employment at any time, for any or no reason, subject to the terms of this Agreement and the Offer

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

Letter. Your Employment will continue in effect, however, until terminated by either the Company or you.

6.  (a) You understand and agree that you will have access to Customer Confidences, Confidential Information, Intellectual Property and Customer relationships belonging to the Company. You recognize and agree that it is reasonable and necessary for the Company to protect such Customer Confidences, Confidential Information, Intellectual Property, and Customer relationships and to provide a smooth transition if you choose to leave the Company. Consequently, you agree to provide the Company with the following periods of prior notice (the "Notice Period"), in writing, depending on your title at the time of your resignation, of your intent to terminate your employment with the Company: President and Executive Vice Presidents – three (3) months; Senior Vice Presidents – two (2) months; and Vice Presidents and below – one (1) month. If such notice is provided to the Company prior to the bonus payment date for that year, (i) you shall not be entitled to receive any annual or long-term incentive compensation award for that year and (ii) vesting of deferred amounts not yet vested shall cease upon notice of your intent to terminate your employment.

(b)  If, at the time you provide notice in accordance with this paragraph 6, you intend or contemplate alternative employment, you also agree to provide sufficient details, in writing, about such alternative employment to allow the Company to meaningfully exercise its rights under this paragraph 6.

(c)  During the Notice Period, you will: (i) perform any reasonable duties and responsibilities the Company requests; (ii) devote all of your working time, labor, skill and energies to the business and affairs of the Company; (iii) be paid your base salary; and (iv) be entitled to continue to participate in the Company's employee benefit plans as provided for herein. After you have given notice of your resignation, the Company may, at any time during the Notice Period and in its sole and absolute discretion, (A) elect to place you on paid leave for all or any part of such Notice Period, subject to applicable law, (B) relieve you of some or all of your duties as an employee of the Company and/or exclude you from its premises or (C) shorten or eliminate the Notice Period and accelerate the date on which your resignation will be effective without any obligation to compensate you for the period between the date that the Company effected the acceleration of the effective date of your resignation and the date on which the Notice Period was originally due to end. For the avoidance of doubt, you agree that the taking of any action described in the preceding sentence by the Company shall not constitute a breach of this Agreement or your Offer Letter.

(d)  You further agree that during your employment, including during the Notice Period, whether or not the Company requires you to work during the Notice Period, you will not provide services for any Competitor including, without limitation, engaging in, directly or indirectly, or managing or supervising personnel engaged in, any activity (i) which is similar or substantially related to any activity in which you were engaged, in whole or in part, at the Company; (ii) for which you had direct or indirect managerial or supervisory responsibility at the Company; or (iii) which calls for the application of the same or similar specialized knowledge or skills as those used by you in your activities with the Company. For purposes of this Agreement, a "Competitor" means a business enterprise that (A) engages in any activity, (B) proposes to engage in any activity or (C) owns or controls a significant interest in or is a subsidiary or affiliate of any entity, which, in either case, competes with or proposes to compete with any activity in which the Company is engaged, such as, without limitation, developing and licensing software for federal, state and local governments and governmental agencies.

2

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

**Duties**

7.    <u>Nature of Duties</u>.  Except to the extent expressly permitted in your Offer Letter or as disclosed on Annex A, during your Employment, you shall not engage in any other business activities without the prior written consent of the Company.  In particular, during your Employment, you agree not to work for or assist, whether or not for profit or personal gain, any Competitor or engage in any business or activity that is similar to or competes directly or indirectly with the Company or is inimical to the best interests of the Company or that would interfere with your ability to work for the Company on a full-time basis.

8.    <u>Duty to Disclose Business Opportunities</u>.  During your Employment, you shall (a) promptly disclose to the Company all business opportunities that are presented to you in your capacity as an officer or employee of the Company or that are of a similar nature to the Company's existing business or a type of business the Company is currently developing or considering and (b) not usurp or take advantage of any such business opportunity personally or assist any third party in doing so without first offering such opportunity to the Company.

