Exhibit 11

FILED
8/8/2024 11:30 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024CH04952
Calendar, 9
28864526

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| GTY Technology Holdings, Inc., d/b/a Euna Solutions and CityBase, Inc. | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 2024 CH 04952 |
| Wonderware, Inc. d/b/a CORE Business Technologies Michael Duffy, and Christopher Lewis | ) Hon. Ceclia Horan |
| Defendants. | ) |

### CORE AND DUFFY'S EMERGENCY MOTION TO STRIKE TRADE SECRET ISSUES FROM THE UPCOMING PRELIMINARY INJUNCTION HEARING BASED ON PLAINTIFFS' FAILURE TO HONOR THE COURT'S JULY 26 ORDER

### Statement Of Emergency

This is the second time the Court has addressed deficiencies in the plaintiffs answer to trade secret interrogatories (hereinafter "TSI"). At a July 26 hearing, Defendants explained that Plaintiffs had responded to the TSI by providing only generic descriptions of categories of information rather than specifying any particular trade secret beyond the so-called Excel and Deck mentioned in the Complaint. The Court posed Plaintiffs a simple question (Ex. 1, Tr. p. 5:13-15):

> **Is there an allegation that other trade secrets were taken besides the Excel and the deck?**

In response, Plaintiffs' counsel offered no clear answer to the Court's question. After hearing more argument from both sides, the Court made its ruling clear (*Id.*, p. 22:16-18):

> **[I]t does seem like, plaintiff, you're going to have to answer what [trade secret] you know was taken.**

The Court ordered Plaintiffs to supplement its TSI answers by August 2, 2024 (Ex. 2, Order). Plaintiffs, however, did not do the work, repackaging the same old generic categories (Ex. 3 Supplemental TSI Answers). At the preliminary injunction hearing set in just 84 days, _**with trial materials due in just 62 days**_ Plaintiffs propose an injunction that would cripple CORE's business. If this bet-the-company case were about trade secrets, Defendants' discovery plan would involve 15+ depositions, as well as third party and expert discovery. A contract/fiduciary case by contrast is much narrower, requiring 5 or less depositions, and no expert or third-party discovery. Defendants thus need to know as soon as possible whether – and what – trade secrets are at issue.

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

## Argument

A recent case from the First District Illinois Appellate Court *NAV Consulting, Inc. v. Sudrania Fund Servs. Corp.*, 2023 Ill. App. 211015 (Ill. App. Ct. 2023) (copy attached as Ex. 4) makes clear that plaintiffs' failure to provide specific identification of trade secrets must result in the termination of its claims.  In *NAV*, plaintiff provided the same type of generic description of trade secrets provided here: "information regarding [plaintiff's] existing customers…pricing…processes and controls…[including] specialized controls…plans for expansion…processes training and know-how…[and] information regarding…prospective customers." The Appellate Court affirmed the circuit court's decision to dismiss the matter, with prejudice, based on such claims.  After reciting the elements of proof required by a trade secret plaintiff, the Appellate Court stated that "***a plaintiff claiming to possess a trade secret must identify it plainly rather than 'invite the court to hunt through…details in search of items meeting the statutory definition.'***" *Id*. at ¶44, citation omitted.  Plaintiffs' trade secret description here is functionally identical to the description found wanting in *NAV*. Plaintiffs describe their so-called Trade Secrets as (Ex. 3, p. 2):



As in *NAV*, such generic descriptions cannot provide plaintiffs with an avenue for relief.[1]

---

[1] *NAV* also makes clear that "inevitable disclosure" cannot rescue deficient trade secret claims: "inevitable disclosure is not assumed when, like here, there is no allegation that the employee copied the employer's confidential information in some tangible format." (*Id*. at ¶49, internal citations omitted).

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

Plaintiffs have provided the same generic trade secret description in no less than ten papers:

- The Original Complaint filed May 24, 2024
- The Original Preliminary Injunction Motion filed May 29, 2024
- The Amended Complaint filed June 18, 2024
- The TRO Motion filed June 10, 2024
- The Reply in Support of TRO filed June 27, 2024
- The first answers to TSI, served July 19, 2024
- The first renewed Preliminary Injunction Motion filed July 22, 2024
- The second answers to TSI served August 2, 2024  (Ex. 3)
- The second renewed Preliminary Injunction Motion filed August 5, 2024
- The third answers to TSI served August 8, 2024

But other than the Excel and the Deck, Plaintiffs have offered no specific trade secret, and under *NAV* plaintiffs cannot move forward with a trade secret claim predicated on such generic descriptions.  There are just 84 days until the October 31 hearing, and just 62 days before all hearing materials must be submitted.  A trade secret case requires massive work from defendants to expose where in the public domain the "trade secrets" reside.  Without knowing what the "trade secrets" are, it is simply not possible for Defendants to start the work of debunking Plaintiffs' claims. Under *NAV* Plaintiffs cannot be allowed to conduct discovery AND THEN declare their trade secrets. While discovery on plaintiffs' non-trade secrets claims can go forward (at least until the Court addresses the motions to dismiss those claims) in the 43 business days remaining before trial materials are due, it makes no sense for the parties to waste time and money conducting discovery, including the retention of costly expert witnesses, on trade secret issues that have not yet been articulated.

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

WHEREFORE, Defendants request that the Court enter an order striking the trade secret claims from the current preliminary injunction schedule.

Dated: August 8, 2024

Respectfully submitted,

Daniel Lynch
Amy J. Kanarowski
LYNCH THOMPSON LLP   (#60040)
150 S. Wacker Dr., Ste 2600
Chicago, Illinois 60606
(312) 346-1600
dlynch@lynchthompson.com
akanarowski@lynchthompson.com
docketing@lynchthompson.com

Wonderware, Inc. (d/b/a Core Business Technologies) and Michael Duffy


/s/   *Daniel Lynch*
*One of their Attorneys*

4

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

Exhibit 1

Transcript of Proceedings
July 26, 2024

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - CHANCERY DIVISION


GTY TECHNOLOGY HOLDINGS,          )
INC., d/b/a EUNA SOLUTIONS        )
and CITYBASE, INC.,               )
                                  )
          Plaintiffs,             ) No. 24 L 04952
                                  )
     -vs-                         )
                                  )
WONDERWARE, INC. (d/b/a           )
CORE BUSINESS                     )
TECHNOLOGIES), MICHAEL            )
DUFFY and CHRISTOPHER             )
LEWIS,                            )
                                  )
          Defendants.             )
_____)


REPORT OF REMOTE PROCEEDINGS
COOK COUNTY, ILLINOIS
July 26th, 2024
Before Honorable Cecelia Horan









REPORTED BY:
Linda A. Barger
CSR No. 084-0044442
APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS

Transcript of Proceedings
July 26, 2024

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

Page 2

```
 1    A P P E A R A N C E S:
 2       ROPES GRAY, LLP., By
         MR. TIMOTHY R. FARRELL
 3       MR. JEFFREY BUSHOFSKY
         MS. JANE McGRAW
 4       191 North Wacker Drive, 32nd Floor
         Chicago, Illinois 60606
 5       (312) 845-1200
         timothy.farrell@ropesgray.com
 6
 7             On behalf of the Plaintiff;
 8
         LYNCH THOMPSON, LLP., By
 9       MR. DANIEL LYNCH
         150 South Wacker Drive, Suite 2600
10       Chicago, Illinois 60606
         (312) 346-1600
11       dlynch@lynchthompson.com
12
               On behalf of Core Business Technologies, Inc.
13             And Michael Duffy;
14
15       CARPENTER LIPPS, LLP., By
         MR. JONATHAN CYRLUK
16       MR. STEVE MOELLER
         180 North LaSalle Street, Suite 2105
17       Chicago, Illinois 60601
         (312) 777-4300
18       cyrluk@carpenterlipps.com
19             On behalf of Christopher Lewis.
20
21       Also Present:  Mike Duffy.
22
23
24
```

Page 3

```
 1            THE COURT:  Good morning, everybody.  I'm
 2    Judge Horan.  We are here on an emergency motion in
 3    the GTY case.  I assume we have a court reporter so
 4    would the parties introduce themselves for the record.
 5            MR. FARRELL:  Jeffrey Farrell, Jeff Bushofsky
 6    and it looks like our colleague, Jane McGraw, is on as
 7    well for the plaintiffs.
 8            THE COURT:  Okay.
 9            MR. LYNCH:  Daniel Lynch for Core and Duffy,
10    your Honor.
11            MR. CYRLUK:  Good morning, your Honor,
12    Jonathan Cyrluk and Steve Moeller on behalf of
13    Defendant Lewis.
14            THE COURT:  Okay.  Who else?  Moeller?
15            MR. CYRLUK:  Moeller, M-O-E-L-L-E-R.  I'll
16    also note that the record can reflect that Mr. Duffy
17    is also present in the Zoom room here.
18            THE COURT:  Okay, very good.
19            So I saw there is an emergency motion and the
20    complaint is that the Interrogatories, the responses
21    to the Interrogatories, are not helpful in furthering
22    discovery.  Who wants to speak to that?
23            MR. LYNCH:  So it's my motion, your Honor,
24    and I'll try and be as brief as possible, but we have
```

Page 4

```
 1    a deadline today.  We are to submit additional written
 2    discovery.  And in the conversations that led up to
 3    the agreement on the order, the scheduling order that
 4    the Court entered, there was to be a two-step process.
 5    The first step was to have been completed by the
 6    plaintiffs last Friday, and that is to answer a set of
 7    Interrogatories that we had served on them before we
 8    agreed on the schedule so they knew what they were.
 9    The Interrogatories were a series of eight
10    Interrogatories keyed off the allegations of the
11    complaint in which they specifically alleged the
12    existence of trade secrets beyond the Excel and the
13    deck.
14            As the Court will recall we resolved the
15    issues on the so-called Excel and the so-called deck
16    by an agreed order that was entered at the TRO hearing
17    that had been scheduled.
18            So these Interrogatories were designed to get
19    at the issues to determine whether and, if so, what
20    there are additional trade secrets.  Now, at least
21    from our point of view, that information should have
22    been disclosed in the complaint but, okay, it wasn't,
23    so we said if you're alleging there are other trade
24    secrets, please tell us what they are.
```

Page 5

```
 1            THE COURT:  Are they alleging those other
 2    trade secrets were taken?
 3            MR. LYNCH:  Well, that's not clear.  They do
 4    say the words that they were, but it's a little tricky
 5    when you're trying to unpack the complaint because the
 6    complaint makes clear the allegation that the
 7    defendants took Excel and the deck.  The complaint is
 8    not as crystal clear that their allegation is that
 9    they took other stuff.
10            THE COURT:  Does that matter?  Doesn't that
11    matter?
12            MR. LYNCH:  Of course it does, your Honor.
13            THE COURT:  Let's ask them.  Is there an
14    allegation that other trade secrets were taken besides
15    the Excel and the deck?
16            MR. FARRELL:  Your Honor, the trade secrets
17    claim, as its currently stated, is two-fold.  We know
18    that Mr. Duffy and Mr. Lewis conspired against my
19    client when they left.  We know for sure that
20    Mr. Lewis took two trade secret documents before he
21    left based on a forensic investigation.  We've done
22    some more digging.  Mr. Duffy was not subjected to the
23    same as the CEO -- was not subjected to the same
24    forensic software with respect to his accounts as Mr.
```