**Confidentiality, Non-Disclosure and Intellectual Property**

9.    <u>Customer Confidences</u>.  As used in this Agreement, "Customer" means any person, corporation or other entity (a) for which the Company has performed any services or to which it has sold any products, (b) with which it has engaged in any business activity or (c) from which the Company has actively solicited business or discussed other business arrangements in the year preceding the termination of your Employment.  The Company's Customers expect that the Company will hold all business-related information about them, including the fact that they are doing or are considering doing business with the Company and the specific matters on which they are or may be doing business, in the strictest confidence ("Customer Confidences").  You acknowledge that, during the course of your Employment, you will have access to such Customer Confidences.  You also acknowledge and agree that all relationships with Customers that you initiate or develop during your Employment with the Company belong to the Company, not to you personally.

10.    <u>Confidential Information</u>.    You acknowledge that, during the course of your Employment, you will have access to information relating to the Company's business that provides the Company with a competitive advantage, is not generally known by persons outside the Company and could not easily be determined or learned by someone outside the Company ("Confidential Information").  Such Confidential Information, whether or not explicitly designated as confidential, includes both written information and information not reduced to writing and includes but is not limited to information about Customers, trade secrets, internal corporate policies and strategies, pricing, financial and sales information, personnel information, forecasts, formulas, compilations, software programs, data, databases, directories, research, client lists and business and marketing plans, and any modifications or enhancements of any of the foregoing.  You further agree that if you previously rendered services to the Company (e.g., as an independent contractor or consultant) or otherwise gained knowledge of Customer Confidences and/or Confidential Information (e.g., by executing a Non-Disclosure Agreement prior to your rendering services to the Company in any capacity), your obligations under any such agreement between you and the Company to preserve Customer

3

Confidences and/or Confidential Information shall remain in full force and effect pursuant to the applicable terms contained therein.

11. <u>Duty to Preserve Customer Confidences and Confidential Information.</u>  You agree not to use or disclose, without the prior written consent of the Company, both during and after your Employment with the Company, Customer Confidences and Confidential Information, except as may be necessary in the good faith performance of your duties to the Company or as permitted by paragraphs 23 and 24 hereof.

12. <u>Company Documents.</u>  You acknowledge that all documents, in hard copy or electronic form, received, created or used by you in connection with your Employment with the Company, other than those relating solely to your personal compensation and benefits, are and will remain the property of the Company.  You agree to return and/or cooperate in permanently deleting all such documents (including all copies) promptly upon the termination of your Employment and agree that, during or after your Employment, you will not, under any circumstances, without the written consent of the Company, disclose those documents to anyone outside the Company or use those documents for any purpose other than the advancement of the Company's interests, or as permitted by paragraphs 23 and 24 hereof.  You further understand and agree that you are prohibited from searching for, accessing, viewing, printing, transferring and/or using documents, e-mails, and any other data stored on any of the Company's computer systems in the absence of a legitimate business need or Company objective, and any such actions or use will be considered unauthorized.

13. <u>Obligation to Return Signed Termination Certificate Upon Termination.</u>  Upon termination of your Employment, you will be asked to participate in an exit interview and to sign and deliver a "Termination Certificate," the form of which is attached hereto as Annex B.  If you do not attend an exit interview, you are still obligated to sign and deliver the Termination Certificate.  Your failure to sign the Termination Certificate, however, shall not affect any of your obligations under this Agreement.

14. <u>Intellectual Property.</u> (a) You agree to fully and promptly disclose to the Company, without additional compensation, all ideas, original or creative works, inventions, discoveries, computer software or programs, trading strategies, statistical and economic models, improvements, designs, formulae, processes, production methods and technological innovations, whether or not patentable or copyrightable, which, during your Employment with the Company, are made, conceived or created by you, alone or with others, during or after usual working hours, either on or off the job, and which are related to the business of the Company or which relate in any way to the work performed by you for the Company ("Intellectual Property").  You acknowledge that the Company owns all such Intellectual Property rights as works made for hire to the fullest extent of the law.  For the avoidance of doubt, you hereby assign to the Company all such Intellectual Property rights in any and all media now known or hereafter developed, along with all existing causes of action, known or unknown.