Transcript of Proceedings
July 26, 2024

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

Page 6

1  Lewis and so, to some extent, we need discovery from
2  Mr. Duffy and his personal devices and personal
3  accounts to understand the full extent of what he has
4  and what he took.  But we have pled the inference that
5  we know they have already taken certain things.  I can
6  tell your Honor based on the limited Interrogatory
7  responses we've gotten from the defendants so far, we
8  have been able to look into some of the activities of
9  some of the other agents that have since left my
10 client that Mr. Duffy poached, and it appears they
11 have also sent information to themselves.  Maybe those
12 people were acting through Duffy.  That is something
13 we are just investigating now.  But we know all of
14 that is true.
15        We have also raised the inevitable disclosure
16 doctrine, your Honor, which says that by virtue of
17 Mr. Duffy's role at my client, he had access to
18 non-public customer lists, customer profiles, employee
19 information.  The list goes on and on, your Honor.
20 That's all in our Interrogatory responses.  Under
21 Illinois law the fact that he can't unlearn those
22 things -- and this is all outlined in our
23 Interrogatory responses -- that constitutes a theft of
24 trade secrets under Illinois law and under the

Page 7

1  Illinois Trade Secret statute.  So that is where we
2  are today.  But what Mr. Lynch and Mr. Cyrluk want us
3  to do is to identify every trade secret in Mr. Duffy's
4  possession.  Your Honor, we need discovery to be able
5  to do that and so they are putting the cart before the
6  horse here.  We have issues with their discovery
7  responses as well.  Your Honor, this is not an
8  emergency.  It's a discovery dispute.
9        I think I can cut to the chase here.  If the
10 real emergency that defense counsel is asserting is
11 that they can't propound discovery requests without --
12 every trade secret that Mr. Duffy has, despite the
13 fact we don't have full visibility into that, we are
14 happy to amend the schedule to allow them and us to
15 supplement our discovery requests to the extent
16 further discovery comes along that prompts the need to
17 propound more specific discovery requests.  That seems
18 like the easiest fix to me.  There is no present to
19 prejudice to either party and, frankly, your Honor, we
20 are going to need to do that too based on the
21 insufficiency of defendants' Interrogatory responses.
22 So it seems to me that is the easy fix here -- and,
23 again, your Honor's standing order says true
24 emergencies are rare.  Defense Counsel is running into

Page 8

1  this Court over what is a discovery dispute.  We have
2  until September 16th to file motions to compel.  So,
3  anyway, I'll stop there.  But, your Honor, it seems
4  like the easy fix here is to amend the schedule to
5  allow the parties to just amend their discovery
6  request so that, as Mr. Lynch says, he feels like he's
7  jammed up today.  As we work through discovery and
8  supplement our Interrogatories, like we're likely to
9  do based on our investigation and based on the
10 discovery we expect to get from Mr. Duffy, they can
11 then propound additional discovery requests based on
12 that.
13        THE COURT:  Okay.  Mr. Cyrluk, what do you
14 want to say?
15        MR. CYRLUK:  Your Honor, it's been three
16 minutes and 30 seconds that Mr. Farrell spoke.  And if
17 he was in a deposition, I'd ask him this:  Do you
18 remember the Court's question?  The Court asked:
19 Mr. Farrell, are you alleging that they took any other
20 trade secrets?  It's a yes or no.  He didn't answer
21 the question.  He filibustered.  He would have been
22 great talking head on one of the talk shows talking
23 politics, but he hasn't answered the question, what
24 else do you allege that we took?  And it's

Page 9

1  insufficient to say data, code.  You have to identify.
2  And he likes to talk about this inevitable disclosure.
3  Well, you have stuff.  We don't know what you have,
4  but you have stuff, and it's inevitably disclosed.
5        Well, the leading case in that is that
6  Pepsico case.  That Pepsico case six days after an
7  employee left, they filed a complaint and a motion for
8  TRO and a motion for preliminary injunction.  In that
9  case, in the complaint and in the proceedings, they
10 identified specific documents.  They identified a
11 written document called a strategic plan.  They
12 identified a written document called the annual
13 operating plan.  They identified another written
14 document called the Tac Plan.  All of them were in
15 writing.  All of them had been marked confidential.
16 They talk about innovation and cited delivery systems
17 that they spent over a million dollars to develop back
18 in 1995.  All of that was in writing and it was
19 specifically identified to allow the Court in the
20 Pepsico case to analyze whether that is a trade secret
21 or not.  They haven't done that.  We've asked them,
22 tell us besides the Excel and the deck what
23 specifically are you claiming in the trade secret?
24 And they tried to flip it around on us by saying

Transcript of Proceedings
July 26, 2024

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

Page 10

1   inevitable disclosure?  It's a yes-or-no question:
2   What did we take?  Start with that one and then he
3   says the second aspect is inevitable disclosure.
4   Disagree about the Excel and the deck.  He can talk
5   about all of that he wants.  But that's put aside or
6   the moment.  Besides those two documents what does he
7   allege we took?  If the answer is none, fine, we'll
8   move forward.  If it's the inevitable disclosure,
9   that's got its own failings.  He still has to identify
10  what we're inevitably going to disclose with
11  particularity.
12          THE COURT:  Isn't the preliminary
13  injunction -- I'm sorry, isn't the -- yeah,
14  preliminary injunction hearing set on the allegations
15  of the taking of the deck and the Excel.
16          MR. CYRLUK:  That is what we thought, but
17  they say there's more.  They just won't tell us what
18  that more is.
19          THE COURT:  So in the regular course of
20  discovery this will come to light, yes?
21          MR. FARRELL:  Yes.
22          MR. LYNCH:  Your Honor, I will say, okay, we
23  had an extensive negotiation about it.
24          THE COURT:  I remember.

Page 11

1           MR. LYNCH:  That, but, also, even after the
2   Court was involved, we had an extensive negotiation
3   about how discovery was going to proceed.  And the
4   very first thing that I told them in my raft response
5   to their initial scheduling order was, guys, the first
6   thing I need to know, I have to know what trade
7   secrets are we talking?  If, your Honor, I can just
8   very briefly explain, the discovery that we need to
9   conduct, the discovery that was due today is going to
10  be very different depending on what trade secrets they
11  claim there are.  So, for example, in the 30-category
12  list of possible trade secrets they gave us, one of
13  them is about pricing, okay?  If they claim that there
14  is some pricing information that is a trade secret,
15  they have to tell me what that is because one of the
16  deposition -- excuse me -- one of the Interrogatories
17  I'm going to ask them is tell me what part of your
18  pricing structure hasn't already been disclosed in
19  public bid packages.  Because in every public bid
20  package -- and that is the only way this company gets
21  business -- they have to make extensive disclosure.
22  If they say to me, no, Dan, the trade secret is the
23  technical details of the way our product works, I'll
24  have a different set of Interrogatories.  I'll be

Page 12

1   asking them where did they get it?  How is it
2   different from off-the-shelf products?  That sort of
3   thing.
4           THE COURT:  I mean, can you revamp your
5   Interrogatories to be more specific about what you're
6   looking for if I give you more time to do that?
7           MR. LYNCH:  Your Honor, I don't know, if the
8   Court was to look at the Interrogatories --
9           THE COURT:  I'm looking at them right now.
10          MR. LYNCH:  Your Honor is exactly right, can
11  you target them a little more closely?  The only way I
12  can target them is to start with this question:  Tell
13  me what your complaint is talking about.  And
14  that's -- I mean, what is your complaint talking
15  about?  Functionally, we included every allegation.
16  The reason there is eight on that and two on the
17  specifics -- there's ten Interrogatories, eight on the
18  allegations of the complaint that are just keyed up,
19  you know, you say this.  What does that mean?  And we
20  did it eight times because I wanted to make sure that
21  we weren't missing something.  The other two are about
22  the specific trade secrets that they did allege, and
23  that is nine and ten.  And if the Court --
24          THE COURT:  So is the answer, Mr. Farrell and

Page 13

1   Mr. Cyrluk that you're not sure -- I guess, what are
2   you saying, Mr. Lynch, if they flipped it around and
3   said what is a trade secret?
4           MR. LYNCH:  Kind of.  What Farrell said in
5   what he told the Court, as I understood it -- what he
6   said is, we can't tell you what the trade secrets are
7   until we get a look at Mr. Duffy's devices.  That is
8   what he said.
9           Now, we submitted a declaration for Mr. Duffy
10  that said two things.  Mr. Duffy's declaration in
11  connection with this motion said, number one, I'm the
12  founder of Citybase, and I have no idea what they are
13  talking about with trade secrets.  That is number one
14  thing he said.  And the second thing he said is that
15  Citybase has robust security measures that can tell
16  them exactly who took what when, and they utilized
17  those security procedures.  Mr. Farrell just talked
18  about how they used them and they specifically
19  apparently uncovered the e-mail sent, by the way, when
20  Mr. Lewis was a Citybase employee of documents to
21  himself.  We also have established in the TRO papers
22  and extensive record that that was entirely permitted,
23  the transmitting stuff to your personal devices was
24  not prohibited at Citybase, and they have never said

Transcript of Proceedings
July 26, 2024

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

Page 14

1  otherwise.  Leave that aside, Mr. Farrell just told
2  the Court they are fully aware of what was taken.
3  Remember when he was talking about --
4      MR. FARRELL:  I said the opposite.
5      MR. LYNCH:  I'm sorry.  He just said, we have
6  been busy the last few weeks looking what these other
7  employees took, and he just said he had some evidence
8  that other employees took stuff and shared it with
9  Mr. Duffy.  That is essentially what he said.  So what
10 is important -- I don't think they can say, we'll tell
11 you what the trade secrets are as soon as you say what
12 you have.  And, by the way, they submitted a set of
13 Interrogatories that said, what do you have?  We
14 answered it, none, because Mr. Duffy, who will raise
15 his right hand -- he's on this call.  He will raise
16 his right hand and tell you I took no trade secrets
17 from Citybase.
18     THE COURT:  All right.  So a little bit of a
19 chicken and an egg problem.  Go ahead Mr. Bushofsky.
20     MR. BUSHOFSKY:  Sorry to jump in but these,
21 unfortunately, are a little bit of a free-for-all.  I
22 haven't been quite as in the weeds on this as Mr.
23 Farrell, so I hopefully can be a little bit more
24 objective -- of course, I'm an advocate, so there is a

Page 15

1  limit to that.
2      But the conundrum to me and the Catch 22
3  seems to be -- and I'm not going to ascribe anything
4  to opposing counsel.  They're doing their job.  But
5  we are in a situation where there position is:  Tell
6  us chapter and versus each and every one of your trade
7  secrets.  This is a big company and there is no rule
8  or obligation under your order for us to do that.
9  What each and every one of our trade secrets --
10     THE COURT:  They're not asking for all of the
11 trade secrets.  Aren't they asking what trade secrets
12 did he take?
13     MR. BUSHOFSKY:  That's the punch line, your
14 Honor, this is discovery that we're in now.  We don't
15 know what they took.  You just heard Mr. Lynch say,
16 you knew what we took because you say you have the
17 technology to know what we took.  Well, that is one
18 side of the coin.
19     We are entitled to know what they took.  So
20 we have an affidavit that says -- and the words were
21 very careful chosen clearly.  Mr. Duffy says that he
22 took no trade secrets.  Well, we know from Counsel
23 that they don't believe that we have any trade
24 secrets.  So Mr. Duffy could've taken a million things