(b) You agree, at any time during or after your Employment, to sign all papers and do such other acts and things, at the Company's expense, as the Company deems necessary or desirable and may reasonably require of you to protect the Company's rights to such Intellectual Property, including applying for, obtaining and enforcing patents or copyrights with respect to such Intellectual Property in any and all domestic and overseas jurisdictions.

4

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

**Restrictive Covenants**

15.     <u>Nature of Company's Business</u>.  You acknowledge that the Company is engaged in a highly competitive business and that the preservation of its Customer Confidences and Confidential Information is critical to the Company's continued business success.  You also acknowledge that the Company's relationships with its Customers are extremely valuable and that, by virtue of your Employment with the Company, you have had or may have contact with those Customers and are being compensated to develop relationships with Customers on behalf of and for the benefit of the Company.  As a result, your engaging in or working for or with any business which is directly or indirectly competitive with the Company would cause the Company great and irreparable harm if not done in strict compliance with this Agreement.

16.     <u>Covenant Not to Compete</u>.  You acknowledge that the Company is in a highly competitive industry and that your leaving the Company to join a competing business would jeopardize the Company's Customer Confidences, Confidential Information, Intellectual Property and Customer relationships.  Accordingly, you agree that:

(a)     Subject to the provisions below, during your Employment with the Company, and for the applicable Non-Compete Period (as defined below), and in consideration for the payments provided for below (excluding, for the avoidance of doubt, any payment in the event your Employment is terminated for Cause (as defined below)), you will not directly or indirectly work for or with, own, invest in, render any service or advice to or otherwise assist (in each case, whether or not for compensation) or act as an officer, director, employee, partner or independent contractor for any Competitor in the United States or any foreign country.  You acknowledge that, given the nature of the Company's business and the geographical market of the Company combined with your role and responsibilities, the geographical area of the United States or any foreign country and the Non-Compete Period are both reasonable.

(b)     To the extent that, at the time of the termination of your Employment, you intend to work for or provide services to a Competitor or any arguably competing business, you agree to provide the Company at the time of such termination with at least two weeks' advance written notice of your intention to do so.  You also agree that, should you consider working for any Competitor or arguably competing business at any time during the applicable Non-Compete Period, you will provide the Company with at least two weeks' advance written notice of your intention to do so.  The notices contemplated by this paragraph shall be delivered by you in writing to the attention of the General Counsel of the Company.

(c)     If your Employment with the Company is terminated due to your voluntary resignation, the Company agrees that the covenant not to compete set forth in paragraph 15(a) shall apply only during the period of the applicable Non-Compete Period that the Company, in its sole discretion, elects to pay you (in accordance with the Company's normal payroll practices) an amount equal to your regular base salary in effect on the effective date of your termination from the Company (the "Non-Compete Payments").  In the event the Company elects to make the Non-Compete Payments, you will be required to execute and not revoke a general release of claims in a standard form utilized by the Company as a condition to your receipt of the Non-Compete Payments.  The release must become effective within thirty (30) days following the date the Company notifies you of its intent to enforce the provisions of paragraph 15(a).  The Company will determine the timing and duration of the Non-