Page 16

1  and the premise is, we have no trade secrets so in his
2  mind his statement is true.  We took no trade secrets
3  because you have no trade.  We need to know what they
4  took.
5      There is one problem that is a false premise
6  in this entire conversation, which is that our case is
7  only about trade secrets under this definition of
8  trade secrets in Illinois.  That is not true, your
9  Honor.  We have other claims in this case.
10     So if you're an executive of a company in
11 Illinois or Delaware or anywhere else in this country,
12 as far as I'm aware, you take things with you when you
13 leave that you're not entitled to keep, whether it's a
14 trade secret or a stapler, to be frank, you have
15 probably violated some duty to the company, including
16 fiduciary duty.
17     THE COURT:  Okay.  Let me just say something.
18 You know, when you're say identify what trade secrets
19 you took and then they identify something, then
20 they're I guess tasked with making an admission that
21 they were trade secrets, right?  Can you ask the
22 question?  Can you propound the Interrogatory in a way
23 that doesn't include -- that doesn't require them to
24 admit that they're -- what documents --

Page 17

1      MR. BUSHOFSKY:  Of course, your Honor, we can
2  ask them --
3      THE COURT:  Then you can subsequently make
4  the argument that they were trade secrets, right?
5      MR. BUSHOFSKY:  Right.  That is the order
6  that we think this should go in and that's the
7  opposite of what Counsel is saying.  They're saying
8  tell us all the trade secrets, and we will tell you
9  what we took.  We're saying, tell us what you took,
10 and we will tell you whether it's a problem or not.
11     And, your Honor, this can all happen in the
12 ordinary course.  We can supplement.  We have now
13 discovered through our own forensics and through their
14 answers and looking at whatever forensic information
15 that they give us regarding personal devices and
16 whatever we have asked for and whatever we are
17 entitled to, we can say, ah-ha, we found another trade
18 secret, we're supplementing.  We've found another
19 thing, maybe there's a dispute over whether it's a
20 trade secret or not, but taking that thing violated
21 their duties.  This is ordinary course stuff.
22     MR. CYRLUK:  Your Honor, may I?  This is
23 unbelievable.  I take my obligation under Rule 137
24 seriously and I hope my opponents do too.  They made

Transcript of Proceedings
July 26, 2024

FILED DATE: 8/8/2024 11:30 AM    2024CH04952

Page 18

1  an allegation in paragraph 103 of their complaint and
2  it says -- and this is the Interrogatories Number 2,
3  we asked them, other than the Excel and the deck,
4  identify with particularity and in detail all trade
5  secrets of plaintiffs that plaintiffs allege that,
6  quote -- this is their own complaint: "Core, Duffy
7  and Lewis are in possession of it through Duffy and
8  Lewis's improper and unlawful extraction thereof from
9  plaintiff's systems," as alleged in plaintiff's first
10 amended complaint. Now I know that doesn't relate to
11 inevitable disclosure because inevitable disclosure
12 does not talk about doing anything improper. It says
13 just by virtue of you working there, you learn certain
14 things that even if you wanted to compartmentalize,
15 you know you didn't take with you necessarily in
16 paper, you saw them and then you inevitably disclosed
17 them. That is not unlawful and it's not extraction.
18       So when they wrote those words, I assume they
19 did an investigation. And so they had something in
20 mind. And if it's just the deck and Excel, just say
21 so. But if it's more, now is the time to put up or
22 shut up or they should have never made that
23 allegation.
24       THE COURT: It does -- listen, it is the

Page 19

1  allegation made by the plaintiff, so plaintiff should
2  have to disclose what information supports that
3  allegation, right? Is there a way to revise or
4  supplement these Interrogatories by taking the word
5  trade secrets out?
6       MR. LYNCH: The answer to that would be,
7  sure. In fact, if you look at the Interrogatories, it
8  also in several places talks about so-called
9  confidential information. Also, if they -- I mean,
10 again, we are not talking about -- I'm happy to talk
11 about their Interrogatories to us, but Mr. Bushofsky
12 would like -- Mr. Bushofsky is complaining about their
13 Interrogatories to us, where he says, well, maybe we
14 didn't carefully ask the question because we defined
15 it to be confidential information and if they say
16 there is no confidential information, they would say
17 none.
18       But I'll say to the Court that Mr. Duffy was
19 the founder of Citybase. He had a laptop. He worked
20 there for nine-plus years. The only computer device
21 he had was owned by Citybase and he left it there when
22 he left. And Citybase has already established in this
23 situation that it has security architecture that
24 allows it to tell when employees are downloading stuff

Page 20

1  or sending stuff to their personal devices. That came
2  up in the complaint. It came up in the Amberde
3  (phonetic) declaration and it came up most recently in
4  Mr. Farrell's remarks to the Court because he said
5  that they have been investigating the things that the
6  other employees did after apparently after the TRO
7  meeting.
8       Mr. Bushofsky would like us to say, here is
9  what we have, okay? Whether they do or don't answer
10 this trade secret Interrogatory, whether trade secrets
11 are or are not in this case, that is a question that
12 he can ask, but it's not going to change what trade
13 secrets are at issue in the case because the time to
14 make a trade secrets claim is in the complaint, and
15 the proof of that is in the pudding. Because not only
16 is there this allegation that Mr. Cyrluk just read,
17 but they know they the obligation to disclose some
18 specific trade secret to get the ball rolling in this
19 case because they did it when they talked about the
20 Excel and the deck.
21       Now, if it turns out that somehow they find
22 out in discovery that somehow Mr. Duffy slipped past
23 their security architecture and took something that
24 they just are stunned that he somehow got his hands

Page 21

1  on, okay, well, then maybe we come back and they say
2  the defendants are playing dirty pool here and the
3  Court will take whatever action they take. But right
4  now all we want to know is what is the complaint
5  talking about? And they refuse to answer it. And I
6  don't know how -- your Honor, there is a tremendous
7  amount of material that is out in the public domain,
8  not about this business generally -- of course, there
9  is -- but about Citybase specifically and the business
10 it does. And depending on what they say the trade
11 secret that they are worried about Duffy using -- and,
12 remember, in all of these inevitable disclosure cases
13 there is specific disclosure, as Mr. Cyrluk said, what
14 is the harm in just forcing them to tell us what they
15 are worried about?
16       THE COURT: What are you asking me for?
17       MR. LYNCH: Right now I'm asking you to
18 either --
19       THE COURT: This isn't a motion to compel,
20 right, to compel disclosure? You're asking me to
21 compel him -- all right --
22       MR. LYNCH: The Court asked a great question.
23 I can get right to it.
24       Right now we are supposed to have a hearing

Transcript of Proceedings
July 26, 2024

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

Page 22

1  on the trade secrets and the other issues on
2  October 23rd.  We had built a schedule that required
3  them to disclose their trade secrets last Friday so
4  that so I submit trade secret discovery today.  Then
5  we are going to go off and do additional discovery.
6  So, I mean, I don't know.  I think the October 23rd
7  date is in jeopardy because hat date -- because the
8  discovery schedule is built up to get us to that date
9  and they have already used a week that -- they took a
10 week that they didn't have is my point and, yet, the
11 Court says by Monday, and I have to draft my discovery
12 by Wednesday?  I guess I could live with that, but
13 they have to tell me what the trade secrets are before
14 I draft my discovery because the discovery is going to
15 be different depending on what they tell me.
16         THE COURT:  I mean, it does seem like,
17 plaintiff, you're going to have to answer what you
18 know was taken, right?  Why wouldn't you?
19         MR. BUSHOFSKY:  As long as we can
20 supplement -- here is the problem I think is implicit
21 in what Counsel has been saying.
22         When he said if we discover through our own
23 investigation or through the materials we get from
24 Mr. Duffy, and, frankly, Mr. Farrell earlier was

Page 23

1  referring to something in good faith for the Court's
2  edification and for Counsel to let everyone know we
3  are still investigating this.  There are -- as far as
4  we know -- more and more people jumping ship and going
5  over to Mr. Duffy's new business.  We have reason to
6  believe -- and this is work product, your Honor.  We
7  are in the middle of it.  I can't make a specific
8  representation that a particular person took a
9  particular thing and that it was a trade secret.  I'm
10 not doing that right now just to be clear.
11         What I'm saying is we are seeing smoke around
12 other people who were recruited away from my client to
13 Mr. Duffy's new employer who took things, downloaded
14 things to their own personal devices --
15         THE COURT:  Is that part of your complaint?
16         MR. BUSHOFSKY:  No, it's something we learned
17 within the past few days.
18         THE COURT:  Go ahead.
19         MR. BUSHOFSKY:  We want to be able to
20 supplement and at some point before the preliminary
21 injunction hearing, as a practical matter, I agree
22 that the door should probably close so that we go to
23 this mini trial on a particular set of facts.  There
24 is no question about that.

Page 24

1         We are going to keep learning things and
2  they're going to keep learning things in discovery.
3  That is just the nature of discovery.  We will answer
4  the Interrogatory as best we can based on the
5  knowledge that we have today.  We know that at least
6  two trade secrets in our view of what trade secrets
7  are were absconded with by Mr. Lewis, and that is what
8  was in our complaint.  That was the nature of our TRO
9  papers.  We believe we'll continue to discover more
10 things were taken that we consider to be trade
11 secrets, and even if they're not trade secrets, it was
12 a breach of a duty for the people to take them.
13         THE COURT:  Those people -- is the allegation
14 that those people were under the direction of Duffy?
15         MR. BUSHOFSKY:  That wouldn't be the
16 allegation and we are not making that allegation yet.
17 If they were lured over to the new company by
18 Mr. Duffy or Mr. Lewis and around the same time they
19 were downloading a bunch of stuff from their then
20 current employer and then they popped up at the new
21 company a week later, which is the scenario we're
22 looking at now with one particular person, then that
23 would support a reasonable inference that they took it
24 for the new company, which is a defendant in this

Page 25

1  case.
2         I don't want to get too far into the weeds,
3  but I wanted to give your Honor an idea of what we are
4  arguing about here.  We have answered the
5  Interrogatories.  We will supplement them.  We can
6  supplement them tomorrow with the most up-to-date
7  information that we have.
8         THE COURT:  I think you should do that.
9         All right.  Let me hear from Mr. Cyrluk.
10         MR. CYRLUK:  I appreciate that but the
11 Interrogatories -- the rules, A, allow you to somewhat
12 keep your finger on the check.  You always have a duty
13 to supplement information you learn.  If there was any
14 doubt in every answer that Buna -- that plaintiffs
15 answer every single one of them, the very last
16 sentence of every Interrogatory says:  Buna reserves
17 the right to revise, supplement or clarify this
18 response based on any facts, documents, evidence or
19 other contentions that may develop or come to Buna's
20 attention at a later date.
21         They have already kept their finger on the
22 checker.  The Interrogatories that were due last
23 Friday asked them as of today, as of this writing,
24 tell us everything that you put in your complaint that

Transcript of Proceedings
July 26, 2024

FILED DATE: 8/8/2024 11:30 AM    2024CH04952

Page 26

1   you believe that Mr. Duffy and Mr. Lewis -- they love
2   their adjectives and adverbs, legally absconded, et
3   cetera.  But tell us -- as of last Friday they should
4   have been able to tell us besides the deck and Excel
5   it's these four pieces of paper.
6            THE COURT:  Right.
7            MR. CYRLUK:  And if the answer is none,
8   great.  And if they discover something later on, they
9   have a duty to seasonably supplement; that's the
10  rules.
11           THE COURT:  Right.  Listen, I have a 9:30
12  call that I'm late for so let's try and figure this
13  out.
14           Would it make sense to allow plaintiffs a
15  week to supplement their responses with the
16  information that you're seeking, Mr. Lynch?
17           MR. LYNCH:  So sure, but that means the
18  entire schedule is new.
19           THE COURT:  Is it really?  How?
20           MR. LYNCH:  Respectfully it is, your Honor,
21  because we had --
22           THE COURT:  What do you need from me?
23           MR. LYNCH:  They want depositions, right?
24  You know, presumably when you prepare witnesses for

Page 27

1   deposition you get to say, here is what the plaintiffs
2   are alleging.  Do you know anything about that?  So I
3   can't really start doing any work on this case to get
4   people --
5            THE COURT:  So what is the date of the
6   hearing that we have?
7            MR. LYNCH:  October 23rd.
8            MR. BUSHOFSKY:  Your Honor, for the record,
9   our position -- the plaintiff's position is October
10  23rd was picked because of your Honor's schedule and
11  because of Counsel's schedule.  It's not because that
12  is the bare minimum amount of time that was needed to
13  conduct discovery.  A week here and there should not
14  derail the hearing date.
15           THE COURT:  If you want to put it over a
16  week, I can put it over a week.  We can do it
17  October 30th and the 31st and November 1st, if you
18  want to do that?
19           MR. LYNCH:  That would be fine, your Honor.
20           THE COURT:  You all want to do that?  It's a
21  Thursday and Friday the next week.  Why do I feel like
22  I have something in here for -- do we have a status in
23  September?
24           MR. FARRELL:  We do, your Honor.