5

FILED DATE: 5/24/2024 5:27 PM 2024CH04952

Compete Payments, although in no event will the duration of such payments extend beyond the end of the applicable Non-Compete Period.  The Company shall have the right at any time during the Non-Compete Period to invoke its right to make the Non-Compete Payments.  For example, if at the time of your termination of Employment, you notify the Company of your intent to go to a non-competing entity, the Company may elect not to make Non-Compete Payments.  If, however, you decide later in the Non-Compete Period to go to a Competitor, you must notify the Company in accordance with paragraph 16(b) above, and the Company shall then have the right to elect to make the Non-Compete Payments for a period lasting no longer than the remainder of the Non-Compete Period.  In any instance where the Company has the right to elect to make the Non-Compete Payments, it must do so within ten (10) business days of the Company's receipt of your written notice of your intent to resign or your intent to go to a competing entity, as the case may be.  If during the period the Company is making the Non-Compete Payments, you perform services for and receive compensation from a non-competing entity, you shall notify the Company of such compensation, and the Company may in its discretion determine whether to offset such amounts against the Non-Compete Payments.

(d)     If your Employment is terminated by the Company for "Cause" (as that term is defined in your Offer Letter), the terms of paragraph 15(a) will apply for the duration of the applicable Non-Compete Period and you shall not be entitled to any Non-Compete Payments.

(e)     For purposes of this Agreement, the Non-Compete Period means: (i) if your employment is terminated by the Company without Cause or you resign for Good Reason, the period of time during which you are entitled to receive severance payments from the Company as set forth in your Offer Letter; (ii) if your employment is terminated by the Company for Cause, six (6) months from the effective date of your termination; and (iii) if your employment is terminated due to your voluntary resignation, the period time during which you receive Non-Compete Payments but in no event longer than six (6) months.

17.     <u>Non-Solicitation of Customers</u>.  You acknowledge that, by virtue of your Employment by the Company, you have gained or will gain knowledge of the identity, characteristics and preferences of the Company's Customers, among other Customer Confidences and Confidential Information, and that you would inevitably have to draw on such information if you were to solicit or service the Company's Customers on behalf of a Competitor.  Accordingly, you agree that during your Employment by the Company (including during any applicable Notice Period), and for twelve (12) months following the termination of that Employment for any reason, (the "Restricted Period"), you will not, on your own behalf or behalf of anyone else, directly or indirectly, solicit the business of, or direct tailored advertisements to, actual or prospective Customers of the Company (a) as to which you performed services or had direct contact, or (b) as to which you had access to Customer Confidences or Confidential Information during the course of your Employment by the Company.  You further agree that during the Restricted Period, you will not provide services that are the same as or similar to those provided by the Company or encourage or assist any person or entity in competition with the Company to solicit, service, or direct tailored advertisements to any actual or prospective Customer of the Company covered by the previous sentence of this section, or otherwise seek to encourage or induce any such Customer to cease doing business with, or reduce the extent of its business dealings with, the Company.  The prohibitions contained in this section shall not, however, apply to any Customers you developed without any substantial assistance from the Company, provided you so demonstrate in writing during your Employment with the Company.

6

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

18.  <u>Non-Solicitation of Employees</u>.  You also agree that, during the Restricted Period, you will not, directly or indirectly, solicit, hire or seek to hire (whether on your own behalf or on behalf of some other person or entity) any person who is at that time (or was during the prior six (6) months) an employee, consultant, independent contractor, representative or other agent of the Company.  Nor will you during the Restricted Period, directly or indirectly, on your own behalf or on behalf of any other person, entity or organization, induce or encourage any employee, consultant, independent contractor, representative or other agent of the Company to terminate or reduce his or her employment or other business relationship or affiliation with the Company.  Nor will you directly or indirectly assist any third party in doing what you yourself are prohibited from doing under this paragraph.

19.  <u>Non-Disparagement.</u>  Except as otherwise permitted by this Agreement or applicable law, you agree that during your Employment with the Company and at all times thereafter you will not make disparaging or defamatory comments regarding the Company or its owners, members, directors, officers, employees, shareholders, agents, representatives or others with whom the Company has a business relationship as of the date of termination of your Employment or make any public statements that are intended to, or can reasonably expected to, damage the reputations of any of such entities or persons.