Page 28

1            MR. LYNCH:  September 16th the Court's
2   already --
3            THE COURT:  That's just to see that things
4   were moving along, right?
5            MR. LYNCH:  That and also there's a motion to
6   dismiss that will be fully briefed and ready for your
7   Honor to rule on September 16th.
8            THE COURT:  That's a Monday, I'm surprised I
9   put it on Monday.
10           MR. BUSHOFSKY:  Your Honor, while you're
11  doing housekeeping, if you want to move that --
12           THE COURT:  Let's do that.
13           MR. LYNCH:  Respectfully, your Honor, that is
14  a date that there is no reason to move that.
15           THE COURT:  Except that for me there is.
16  Just because I know that this is going to take a lot
17  of time.  I'd be happier doing it on the 18th, if you
18  guys are happy with the 18th?
19           MR. LYNCH:  September 18th is fine.
20           THE COURT:  Again, at 1 o'clock?
21           MR. LYNCH:  That's fine.
22           THE COURT:  Let's do that.  Does that work
23  Alex or Ali, whoever has got the book?
24           CLERK ALI:  Yes, that works, Judge.

Page 29

1            THE COURT:  Okay, thank you, Ali.  So let's
2   move it to that Wednesday and then at least I'll have
3   a couple of -- so this is two motions to dismiss and
4   then a hearing and status on discovery, right?  The
5   company valuation, is that also --
6            MR. BUSHOFSKY:  I think that has been
7   resolved.
8            THE COURT:  Okay, good, I'll take that out.
9   Okay, good.  So then --
10           MR. LYNCH:  That issue has not been resolved
11  unless they just want to cave.
12           MR. BUSHOFSKY:  I'm sorry, I thought we had
13  come to an agreement on that.
14           MR. LYNCH:  That issue has not been resolved.
15  I mean I'm happy if it has been resolved because that
16  means they are withdrawing their motion.
17           MR. BUSHOFSKY:  What happened last time, your
18  Honor, is they -- in response to your reasonable
19  request, they agreed to leave that steel indefinitely
20  because we are talking about months from now they want
21  some answer on that --
22           THE COURT:  Can we agreed to keep that sealed
23  Mr. Lynch?
24           MR. LYNCH:  That was another one of the

Transcript of Proceedings
July 26, 2024

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

Page 30

1　motions that the Court set for September 16.
2　Certainly it can be sealed until then if that's what
3　they want.  But the idea that we're just going to
4　perpetually seal stuff that makes no sense to seal
5　is --
6　　　　THE COURT:  Is that motion going to be
7　briefed?
8　　　　MR. LYNCH:  It has briefed, I believe.
9　　　　THE COURT:  Then I'll here it on that day on
10　the 18th.  So let's move everything that was on the
11　16th let's move it to the 18th at 1:00, okay?  Let's
12　do that.  And then so we are going to move this
13　hearing, the preliminary injunction hearing, by a
14　week; is that right?
15　　　　MR. BUSHOFSKY:  So we are talking about
16　Halloween and the Day of the Dead.
17　　　　THE COURT:  That's right.  Is that
18　appropriate?
19　　　　MR. FARRELL:  We'll come in costume, your
20　Honor.
21　　　　THE COURT:  All right.  Wouldn't that be
22　funny.
23　　　　MR. FARRELL:  Your Honor, we will supplement
24　the responses as I hope all parties will do.  What I

Page 31

1　suggested at the beginning of this:  If either party
2　has an issue and needs to propound additional
3　discovery based on supplemented discovery responses,
4　I'd be happy to propose amending the schedule to allow
5　the parties to do that.
6　　　　THE COURT:  Do you even want to set a date?
7　I mean, it's best to lock things in but if this is
8　going to keep happening.
9　　　　MR. BUSHOFSKY:  No.  We want Halloween, your
10　Honor, as the date and we'll live with it.  Even that
11　means that Mr. Lynch and his colleagues get to put a
12　stake in our claims and we have to go in on Halloween
13　with fewer than all of our potential claims, that is
14　the breaks, I guess, but we'll do what we can in
15　discovery until then.
16　　　　MR. LYNCH:  Just to be clear, today's order
17　is going to reflect that within a week they are going
18　to give us actual answers to the Interrogatories that
19　we submitted to them already?
20　　　　MR. BUSHOFSKY:  We said we're going to
21　supplement, your Honor, and here's a representation
22　I'll make for the record:
23　　　　These things that I alluded to that we are
24　investigating, we are in the middle of investigating,

Page 32

1　we will do our damndest, excuse the language, to get
2　that to a place where that can be part of the
3　supplement.  If we determine in good faith that the
4　thing that I was talking about, which does not involve
5　Mr. Lewis or Mr. Duffy individually but relates to one
6　of the other relatively high-level employees who moved
7　to the defendant, that will be part of our
8　supplementation if we've got it.
9　　　　MR. LYNCH:  Let me say this, your Honor, they
10　are trying to take a series of depositions of people.
11　I don't think it's fair for us to have to present
12　anybody for deposition and then later find out that
13　they are going to tell us that so and so did what
14　Mr. Lewis did and while they were an employee sent an
15　e-mail to themselves.
16　　　　MR. BUSHOFSKY:  Your Honor, that's --
17　　　　THE COURT:  Wait, listen, listen, let's give
18　them an opportunity to supplement the discovery.  I'm
19　not going to start jumping into hypotheticals right
20　now.  We don't have those facts.  Take a week,
21　supplement the discovery.  If there are still problems
22　I guess come back but, you know, I don't know what
23　else to tell you.
24　　　　MR. BUSHOFSKY:  Your Honor, just one thing on

Page 33

1　the depositions, this is not unique for this case in
2　any way.  No one in this Court, as far as I'm aware,
3　is entitled to have all paper discovery done before
4　any percipient fact witness can be deposed.  It's
5　really my disadvantage and my problem if I chose to
6　take someone's deposition, and I don't have all of
7　those person's documents yet, and that's a strategic
8　decision.  If I want to take -- sometimes plaintiff's
9　lawyers take a CEO's deposition on the first day.
10　Certainly no paper has been exchanged but they want to
11　catch he or she flatfooted and show they don't know
12　anything about these supposedly important issues.  It
13　happens all the time.  We are not going to take
14　depositions to harass people or take them early to do
15　any sort of "got you" because we are not going to pull
16　out something at a deposition that we should have
17　given to Mr. Lynch in discovery before the deposition.
18　But if I choose, your Honor, to take someone's
19　deposition tomorrow before I've gotten one piece of
20　paper from Mr. Lynch, that may be stupid on my part,
21　that might not be serving my client that well in his
22　view, but that's my problem not his problem.  He has
23　the information.
24　　　　THE COURT:  All right.  I'm shutting this

Transcript of Proceedings
July 26, 2024

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

Page 34

1   down, guys, because you guys get on the phone with
2   each other if you want to fight with each other.  We
3   made a decision, you're going to supplement within a
4   week and follow the schedule if you want to shift
5   everything by one week, then that is fine.  Do that in
6   the schedule and put it in an order and we'll come
7   back in September and have a hearing on those motions,
8   okay?
9         MR. LYNCH:  Thank you, your Honor.
10        MR. FARRELL:  Thank you, Judge.
11        MR. CYRLUK:  Thank you.
12              (Whereupon, at 9:51 a.m. an
13               adjournment was taken.)
14
15
16
17
18
19
20
21
22
23
24

Page 35

1   STATE OF ILLINOIS  )
                       )  SS:
2   COUNTY OF C O O K  )
3
4
5         Linda A. Barger, being first duly sworn on
6   oath says that she is a court reporter doing business
7   in the City of Chicago; that she reported in shorthand
8   the proceedings given at the taking of said hearing
9   and that the foregoing is a true and correct
10  transcript of her shorthand notes so taken as
11  aforesaid and contains all the proceedings given at
12  said hearing.
13
14
15
          Linda A. Barger, CSR
16        License No.:  084-004442
17
18
19
20
21
22
23
24

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

Exhibit 2

FILED DATE: 8/8/2024 11:30 AM    2024CH04952

## IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, CHANCERY DIVISION

GTY TECHNOLOGY HOLDINGS, INC.,            )
d/b/a EUNA SOLUTIONS and CITYBASE,        )
INC.,                                     )
                                          )
        Plaintiffs,                       )    2024 CH 04952
                                          )
                                          )
    v.                                    )
                                          )
WONDERWARE, INC. (d/b/a CORE              )
BUSINESS TECHNOLOGIES), MICHAEL           )
DUFFY, and CHRISTOPHER LEWIS,             )

        Defendants.

### AMENDED SCHEDULING ORDER

This Order is entered following the Court's hearing on Defendants' Motion to Re-Set Schedule and to Compel. That Motion is granted in part as reflected below and on the record and the original Scheduling Orders dated July 10_ and 15 2024, are modified to provide for the following hearing schedule:

    A. Plaintiffs' Motion for Preliminary Injunction is set for October 31 and November 1, 2024 (and the previously set dates of October 23 and 24, 2024 are stricken).

    B. Defendants' Motions to Dismiss (and all other matters previously set for September 16, 2024, including discovery status) are now set for September 18, 2024 at 1:00 p.m. by zoom 956 5899 1093, PW 129359.

    C. The Agreed Scheduling Order submitted July 12, 2024 is stricken and the following order entered in its place.

    IT IS HEREBY ORDERED:

1. All Parties shall by July 12, 2024, serve initial interrogatories . The Parties shall answer their respective initial interrogatories no later than July 19, 2024. Plaintiffs shall submit supplemental answers to Defendants initial Interrogatories by August 2, 2024

2. All Parties shall serve additional written discovery by August 9, 2024. Responses to Plaintiffs' requests for production served prior to July 12, 2024 shall be served by August 19, 2024; responses to written other discovery shall be served by September 9, 2024. Documents may be produced on a rolling basis in response to requests for production, and (as to requests submitted as of the date of this Order) the parties will substantially

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

complete production by September 11, 2024. As to document requests not yet served, Defendants will make best efforts to substantially complete production by September 16, 2024.  Discovery motions pertaining to written discovery (including, for the avoidance of doubt, requests for production) shall be presented on or before the September 18, 2024 discovery status conference previously set by the Court.