20.  <u>Tolling</u>.  In the event that you violate any of the preceding provisions of the Restrictive Covenants sections of this Agreement, the time periods set forth in those sections shall be extended for the period of time you remain in violation of the provisions.

## Arbitration

21.  (a)  It is understood and agreed between the parties hereto that any and all claims, grievances, demands, controversies, causes of action or disputes of any nature whatsoever (including, but not limited to, tort and contract claims, and claims based upon any law, statute, order, or regulation) arising out of, in connection with, or in relation to (i) the interpretation, performance or breach of this Agreement, (ii) Employee's employment by the Company, (iii) the termination of Employee's employment with the Company, and (iv) the arbitrability of any claims under or relating to this Agreement, shall be resolved by final and binding arbitration.  This agreement to arbitrate expressly includes, but is not limited to, claims under Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, as amended, the Americans with Disabilities Act of 1990, as amended, Section 1981 of the Civil Rights Act of 1866, the Family and Medical Leave Act, as amended, the Employee Retirement Income Security Act, as amended, the Fair Labor Standards Act, as amended, and any similar federal, state, local or municipal law, statute or regulation.

(b)  The forum for any arbitration under this Agreement shall be final and binding arbitration before under the auspices of JAMS in New York, NY.

(c)  The arbitration shall be conducted in accordance with the then-existing JAMS Employment Rules and Procedures, except to the extent such rules conflict with the procedures set forth in this paragraph, in which case these procedures shall govern.  Any such arbitration shall be before one arbitrator.  The parties shall select a mutually acceptable retired judge from the panel of arbitrators serving with any of JAMS's offices, but in the event the parties cannot agree on an arbitrator, the Administrator of JAMS shall appoint a retired judge from such panels (the arbitrator so selected or appointed, the "Arbitrator").  The Arbitrator shall render an award and a written, reasoned opinion in support thereof.  The Arbitrator shall have power and authority to award any appropriate remedy (in law

7

or equity) or judgment that could be awarded by a court of law in the State of Illinois, and, upon good cause shown, the Arbitrator shall afford the parties adequate discovery, including deposition discovery.

(d)     The dispute resolution process shall be strictly confidential. Neither party shall disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties, except as required by applicable law. Except as provided herein, the Federal Arbitration Act shall govern the interpretation, enforcement and all proceedings pursuant to this Agreement. The Arbitrator and/or arbitration panel shall be bound by and shall strictly enforce the terms of this paragraph 21 and may not limit, expand or otherwise modify its terms. The Arbitrator and/or arbitration panel shall make a good faith effort to apply the substantive law (and the law of remedies, if applicable) of the State of Illinois, or federal law, or both, as applicable, without reference to conflicts of laws provisions. The Arbitrator and/or arbitration panel shall be bound to honor claims of privilege or work-product doctrine recognized at law, but the Arbitrator and/or arbitration panel shall have the discretion to determine whether any such claim of privilege or work-product doctrine applies. The award rendered shall be final and binding upon the parties, and judgment upon the award may be entered in any court having jurisdiction thereof.

(e)     Claims must be brought by either you or the Company in your or its individual capacity, not as plaintiffs or class members in any purported class or collective proceeding, and the arbitrator shall not have the power to hear the arbitration as a class or collective action. To the maximum extent permitted by law, both you and the Company waive the right to bring, maintain, participate in, or receive money from any class, collective or representative proceeding. The parties intend this arbitration provision to be valid, enforceable, irrevocable and construed as broadly as possible.

(f)     Each party shall bear its own fees and expenses with respect to this dispute resolution process and any litigation related thereto and the parties shall share equally all fees and expenses, in accordance with the JAMS Employment Rules and Procedures, unless prohibited by applicable law.

## Other Terms

22.     In the twelve (12) months following the termination of your Employment with the Company, in the event you seek or obtain employment or another business affiliation with any person or entity other than the Company, you agree to provide that person or entity with a copy of this Agreement. You also agree that the Company may provide a copy of this Agreement to any such person or entity.