3. The Parties shall produce for deposition, subject to witness availability, all non-third party fact witnesses they intend to offer in support of or opposition to Plaintiffs' Motions for Preliminary Injunction, to be conducted prior to September 20, 2024.  Plaintiffs shall make their best efforts to produce their witnesses during the week of September 16. Defendants shall make their best efforts to produce their witnesses during the week of September 23. Notwithstanding the preceding sentences in this paragraph, the parties reserve all rights to notice depositions at the time of their choosing, and to object to such notices, subject to the applicable rules.

4. Subject to their availability, depositions of third-party witnesses offered by the parties in support of, or in opposition to, the preliminary injunction will be conducted on a schedule convenient to the third-party witnesses, to be conducted prior to September 27, 2024.

5. Any expert disclosures shall be made by October  2, 2024, and depositions of any such experts shall be conducted during the week of October 7, 2024.

6. Plaintiffs shall file their revised preliminary injunction motion setting forth the specific relief requested and the grounds therefore on or before August 5, 2024.

7. Plaintiffs shall file their opening brief in support of their preliminary injunction motion on or before September 30, 2024 (provided that they are entitled to file a supplement with any discovery or expert material developed during or after the preparation of that brief).

8. Defendants shall file any opposition brief on or before October 18, 2024 (provided that they are entitled to file a supplement with any discovery or expert material developed during or after the preparation of that brief).

9. Plaintiffs shall file any reply brief on or before October 25, 2024  (provided that they are entitled to file a supplement with any discovery or expert material developed during or after the preparation of that brief).

ENTER:

/s/ *Cecilia A. Horan*          Judge No. 2186
Meeting ID: 956 5899 1093
Password: 129359
Dial-in: 312-626-6799      Judge Cecilia A. Horan

JUL 3 1 2024

Circuit Court - 2186

Order Prepared by:
Daniel Lynch

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

Amy Kanarowski
LYNCH THOMPSON, LLP #60040
150 S. Wacker Drive Suite 1600
Chicago, IL 60606
312 346 1600
Docketing@lynchthompson.com
Counsel for CORE and Duffy

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

# Exhibit 3

## REDACTED VERSION FILED

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

Exhibit 4

ⓘ Cited
As of: August 6, 2024 6:06 PM Z

## *Nav Consulting, Inc. v. Sudrania Fund Servs. Corp.*

Appellate Court of Illinois, First District, Fourth Division

May 4, 2023, Filed

No. 1-21-1015

**Reporter**

2023 IL App (1st) 211015-U *; 2023 Ill. App. Unpub. LEXIS 661 **; 2023 WL 3244785

NAV CONSULTING, INC., Plaintiff-Appellant, v. SUDRANIA FUND SERVICES CORPORATION and NILESH SUDRANIA, Defendants-Appellees.

**Notice:** THIS ORDER WAS FILED UNDER *SUPREME COURT RULE 23* AND MAY NOT BE CITED AS PRECEDENT BY ANY PARTY EXCEPT IN THE LIMITED CIRCUMSTANCES ALLOWED UNDER *RULE 23(e)(1)*.

**Prior History:** **[**1]** Appeal from the Circuit Court of Cook County. No. 20 CH 5198. Honorable David B. Atkins, Judge, Presiding.

**Disposition:** Affirmed.

## Core Terms

trade secret, customers, employees, amended complaint, misappropriation, allegations, confidential, tortious interference, secret, trade secret information, counts, preempted, cause of action, disclosure, solicited, trial court, disposed, induced, terms, confidential information, motion to dismiss, economic value, pricing, secrecy, hiring, misappropriation of trade secrets, resulting damage, improper means, competitor, processes

**Judges:** JUSTICE MARTIN delivered the judgment of the court. Presiding Justice Lampkin and Justice Rochford concurred in the judgment.

**Opinion by:** MARTIN

## Opinion

### ORDER

 **[*P1]** *Held*: (1) Dismissal of tortious interference with a contract claim affirmed as plaintiff failed to plead resulting damages and the claim is otherwise preempted by the Illinois Trade Secrets Act. (2) Dismissal of trade secret misappropriation claim affirmed when plaintiff made insufficient allegations that it has protectable trade secrets, that any trade secret was acquired by improper means, or that any trade secret was being used or would be inevitably disclosed. (3) Dismissal with prejudice affirmed when plaintiff failed to tender proposed amended complaint and had prior opportunity to replead.

 **[*P2]** Plaintiff, NAV Consulting, Inc. (NAV), sued a former NAV employee, Nilesh Sudrania, and the company he started, Sudrania Fund Services Corporation (SFS) (collectively, defendants), alleging that they were competing unfairly. NAV's initial complaint included claims of tortious interference with a contract, trademark infringement, unfair competition, **[**2]** and deceptive trade practices. NAV later filed an amended complaint, adding claims of trade secret misappropriation and civil conspiracy. The circuit court dismissed three counts of NAV's amended

FILED DATE: 8/8/2024 11:30 AM 2024CH04952

Case: 1:24-cv-09069 Document #: 25-11 Filed: 11/27/24 Page 24 of 33 PageID #:444

Page 2 of 11

2023 IL App (1st) 211015-U, *211015-U; 2023 Ill. App. Unpub. LEXIS 661, **2

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

complaint pursuant to the defendants' motion to dismiss. After voluntarily dismissing the remaining counts, NAV appealed.[1]

**[*P3]**  I. BACKGROUND

**[*P4]**  NAV provides accounting services for hedge funds.[2] The company has a contract with Back Office, a company located in Jaipur, India, to perform certain accounting tasks.

**[*P5]**  Sudrania began working for NAV in 2001. Through the training and experience he received from NAV, Sudrania became well-versed in the hedge fund accounting industry. NAV promoted him to head a department and considered him a "key employee." Through his 15-year tenure with the firm, Sudrania is, according to NAV, "intimately familiar with NAV proprietary, confidential, or trade secret information."

**[*P6]**  Sudrania resigned from NAV in 2015 and started his own hedge fund accounting business, SFS, in 2016. Like NAV, SFS contracts with an Indian company, Sudrania Software LLP (SSLLP), for certain accounting tasks.[3] According to NAV's amended complaint, "as of early 2020, Sudrania ***[had] **[**3]** established a business to compete with NAV by replicating the business model and structure NAV utilizes using NAV *** proprietary, confidential, or trade secret information."

**[*P7]**  In the Spring of 2020, SFS hired Amit Arora, a NAV senior account manager, who also had a lengthy tenure at the company. Two years before he left NAV, Arora signed an employment contract that contained several noncompetition provisions, imposing certain restrictions if he were to leave the company. Among other restrictions, the contract barred Arora from working, in any capacity, for any entity that provides hedge fund accounting services for a period of two years. The contract also barred Arora from soliciting any NAV client for two years.

**[*P8]**  Apart from Arora's departure to SFS, three employees, Ravi Kant Modi, Abhay Sharma, and Shubham Godha, resigned from Back Office and went to work for SSLLP in Spring 2020.

**[*P9]**  NAV's initial complaint asserted four claims against Sudrania and SFS. The defendants filed a motion to dismiss and, by agreement, NAV later filed a verified amended complaint. NAV's amended complaint asserted six counts: (1) tortious interference with Arora's employment contract, (2) trade secret misappropriation, **[**4]** (3) civil conspiracy, (4) trademark infringement, (5) unfair competition, and (6) a violation of the *Uniform Deceptive Trade Practices Act (815 ILCS 510/1 et seq. (West 2020))*. We describe only the first two, as they are the counts at issue in this appeal.[4]

**[*P10]**  NAV claimed that, by hiring Arora, the defendants intentionally induced him to breach his employment contract with NAV. Arora's contract prohibited him from working for a competitor like SFS and his employment with SFS "encourag[es] him to use and disclose NAV proprietary, confidential, or trade secret information." NAV claims

---

[1] In adherence with the requirements of *Illinois Supreme Court Rule 352(a)* (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] "A hedge fund is a limited partnership of private investors whose money is managed by professional fund managers who use a wide range of strategies, including leveraging or trading of non-traditional assets, to earn above-average investment returns. Hedge fund investment is often considered a risky alternative investment choice and usually requires a high minimum investment or net worth, often targeting wealthy clients." Investopedia, *What is a Hedge Fund*? (visited April 21, **2023**) <investopedia.com/terms/h/hedgefund.asp> .

[3] Neither Back Office nor SSLLP are parties to this suit. The record indicates litigation is ongoing between the two companies in India regarding former Back Office employees working for SSLLP.

[4] NAV advances no argument on appeal regarding the dismissal of its civil conspiracy claim. Points not argued in an appellant's initial brief are forfeited. *Crawford v. Schmidt (In re Estate of Crawford), 2019 IL **App** (1st) 182703, ¶ 22, 444 Ill. Dec. 72, 163 N.E.3d 197* (citing *Ill. S. Ct. R. 341(h)(7)* (eff. May 25, 2018)).

2023 IL App (1st) 211015-U, *211015-U; 2023 Ill. App. Unpub. LEXIS 661, **4

"on information and belief" that Arora breached his employment contract with NAV by accepting employment with a direct competitor and that Arora is using and disclosing NAV's confidential information. NAV states that it does not know the full scope of Arora's breach, "in part because information concerning the same is in the possession of Arora and Defendants." Nevertheless, NAV alleges that Arora has used NAV's confidential pricing and profit margin information to solicit existing NAV customers.

[*P11]  In its misappropriation claim, NAV set forth a nine-point "unlimited" list of what it labeled "NAV Trade Secret Information." The list read as follows:

"a. information regarding [**5]  NAV's existing customers, including (i) the nature of the services NAV provides the customers; (ii) the projected duration of NAV's relationship with the customers; (iii) the contract status of NAV's customers, including expiration dates; (iv) the needs of NAV's customers and prospects for NAV to expand its business with those customers; (v) new markets or new domiciles where NAV's existing customers plan to do business; (vi) key contacts within customer organization; and (vii) what terms in NAV's customer contracts are negotiable and which terms are not, as well as historical information regarding customer contract negotiation;
b. information regarding pricing of NAV's products and services, including (i) NAV's profit margins; (ii) NAV's break-even prices; (iii) NAV's pricing philosophy and practices; and (iv) NAV's historical and strategic pricing, including but not limited to the pricing knowledge Arora used when he solicited NAV's existing customers while he was working for SFS;

c. information regarding the processes and controls NAV employs in servicing its customers, including process measures, additional steps, algorithms, rules, formulas, tools, checks, checklists, and procedures [**6]  aimed at increasing efficiency, preventing errors, ensuring integrity of the final product or detecting and preventing fraud (collectively, "Controls");
d. information regarding process Controls, including but not limited to those known and used by Modi as an Executive Manager in Fund Accounting at Back Office;
e. information regarding specialized Controls involving complex accounts, including but not limited to those used by Sharma as a Senior Accounts Executive in the Portfolio Services department at Back Office;
f. information regarding Controls pertaining to monthly fee calculations, including but not limited to those known and used by Godha as a Senior Accounts Executive in the Monthly Team in the Fund Accounting Department at Back Office;

g. information regarding plans for expansion of NAV's product and service offerings, including (i) the identification of new areas of business for NAV; (ii) the identification of opportunities to fill gaps in NAV's list of products and service offerings; (iii) the status of NAV's consideration or action toward business expansion; (iv) contemplated strategic partnering within industry; and (v) identification of terms with proposed or actual vendors [**7]  for work in new product and service offerings;
h. information regarding processes, training and know-how required for handling a higher volume of clients per account manager than anywhere else in the industry; and
i. information regarding NAV's prospective customers (such as fund managers and investors) and parties which are in the sphere of influence of potential customers (such as attorneys, accountants and brokers), which information includes the name, contact information, date or dates of contact, the outcome of such contacts and next steps to take in order to procure the new business."