23.     Nothing in this Agreement restricts or prohibits you from initiating communications directly with, responding to any inquiries from, providing testimony before, providing confidential information to, reporting possible violations of law or regulation to, or from filing a claim or assisting with an investigation directly with a self-regulatory authority or a government agency or entity, including without limitation, the U.S. Securities and Exchange Commission or the Financial Industry Regulatory Authority, (collectively, the "Regulators"), or from making other disclosures that are protected under the whistleblower provisions of federal, state, or local law or regulation. You do not need the prior authorization of the Company to engage in conduct protected by this paragraph, and you do need to notify the Company that you have engaged in such conduct. This Agreement does not limit your right to receive an award from any Regulator that provides awards for providing information relating to a potential violation of the law.

8

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

24.     Pursuant to the Defend Trade Secrets Act of 2016, non-compliance with the confidentiality provisions of this Agreement shall not subject you to criminal or civil liability under any Federal or State trade secret law for the disclosure of a Company trade secret: (i) in confidence to a Federal, State or local government official, either directly or indirectly, or to an attorney in confidence solely for the purpose of reporting or investigating a suspected violation of law; (ii) in a complaint or other document filed in a lawsuit or other proceeding, provided that any complaint or document containing the trade secret is filed under seal; or (iii) to an attorney representing you in a lawsuit for retaliation by the Company for reporting a suspected violation of law or to use the trade secret information in that court proceeding, provided that any document containing the trade secret is filed under seal and you do not disclose the trade secret, except pursuant to court order.

25.     You acknowledge that the restrictions contained in this Agreement are fair, reasonable and necessary for the protection of the legitimate business interests of the Company, and that, in the event of any actual or threatened breach by you, the Company may suffer serious, irreparable and substantial harm to its business and interests, the extent of which may be difficult to determine and impossible to fully remedy by an action at law for momentary damages.  You therefore acknowledge the Company may seek the entry of a restraining order, preliminary injunction or other preliminary, provisional or permanent court order to enforce this Agreement, and you further agree that the dispute resolution process set forth in paragraph 21 of this Agreement in no law limits the Company's right to obtain any preliminary, provision or permanent relief as may be necessary to protect the Company's rights and interests.  You also agree that any request for such relief by the Company shall be in addition and without prejudice to any claim for monetary damages which the Company might elect to assert.  In the event you violate any provision of this Agreement, the Company shall be entitled to recover all costs and expenses of enforcement, including reasonable attorneys' fees.

26.     You agree defend, indemnify and hold the Company harmless from and against any and all losses, claims, causes of action, liabilities, damages, costs and expenses (including attorney's fees) suffered or incurred by the Company as a result of any violation or threatened violation of any of your representations, warranties, covenants or undertakings set forth in this Agreement.  In the event of litigation arising from or related to the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and other expenses.

27.     If any provision of this Agreement is held to be unenforceable by a court or other decision-maker, the remaining provisions shall be enforced to the maximum extent possible.  If a court or other decision-maker should determine that any portion of this Agreement is overbroad or unreasonable, such provision shall be given effect to the maximum extent possible by narrowing or enforcing in part that aspect of the provision found overbroad or unreasonable.

28.     This Agreement represents the entire agreement of the parties with respect to the subject matter covered, supersedes any and all prior written or oral agreements and cannot be modified except in a writing signed by both parties.  The waiver by any party to this Agreement of a breach of any of the provisions of this Agreement shall not operate or be construed as a waiver of any subsequent or simultaneous breach.

29.     This Agreement shall be binding upon and shall inure to the benefit of the Company and its successors and assigns.  Neither a formal assignment nor notice to you shall be required.  This

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

Agreement shall be binding upon you and your heirs, executors, administrators and legal representatives. However, your duties and obligations hereunder are personal and shall not be assignable or delegable by you in any manner whatsoever.