[*P12]  NAV asserted that its trade secret information "is sufficiently secret such that NAV derives economic value, either actual or potential, for it not being generally known to other persons, such as SFS or SSLLP, who can obtain economic value from its disclosure or use." The company maintains the confidentiality of its information by various means. Employees, customers, and vendors are required to sign confidentiality agreements. Computer networks are password protected and employees can access only the portions of NAV's systems that are necessary for their duties. In addition, NAV's computers lack ports [**8]  that could be used to download data to an external device. By company policy, employees are prohibited from sending confidential information by electronic mail to personal accounts or other parties without prior management approval. During the COVID-19 pandemic, NAV implemented

FILED DATE: 8/8/2024 11:30 AM  2024CH04952

2023 IL App (1st) 211015-U, *211015-U; 2023 Ill. App. Unpub. LEXIS 661, **8

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

measures to protect its information while employees worked from home. NAV also requires Back Office and its employees to abide by similar measures.

 [**P13**]   According to NAV, by SFS hiring Arora and SSLLP hiring Modi, Sharma, and Godha, the defendants induced each of them to breach their confidential relationships with NAV and, thereby, improperly acquired NAV's trade secret information. Regarding each of the four employees, NAV alleges "[o]n information and belief," that their employment with SFS or SSLLP "creates the likelihood of the inevitable disclosure and use of NAV Trade Secret Information in SFS's business insofar as he occupies a position in which a person would customarily rely on and could not help but use the information." Further, NAV claims that, "[d]uring 2020[,] Arora has used NAV Trade Secret Information in soliciting new business for SFS from existing NAV customers." Similarly, NAV claims that Modi [**9]  "has used NAV Trade Secret Information to apply processes and controls related for customers to whom SFS is offering cryptocurrency-related fund services." Finally, NAV alleges that it has been injured by use of its trade secret information and will be injured further by inevitable disclosure of such trade secret information.

 [**P14**]   The defendants filed a motion to dismiss the first three counts of NAV's amended complaint pursuant to _sections 2-615_ and _2-619 of the Code of Civil Procedure_ (_735 ILCS 5/2-615_, _2-619_ (West 2020)). Defendants argued, _inter alia_, that (1) the tortious interference with a contract and civil conspiracy claims were preempted by the _Illinois Trade Secrets Act (ITSA) (765 ILCS 1065/1 et seq.)_, (2) NAV lacked standing to assert claims related to Back Office's former employees, and (3) NAV failed to allege sufficient facts that the defendants misappropriated NAV trade secrets, including identifying specific trade secrets or stating how such trade secrets were obtained by improper means. In addition, the defendants noted that NAV's amended complaint merely listed broad categories of claimed trade secrets and failed to allege how any such information was taken, such as by downloading computer files.

 [**P15**]   NAV argued that it properly stated a claim for trade secret misappropriation by alleging that the [**10] defendants induced Arora and three Back Office employees to breach their duties of confidentiality with NAV. Specifically, NAV alleged that Sudrania knew (1) that those employees were privy to NAV's confidential information and (2) had confidentiality agreements with NAV. See _765 ILCS 1065/2(b)_ (West 2020) (defining "misappropriation" as "acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means."). NAV further alleged that SFS recruited those employees and hired them into positions at SFS or SSLLP in which they would inevitably disclose NAV's confidential information. Thus, NAV contends that its amended complaint sufficiently pled that the defendants misappropriated NAV's information by acquiring it through the improper means of inducing Arora, Modi, Sharma, and Godha to breach their confidential relationships with NAV. See _Id. § 1065/2(a)_ (defining "improper means" are "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means."). NAV's response relied on the inevitable disclosure doctrine, [**11] which enables a plaintiff to state an actionable claim under ITSA based on allegations that the defendant would inevitably rely on the plaintiff's secrets, rather than alleging actual disclosure or use of trade secrets. See _Strata Marketing, Inc. v. Murphy, 317 Ill. **App**. 3d 1054, 1070, 740 N.E.2d 1166, 251 Ill. Dec. 595 (2000)_ (recognizing the inevitable disclosure doctrine to establish a cognizable claim of trade secret misappropriation).

 [**P16**]   On June 23, 2021, the trial court entered a written order granting the defendants' motion and dismissed counts I through III with prejudice. The court found that the harm asserted in the tortious interference with a contract and civil conspiracy claims was based on misappropriation of alleged trade secrets, and thus preempted by ITSA. In addition, the court found the noncompetition terms of Arora's employment contract were unenforceable as a matter of law. Specifically, the court found that the terms were overly broad, as it prohibited Arora from working for any entity that provides hedge fund accounting services in any capacity, worldwide. As to the misappropriation claim, the court found that NAV lacked standing to assert any rights that Back Office may have regarding its former employees and merely alleged "on information and belief" that SFS conspired [**12] with SSLLP to induce Back Office employees to leave. Additionally, the court found NAV's allegations insufficient as NAV failed to specify (1) the trade secrets the employees possessed, (2) whether noncompetition agreements restricted the Back Office employees, (3) how the Back Office protects trade secrets, and (4) whether the Back Office employees owed NAV a duty of confidentiality.

2023 IL App (1st) 211015-U, *211015-U; 2023 Ill. App. Unpub. LEXIS 661, **12

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

[*P17]  Subsequently, NAV voluntarily dismissed the remaining counts (IV through VI) of the amended complaint by order entered on July 21, 2021. NAV filed a notice of appeal from the June 23 order on August 18, 2021.

[*P18]  II. ANALYSIS

[*P19]  A. Appellate Jurisdiction

[*P20]  As a threshold matter, we consider our jurisdiction to review the circuit court's dismissal of three counts of NAV's six-count complaint. We have an independent duty to examine our jurisdiction even if the parties do not raise the issue. *In re Marriage of Padilla and Kowalski, 2022 IL App (1st) 200815, ¶ 16*. The Illinois Constitution of 1970 grants the appellate court jurisdiction to review final judgments entered in the circuit court. *Ill. Const. 1970, art. VI, § 6*; *Johnson v. Armstrong, 2022 IL 127942, ¶ 19*. An order is final, even when it disposes of less than all claims asserted in the pleadings, if the order "'disposes of the rights of the parties, either upon the entire controversy or upon some [**13]  definite and separate part thereof.'" *Id. ¶ 21* (quoting *Blumenthal v. Brewer, 2016 IL 118781, ¶ 25, 410 Ill. Dec. 289, 69 N.E.3d 834*). An order disposing of fewer than all claims, though final, is not appealable unless the circuit court makes a special finding pursuant to *Illinois Supreme Court Rule 304(a)* (eff. Mar. 8, 2016) that no just cause exists to delay appeal or enforce the judgment.

[*P21]  Here, the circuit court's June 23 order disposed of three of NAV's counts while three others remained pending. The court did not make a *Rule 304(a)* special finding. On July 21, the court granted NAV's motion to voluntarily dismiss the remaining three counts. NAV filed its notice of appeal from the June 23 order on August 18.

[*P22]  The June 23 order dismissing NAV's counts I through III with prejudice was a final order since it disposed of the rights of the parties upon a definitive and separate part of the action. *Cf. Dinerstein v. Evanston Ath. Clubs, Inc., 2016 IL App (1st) 153388, ¶ 19-20, 408 Ill. Dec. 47, 64 N.E.3d 1132* (finding that an order dismissing one count of a three-count complaint on the merits pursuant to *section 2-619* was final when the other two counts were later voluntarily dismissed). Without a *Rule 304(a)* finding, however, the June 23 order was not appealable as it did not dispose of the entire case. When an order of voluntary dismissal terminates an action in its entirety, all orders final in nature, though not previously appealable, become [**14]  immediately final and appealable. *Dubina v. Mesirow Realty Development, Inc., 178 Ill. 2d 496, 503, 687 N.E.2d 871, 227 Ill. Dec. 389 (1997)*. The June 23 order, therefore, only became appealable upon entry of the order of voluntary dismissal on July 21, disposing of all remaining claims. Accordingly, NAV filed a notice of appeal within the required 30 days after entry of the order that made the June 23 order appealable. See *Secura Insurance Co. v. Illinois Farmers Insurance Co., 232 Ill. 2d 209, 213, 902 N.E.2d 662, 327 Ill. Dec. 541 (2009)* ("The timely filing of a notice of appeal is both jurisdictional and mandatory."); *Ill. S. Ct. R. 303(a)(1)* (eff. Jul. 1, 2017) (providing a 30-day period from the entry of final judgment to file notice of appeal). Thus, we have jurisdiction to review the June 23 order.

[*P23]  B. Standard of Review

[*P24]  The defendants filed a motion to dismiss pursuant to *section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2020))*, which permits a defendant to assert grounds for dismissal under both *sections 2-615* (id. § 2-615) and *2-619* (id. § 2-619) of the Code in a single motion. A *section 2-615* motion to dismiss tests the legal sufficiency of the complaint. *Hadley v. Doe, 2015 IL 118000, ¶ 29, 393 Ill. Dec. 348, 34 N.E.3d 549*. Upon the filing of such a motion, the court's inquiry is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, state sufficient facts to establish a cause of action upon which relief may be granted. *Id.* The court should consider all facts apparent from the face of the complaint, including any attached [**15]  exhibits. *Id.* However, we do not take mere conclusions of law or fact as true unless supported by specific factual allegations. *Cretella v. Azcon, Inc., 2022 IL App (1st) 211224, ¶ 11*. A cause of action should not be dismissed unless it is clear that no set of facts can be proved under the pleadings that would entitle the plaintiff to recover. *Tuite v. Corbitt, 224 Ill. 2d 490, 510, 866 N.E.2d 114, 310 Ill. Dec. 303 (2006)*.

2023 IL App (1st) 211015-U, *211015-U; 2023 Ill. App. Unpub. LEXIS 661, **15

FILED DATE: 8/8/2024 11:30 AM    2024CH04952

[*P25]  A *section 2-619* motion, though, is a "'yes but' motion that admits both that [the] complaint's allegations are true and that the complaint states a cause of action, but argues that some other defense exists that defeats the claim nevertheless." *Doe v. Univ. of Chi. Med. Ctr., 2015 IL App (1st) 133735, ¶ 40, 391 Ill. Dec. 647, 31 N.E.3d 323*. When considering a *section 2-619* motion, a court must likewise accept all well-pled allegations in the complaint as true, as well as any inferences that may reasonably be drawn in the plaintiff's favor. *Id. ¶ 35*. Dismissal is appropriate if, considering the matter raised in the *section 2-619* motion, the plaintiff can prove no set of facts that would support a cause of action. *Id.*

[*P26]  We review dismissal pursuant to *sections 2-615* and *2-619 de novo*. *Calloway v. Chi. Bd. of Election Comm'rs, 2020 IL App (1st) 191603, ¶ 9, 440 Ill. Dec. 739, 155 N.E.3d 509*. *De novo* review means we consider the motion anew and perform the same analysis that a trial court would. *Muhammad v. Abbott Lab'ys, Inc., 2022 IL App (1st) 210478, ¶ 22, 461 Ill. Dec. 399, 203 N.E.3d 1001*. We may affirm on any basis supported by the record. *Rivera v. Allstate Ins. Co., 2021 IL App (1st) 200735, ¶ 25, 454 Ill. Dec. 421, 189 N.E.3d 982*.