30.     This Agreement shall be construed in accordance with the laws of the State of Illinois, without regard to the state's principles of conflict of laws.

31.     Any notice required or permitted to be given under this Agreement shall be in writing and sent by both email and certified mail, return receipt requested. If the notice is from you to the Company, it shall be sent to the General Counsel of the Company. If sent by the Company to you, such notice shall be sent to your last known email and home addresses.

32.     This Agreement may be executed by fax or email and/or in multiple counterparts, each of which shall be deemed an original.

33.     The parties waive the right to a jury trial to the maximum extent permitted by law.

34.     You acknowledge that you understand the terms and conditions set forth in this Agreement and have had adequate time to consider whether to agree to them and to consult a lawyer or other advisor of your choice if you wish to do so.

*(Signature page follows)*

101887693v2

FILED DATE: 5/24/2024 5:27 PM    2024CH04952

IN WITNESS WHEREOF, the parties have executed this Agreement as of this ___12th___ day of _September_ 2018.

**THE COMPANY**

By: _Harry L. You_

Printed Name: _Harry L. You_

Title: _President & CFO_


**EMPLOYEE**

By: _(signature)_

Printed Name: _MICHAEL DUFFY_

[Signature page to Fair Competition Agreement]

101887693v2

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

## ANNEX A

Description of Restrictive Agreements

Description of Current Outside Business Activities or Board Service

(Covered activities include: (1) Service on a board of directors similar body such as advisory committee, creditors committee, oversight or management body or investment board of any entity (including charitable, civic, religious, fraternal and other nonprofit organizations, etc.) whether or not compensation is received; (2) Outside securities sales activities, including involvement in private placements or offerings, are prohibited whether or not they involve compensation in any form; and (3) Outside business activities for which any compensation is received.) (Include the name of the outside entity/employer, type of business performed, type and method of compensation (if any), the estimated amount of time to be dedicated to the outside activity and any potential conflicts of interest that may arise. Note: Certain outside business activities and board service will require the approval of the Company's Board of Directors or other individuals or committees.

101887693v2

FILED DATE: 5/24/2024 5:27 PM   2024CH04952

## ANNEX B

## TERMINATION CERTIFICATE

The undersigned hereby certifies as follows:

1. When I signed the Fair Competition Agreement dated as of _____ (the "Agreement"), I read and understood the terms contained therein. I have now reviewed the Agreement again as part of my exit interview, and I fully understand the terms thereof and my continuing obligations thereunder, including my obligations (a) not to use for personal benefit or disclose to others any Confidential Information (as defined in the Agreement), and (b) to assign to the Company all rights (if any) that I may have acquired in any Intellectual Property (as defined in the Agreement).

2. I have fully complied with the terms of the Agreement, including the return of any documents and other tangible materials of any nature pertaining to my employment by GTY Technology Holdings Inc. (the "Company").

3. I recognize that the unauthorized taking of any Confidential Information or Intellectual Property is a crime, and that any unauthorized taking of Confidential Information or Intellectual Property may also result in civil liability.

4. The Company may notify my new employer of (a) the general nature or subject matter of the Confidential Information (without actually disclosing such Confidential Information) to which I had access while employed by the Company, and (b) my continuing obligations under the Agreement to keep such Confidential Information in confidence, and not to disclose or use such Confidential Information without the Company's prior written consent.

5. Attached hereto is a complete list of all Intellectual Property which, under the terms of the Agreement, I have assigned to the Company. If no such list is attached, I represent that during my employment I did not make, conceive, reduce to practice or develop, either alone or jointly with others, any Intellectual Property.

6. I understand and acknowledge that should I fail to comply with my obligations under the Agreement, the Company shall have, in addition to a claim for damages, the right to obtain an injunction prohibiting me from disclosing Confidential Information to a third party or using any Intellectual Property.

Employee Signature: _____      Witnessed by: _____

Print Name: _____      Print Name: _____

Date: _____      Date: _____

13