[*P27]  C. Tortious Interference with a Contract

[*P28]  Defendants assert that ITSA preempts NAV's tortious interference with a contract **[**16]** claim since the claim is based on misappropriation of trade secrets that Arora is alleged to be using and disclosing in his employment with SFS. NAV counters that its claim is not preempted since it is not based solely on trade secret misappropriation. Rather, NAV argues that it stated a sufficient claim by alleging that, regardless of trade secrets, the defendants induced Arora to work for a competitor and solicit NAV's customers, thereby breaching provisions of his contract with NAV.

[*P29]  To state a cause of action for tortious interference with a contract, a plaintiff must allege (1) the existence of a valid and enforceable contract between the plaintiff and a third party, (2) the defendant's awareness of the contract, (3) defendant's intentional and unjustified inducement of a breach, (4) defendant's wrongful conduct caused the third party to subsequently breach the contract, and (5) resulting damages. *Purmal v. Robert N. Wadington & Associates, 354 Ill. App. 3d 715, 727, 820 N.E.2d 86, 289 Ill. Dec. 578 (2004)*. Here, NAV fails to allege that any damages resulted from breach of Arora's contract, such as lost customers or profits. Allegations that Arora is working for a competitor or soliciting NAV customers only go to the fourth element—whether Arora has breached his contract with NAV. Damages **[**17]** are a distinct element, which a plaintiff must plead and prove to maintain an action for tortious interference with a contract. *Davis v. Times Mirror Magazines, Inc., 297 Ill. App. 3d 488, 498, 697 N.E.2d 380, 231 Ill. Dec. 826 (1998)*. Pleading that the defendant induced a breach and that a breach occurred are not enough. We do not presume resulting damages. "Illinois is a fact-pleading jurisdiction." (Internal quotation marks omitted.) *Weiss v. Waterhouse Securities, Inc., 208 Ill. 2d 439, 451, 804 N.E.2d 536, 281 Ill. Dec. 571 (2004)*. "[P]laintiffs must allege facts sufficient to bring a claim within a legally recognized cause of action." *Praither v. Northbrook Bank & Trust Co., 2021 IL App (1st) 201192, ¶ 50, 455 Ill. Dec. 918, 192 N.E.3d 747* (citing *Vernon v Schuster, 179 Ill. 2d 338, 344, 688 N.E.2d 1172, 228 Ill. Dec. 195 (1997)*). "[A]bsent the necessary allegations, even the general policy favoring the liberal construction of pleadings will not satisfy the requirement that a complaint set forth facts necessary for recovery under the theory asserted." *Alpha School Bus Co. v. Wagner, 391 Ill. App. 3d 722, 735, 910 N.E.2d 1134, 331 Ill. Dec. 378 (2009)*. Accordingly, NAV's claim is deficient for failure to allege resulting damages.

[*P30]  To the extent that NAV's tortious interference with a contract claim alleges resulting damages based on Arora's use or disclosure of alleged trade secrets, the claim is preempted. With some exceptions not relevant here, ITSA "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret." *765 ILCS 1065/8(a)* (West 2020). In other words, ITSA preempts **[**18]** all common law claims based on misappropriation of trade secrets. *ExactLogix, Inc. v. JobProgress, LLC, 508 F. Supp. 3d 254, 268 (N.D. Ill. 2020)*. "In deciding the preemption issue, courts need not determine whether the alleged trade secret is in fact a trade secret." *Id.* Instead, we assess whether the claim is based on the misappropriation of an alleged trade secret. *Id.* ITSA does not preempt a claim if the claim "would stand even if the information was not alleged to be a trade secret" and the plaintiff seeks redress "for wrongs

Case: 1:24-cv-09069 Document #: 25-11 Filed: 11/27/24 Page 29 of 33 PageID #:449

Page 7 of 11

2023 IL App (1st) 211015-U, *211015-U; 2023 Ill. App. Unpub. LEXIS 661, **18

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

beyond the mere misappropriation." (Internal quotation marks omitted.) *Id.* As we found, NAV's tortious interference claim cannot stand apart from alleging misappropriation of trade secrets. And NAV does not seek redress for breaches of other provisions of Arora's contract since NAV does not allege resulting damages. Rather, NAV's claim ultimately seeks redress for misappropriation of trade secrets and is, therefore, preempted.

[*P31]   NAV cites *Alpha School Bus* to argue that ITSA does not preempt its tortious interference claim. Specifically, NAV likens its claim to the breach of fiduciary duty claim that this court found ITSA did not preempt in *Alpha School Bus*. There, a breach of fiduciary duty claim included an allegation that a former corporate officer was soliciting [**19] the plaintiffs' employees to work for his competing business. *Alpha School Bus, 391 Ill. App. 3d at 737*. This allegation was one reason, among others, that we found that the claim was "not dependent upon the misappropriation of trade secrets." *Id.* NAV argues that its allegation that Arora has solicited NAV customers on behalf of SFS is analogous. We disagree.

[*P32]   We find *Alpha School Bus* distinguishable. Unlike this case, the plaintiff in *Alpha School Bus* pled facts sufficient to establish each element of the separate claim, including a resulting injury. *Id. at 747* (stating the necessary elements to assert a breach of fiduciary duty claim, including injury). Notably, the plaintiff did not allege that the former corporate officer merely solicited the plaintiff's employees to potentially leave and work for the competing company. Rather, the plaintiff alleged that, in conjunction with promises of future employment with the competing company, the officer solicited the employees to sabotage the plaintiff's business and take property—and that this occurred. *Id. at 729-30*. Those actions, along with others, enabled the defendants to obtain contracts to transport public school students that the plaintiff would have otherwise been awarded. *Id. at 733*. Thus, the plaintiffs were injured by the actions [**20] they alleged as breaches of the former officer's fiduciary duty. As we observed, NAV's complaint fails to allege that any injury resulted from the defendants' interference with or Arora's breach of his contract with NAV.

[*P33]   We also observe that, to the extent NAV sought injunctive relief apart from damages, the claim is moot since the two-year term contained in Arora's contract has expired during the pendency of this appeal. See *The Agency, Inc. v. Grove, 362 Ill. App. 3d 206, 209, 839 N.E.2d 606, 298 Ill. Dec. 283 (2005)* (finding that the enforceability of a noncompetition provision was a moot issue where noncompetition period had expired).

[*P34]   For these reasons, we find that NAV failed to state sufficient facts to establish a cause of action under a theory of tortious interference with a contract.

[*P35]   D. Trade Secret Misappropriation

[*P36]   To state a cause of action for misappropriation of trade secrets, a plaintiff must allege facts that the information at issue was (1) a trade secret, (2) misappropriated, and (3) used in the defendant's business. *Alpha School Bus, 391 Ill. App. 3d at 740*.

[*P37]   "[T]rade secret" means "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers [**21] or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 756 ILCS 1065/2(d) (West 2020).

[*P38]   In determining whether information is a trade secret, courts consider the following factors: (1) the extent to which the information is known outside of the plaintiff's business, (2) the extent to which it is known by the employees and others involved in the plaintiff's business, (3) the extent of measures plaintiff took to guard the secrecy of the information, (4) the value of the information to the plaintiff and to its competitors, (5) the amount of effort or money the plaintiff expended in developing the information, and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Strata Marketing, 317 Ill. App. 3d at 1068*.

2023 IL App (1st) 211015-U, *211015-U; 2023 Ill. App. Unpub. LEXIS 661, **21

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

[*P39]  "Whether information constitutes a trade secret focusses fundamentally on its secrecy." (Internal quotation marks omitted.) *Multimedia Sales & Mktg. v. Marzullo, 2020 IL App (1st) 191790, ¶ 17, 453 Ill. Dec. 820, 188 N.E.3d 789*. "[T]he plaintiff must show that the information was sufficiently secret to give plaintiff a competitive **[\*\*22]** advantage and plaintiff took affirmative measures to prevent others from acquiring or using the information." *Id*. The key factor to establishing secrecy "is the ease with which the information can be readily duplicated without involving considerable time, effort or expense." *Stampede Tool Warehouse, Inc. v. May, 272 Ill. App. 3d 580, 588, 651 N.E.2d 209, 209 Ill. Dec. 281 (1995)*.

[*P40]  But, before a court can analyze the secrecy of information, a plaintiff must identify its trade secrets with specificity. *Globaltap LLC v. Elkay Mfg. Co., 13 C 632, 2015 U.S. Dist. LEXIS 704, 2015 WL 94235, *6 (N.D. Ill. Jan. 5, 2015)*. It would be futile to analyze whether information was sufficiently secret to derive economic value or whether the plaintiff took reasonable efforts to maintain secrecy without first knowing, with particularity, what information comprises the secret. *Id*.

[*P41]  NAV's amended complaint sets forth a lengthy list of claimed confidential information. See *supra* ¶ 9. At times, the list uses broad, vague terms such as services and processes without further specificity. Overall, NAV's list appears vast, perhaps encompassing its entire business operation. By so pleading, NAV essentially claims that any and every bit of its information is a trade secret. Since NAV has pled in this manner, we are unable to discern, with particularity, what information comprises the alleged trade secret or secrets.

[*P42]  In addition, **[\*\*23]** NAV's claim is premised on Arora and three Back Office employees joining NAV and SSLLP, respectively. NAV alleges that Arora had access to customer, pricing, and marketing information and the other three knew of NAV's processes. Yet, NAV does not narrow its claim to particular information that any of the former employees possessed.

[*P43]  Furthermore, NAV does not indicate whether any of its information is compiled in an organized format, the medium in which such information exists, or how or where such information is kept. Nor does NAV allege that any of the employees took anything besides the information contained in their own heads. "General knowledge, skill, and experience gained by an employee during employment cannot be claimed as a trade secret." *United States Gypsum Co. v. LaFarge N. Am., Inc., 508 F. Supp. 2d 601, 624 (N.D. Ill. 2007)*. "[A]n employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation." *Delta Med. Sys., Inc. v. Mid-America Med. Sys., Inc., 331 Ill. App. 3d 777, 791, 772 N.E.2d 768, 265 Ill. Dec. 397 (2002)*.

[*P44]  We reiterate that Illinois is a fact-pleading jurisdiction. *Marshall v. Burger King Corp., 222 Ill. 2d 422, 429, 856 N.E.2d 1048, 305 Ill. Dec. 897 (2006)*. A plaintiff must allege facts sufficient to bring a claim within a legally recognized cause of action. *Id. at 429-430*. This pleading standard requires that a plaintiff claiming to possess a trade secret must identify it plainly rather than "'invite the **[\*\*24]** court to hunt through *** details in search of items meeting the statutory definition.'" *Nat'l Tractor Parts Inc. v. Caterpillar Logistics Inc., 2020 IL App (2d) 181056, ¶ 46, 446 Ill. Dec. 566, 171 N.E.3d 1* (quoting *IDX Systems Corp. v. Epic Systems Corp., 285 F. 3d 581, 584 (7th Cir. 2002)*).

[*P45]  Courts evaluating the sufficiency of trade secret misappropriation claims have required specificity. See *Nilssen v. Motorola, Inc., 963 F. Supp. 664, 672 (N.D. Ill. 1997)* ("[A plaintiff] must articulate protectable trade secrets with specificity or suffer dismissal of [their] claim."). Long lists of broad items do not suffice. *Id.* (stating that a plaintiff fails to state a claim under ITSA "by simply producing long lists of general areas of information which contain unidentified trade secrets." (Internal quotation marks omitted.)); see also *Composite Marine Propellers, Inc. v. Van Der Woude, 962 F. 2d 1263, 1266 (7th Cir. 1992)* ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets."). Generic descriptions do not allege a protectable trade secret. See *Nat'l Tractor Parts Inc. v. Caterpillar Logistics Inc., 2020 IL App (2d) 181056, ¶ 53, 446 Ill. Dec. 566, 171 N.E.3d 1* (finding that "'a process that focused on efficiency, cost, quality, safety, and transportation'" did not qualify as a trade secret since this description "contained generic terms that many companies would use to describe their assembly processes."). And a plaintiff cannot resort to claiming all its information is a trade secret. See *Nilssen, 963 F. Supp. at 672* (observing that "a

Case: 1:24-cv-09069 Document #: 25-11 Filed: 11/27/24 Page 31 of 33 PageID #:451

Page 9 of 11

2023 IL App (1st) 211015-U, *211015-U; 2023 Ill. App. Unpub. LEXIS 661, **24

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

blunderbuss statement" **[\*\*25]**  like "'Everything you got from us was a trade secret'" is legally insufficient); see also *Bridgeview Bank Group v. Meyer, 2016 IL App (1st) 160042, ¶ 14, 401 Ill. Dec. 214, 49 N.E.3d 916* (finding that purported confidential information, which "encompassed virtual entirety of its business operations" amounted to a conclusory allegation). NAV's asserted trade secret list bears all these deficiencies. Thus, we find that NAV failed to allege specific trade secrets.

 **[\*P46]**  Some items NAV listed may be the kind of information that could constitute a trade secret, such as customer and pricing information. But NAV fails to allege requisite additional facts to show that its information is sufficiently secret to derive economic value. *Cf. Stampede Tool Warehouse, 272 Ill. App 3d at 589* (finding that a customer list was a trade secret when developed through a "laborious" method, which required "a substantial amount of time, effort, and expense" and the list was not readily available from a public source). Instead, NAV parrots the legal conclusion that its information "is sufficiently secret such that NAV derives economic value *** for it not being generally known." See *Welsh v. Commonwealth Edison, Co., 306 Ill. App. 3d 148, 155, 713 N.E.2d 679, 239 Ill. Dec. 148 (1999)* ("A pleading which merely paraphrases the elements of a cause of action in conclusory terms is not sufficient."). NAV makes no allegations to support how this is so. NAV does **[\*\*26]**  not claim that it spent considerable time, effort, and expense to develop its information.[5] Nor does NAV show whether it would be difficult to duplicate such information. As with the tortious interference claim, we will not infer necessary allegations that NAV failed to plead.

 **[\*P47]**  Further, a close reading of NAV's amended complaint indicates that its information may not be so secret since Sudrania already had it. Again, NAV's misappropriation claim is premised on the acquisition of trade secrets by hiring Arora and three Back Office employees (Modi, Sharma, and Gohda) in contravention of their duties of confidentiality. But, at the same time, NAV alleges that Sudrania, as a former key employee of NAV, is "intimately familiar" with NAV's information and by early 2020—before any of the four employees joined SFS or SSLLP—he "established a business to compete with NAV by replicating the business model and structure NAV utilizes using NAV *** proprietary, confidential, or trade secret information." When considering a motion to dismiss, "a court must accept as true *all* well-pleaded facts, as well as any reasonable inferences that may arise from them." (Emphasis added.) *Patrick Eng'g, Inc. v. City of Naperville, 2012 IL 113148, ¶ 31, 976 N.E.2d 318, 364 Ill. Dec. 40*. The reasonable inference **[\*\*27]**  that arises from these allegations is that Sudrania already knew NAV's information and that NAV's information was not sufficiently secret to derive a competitive advantage. Due to NAV's lack of specificity, its amended complaint fails to identify any specific information that the defendants acquired through hiring Arora and the others that they did not already possess. We cannot simply assume otherwise. Again, liberal construction does not require us to fill in the gaps. If the defendants already possessed NAV's information, this factor not only weighs heavily against finding NAV's information to be trade secrets, but it also negates that the defendants acquired it through improper means, even if NAV's information were to be considered trade secrets.

 **[\*P48]**  In addition, we observe that NAV has not made sufficient allegations that the defendants are using or that Arora and the others will inevitably disclose NAV's trade secrets. First, NAV made nearly every allegation on this element based on "information and belief." "An allegation made on information and belief is not equivalent to an allegation of relevant fact." (Internal quotation marks omitted.) *Patrick Eng'g, Inc., 2012 IL 113148, ¶ 40*. We recognize that certain relevant facts **[\*\*28]**  of a cause of action will not be known to a plaintiff when in the exclusive knowledge of the defendant. *Golly v. Eastman (In re Estate of DiMatteo), 2013 IL App (1st) 122948, ¶ 83, 995 N.E.2d 420, 374 Ill. Dec. 281*. In such cases, "'a complaint which is as complete as the nature of the case allows is sufficient.'" *Id.* (quoting *Yuretich v. Sole, 259 Ill. App. 3d 311, 313, 631 N.E.2d 767, 197 Ill. Dec. 545 (1994)*). But a plaintiff will have knowledge of its own efforts to learn the facts they allege on information and belief and should allege the efforts taken to discover those facts. *Id.* Here, NAV fails to allege how it discovered that Arora and the others have used or will inevitably disclose its claimed trade secrets. Therefore, these are not equivalent to allegations of relevant facts. See *id. ¶ 84* (finding the same).

---

[5] We note that NAV asserts it made significant investment in developing proprietary software, but NAV does not allege that the defendants misappropriated its software.

2023 IL App (1st) 211015-U, *211015-U; 2023 Ill. App. Unpub. LEXIS 661, **28

FILED DATE: 8/8/2024 11:30 AM   2024CH04952

[*P49]  Second, inevitable disclosure is not assumed when, like here, there is no allegation that the employee copied the employer's confidential information in some tangible format. *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700, 734 (N.D. *Ill.* 2011). Likewise, "[t]he fact that a former employee accepted a similar position with a competitor, without more, will not demonstrate inevitable disclosure." *Liebert Corp. v. Mazur, 357 Ill. App. 3d 265, 284, 827 N.E.2d 909, 293 Ill. Dec. 28 (2005)*. Rather, to use this theory, a plaintiff must show that the former employee's new position will inevitably lead them to rely on the plaintiff's trade secrets. *Stenstrom Petroleum Services Group, Inc. v. Mesch, 375 Ill. App. 3d 1077, 1096, 874 N.E.2d 959, 314 Ill. Dec. 594 (2007)*. Such inevitable reliance is established by facts showing that the employee could [**29] not operate or function without using the plaintiff's trade secrets. *Strata Marketing, 317 Ill. App. 3d at 1071*. NAV alleges no such facts. Instead, it merely repeats the element as a conclusion.

[*P50]  For these reasons, we find that NAV failed to allege sufficient facts to state an actionable claim for trade secret misappropriation. Having disposed of NAV's claims on these grounds, we need not address the parties' additional contentions about the sufficiency of NAV's amended complaint.


[*P51]  E. Leave to Replead

Last, NAV contends that it should be permitted to file a second amended complaint to cure any deficiencies found in its amended complaint. Before the trial court, NAV included a request to replead in its response to the defendants' motion to dismiss, if the trial court were to find its amended complaint deficient. However, the trial court found that NAV's claims were deficient as a matter of law and dismissed them with prejudice, implicitly denying NAV's request to replead.

[*P52]  In *Firebirds International, LLC v. Zurich American Insurance Co., 2022 IL App (1st) 210558, 463 Ill. Dec. 119, 208 N.E.3d 1187*, this court analyzed the dismissal of a complaint with prejudice entered after the plaintiff made an oral request to replead as the denial of a motion to amend a complaint. *Id. ¶ 41*. We find the situation here comparable and will do the same.

[*P53]  We review a trial court's [**30] denial of a motion to amend the complaint under an abuse of discretion standard. *Id. ¶ 42*. The factors to consider are: (1) whether the proposed amendment will cure the defective pleading, (2) whether the proposed amendment would surprise or prejudice the opposing party, (3) whether the proposed amendment was timely filed, and (4) whether the movant had previous opportunities to amend. *Id.* (citing *Loyola Academy v. S&S Roof Maintenance, Inc., 146 Ill. 2d 263, 273, 586 N.E.2d 1211, 166 Ill. Dec. 882 (1992)*). "If the amendment would not have cured a defect in the pleading, the other factors are superfluous." *Keefe-Shea Joint Venture v. City of Evanston, 364 Ill. App. 3d 48, 62, 845 N.E.2d 689, 300 Ill. Dec. 800 (2005)*.

[*P54]  Here, NAV never tendered a proposed amended complaint. We note that, although the trial court dismissed NAV's claims with prejudice, NAV was not foreclosed from tendering a proposed second amended complaint along with a post-judgment motion. See *735 ILCS 5/2-1203(a)* (West 2020) (providing 30-day period to file a post-judgment motion for "a rehearing, or a retrial, or modification of the judgment or to vacate the judgment or for other relief."); *Waugh v. Morgan Stanley & Co., 2012 IL App (1st) 102653, ¶ 53, 966 N.E.2d 540, 359 Ill. Dec. 219* (observing that trial courts retain jurisdiction to modify final judgments and orders for 30 days). The failure to tender a proposed amended complaint "significantly diminishes this court's ability to determine whether the proposed amendment would have stated a viable cause [**31] of action." *Firebirds Int'l, LLC, 2022 IL App (1st) 210558, ¶ 43*. As such, NAV offers no specifics on how it might cure the deficiencies in its amended complaint. Instead, NAV essentially asks us to speculate. We decline to do so. In addition, the fact that NAV already had one opportunity to amend its complaint further weighs against another opportunity to replead. Although we disposed of NAV's claims on different grounds from the trial court, we find that the trial court did not abuse its discretion in dismissing NAV's claims with prejudice and we will not remand for an opportunity to file a second amended complaint.

[*P55]  After the conclusion of briefing in this appeal, NAV filed a motion to cite supplemental authority. Specifically, NAV wished to cite an order of the federal district court from a separate action involving the same parties in this case and some similar issues. We allowed the motion but, upon review, find that the district court's

2023 IL App (1st) 211015-U, *211015-U; 2023 Ill. App. Unpub. LEXIS 661, **31

order does not change our analysis or disposition of this case. The federal district court's order makes plain that the case before it involved different pleadings, different facts, and a different procedural posture from this case. The matters in the federal case are outside the scope of our review **[**32]** in this appeal, which was limited to the sufficiency of the amended complaint in this case.

**[*P56]**  III. CONCLUSION

**[*P57]**  In sum, we find that NAV failed to allege sufficient facts to state a cause of action and we affirm the judgment of the circuit court.

**[*P58]**  Affirmed.

---

**End of Document**

FILED DATE: 8/8/2024 11:30 AM   2024CH04952