# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

——————————————————————————————— )
GTY TECHNOLOGY HOLDINGS INC.        )    Case No. 1:24-cv-09069
d/b/a EUNA SOLUTIONS and            )
CITYBASE, INC.,                     )
                                    )
             Plaintiffs,            )    Honorable Jeremy C. Daniel
                                    )
        v.                          )
                                    )
WONDERWARE, INC. (d/b/a CORE        )
BUSINESS TECHNOLOGIES),             )
MICHAEL DUFFY, and CHRISTOPHER      )
LEWIS,                              )
                                    )
             Defendants.            )
——————————————————————————————— )

### AMENDED COMPLAINT

Plaintiffs GTY Technology Holdings Inc., d/b/a Euna Solutions ("Euna") and CityBase, Inc. ("CityBase" and, together with Euna, "Plaintiffs"), by and through their undersigned attorneys, file this Amended Complaint seeking preliminary and permanent injunctive relief against all Defendants pursuant to Federal Rules of Civil Procedure 65, as well as monetary damages against certain Defendants, for misappropriation of trade secrets, unauthorized access to Plaintiffs' computer and computer system, breach of fiduciary duties, civil conspiracy, breach of contract, tortious interference with contractual relations, and concert of action liability against Michael Duffy ("Duffy"), Christopher Lewis ("Lewis"), and Wonderware, Inc., d/b/a CORE Business Technologies ("CORE" and, together with Duffy and Lewis, the "Defendants") and allege as follows:

## INTRODUCTION

1.     Through this action, Plaintiffs seek to prevent the Defendants' ongoing theft and misuse of Plaintiffs' critical trade secrets, which Defendants misappropriated in order to unfairly compete with Plaintiffs in the marketplace for government technology services, as well as damages and costs against certain Defendants flowing from Defendants' intentional misconduct.

2.     The individual Defendants, Duffy and Lewis, are former top-level executives who abandoned Plaintiffs for a direct competitor, Defendant CORE—in Duffy's case, without providing the fair notice he had contractually promised to Plaintiffs in exchange for valuable consideration—and continue to compete with and tortiously harm Plaintiffs.

3.     On their way out the door, Duffy and Lewis breached their fiduciary duties to Plaintiffs and misappropriated some of Plaintiffs' most sensitive, highly confidential strategic business information—trade secrets that these senior executives stole for the benefit of their new employer, and inevitably will misuse and disclose in order to gain an unfair advantage in the marketplace and harm Plaintiffs' business. *See, e.g., PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). In fact, before their abrupt departures, Duffy and Lewis conspired behind the scenes to undermine Plaintiffs' efforts to integrate CityBase with Euna, going so far as to refer to Machiavelli for inspiration in internal chats that Plaintiffs have since uncovered. The reference was apt: "Machiavellian" conduct is, of course, "marked by cunning, duplicity, or bad faith." *Machiavellian*, MERRIAM WEBSTER DICTIONARY (https://www.merriam-webster.com/dictionary/Machiavellian). After resigning, Duffy accessed his company-computer without authorization and subsequently wiped it of all data before returning it to Plaintiffs. And then, before leaving in short succession, Defendant Lewis brazenly and covertly downloaded and

extracted two of Plaintiffs' most strategically sensitive files as part of Defendants' collective scheme.

4.    These files consisted of (1) a highly sensitive and confidential internal PowerPoint deck containing the "CityBase Go To Market" plan "for 2024 and beyond," detailing CityBase's strengths and weaknesses, CityBase's core strategies, CityBase's financial position, and detailed analyses of prospective customers, including personalized pitches for individuals at those customers; and (2) a strategic planning spreadsheet laying out, in minute detail, the markets CityBase was targeting, including revenue projections for those markets and the names of specific leads in those markets generated through Euna's extensive business development efforts. Together, these files effectively comprise the secret formula underlying Plaintiffs' business model, and would be extremely valuable to CORE, which, like Plaintiffs, offers payment solutions technology and services to public sector clients.

5.    Since turning against Plaintiffs, Duffy and Lewis have continued their wrongful conduct with CORE's full knowledge, encouragement, and assistance. In fact, Defendants have doubled down on their tortious misconduct by poaching numerous key CityBase and Euna employees, in violation of Duffy's and Lewis's binding contractual obligations. Defendants' collective actions (only partially summarized in this Introduction) constitute an unlawful scheme to unfairly compete with and tortiously harm Plaintiffs in clear violation of federal and Illinois law—including through overt acts of misconduct occurring in this district.

6.    Duffy's and Lewis's previously-concealed scheme to sabotage Plaintiffs' business behavior initially came as a shock to Plaintiffs, who trusted both men to lead CityBase like the experienced and sophisticated industry pioneers they held themselves out to be. As it turns out, their efforts were instead focused on a Machiavellian plot to undermine Plaintiffs' efforts to

3

integrate CityBase and Euna. Defendants—who have admitted to being in possession of Plaintiffs' confidential information—evidently believe themselves above the law.

7. Defendants' ongoing misconduct must be restrained to avoid further irreparable harm to Plaintiffs. Moreover, ~~Defendants~~ Lewis and CORE must compensate Plaintiffs for the damages and costs, including attorney's fees, that Plaintiffs have incurred and will continue to suffer as a direct result of Defendants' conduct—damages that Plaintiffs seek both in this action, and in other respects will seek in other appropriate fora.

## THE PARTIES

8. Plaintiff GTY Technology Holdings Inc., d/b/a Euna Solutions, is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business at 363 W. Erie St. Floor 7, Chicago, Illinois 60654.

9. Plaintiff CityBase, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business at 363 W. Erie St. Floor 7, Chicago, Illinois 60654. CityBase is a wholly owned subsidiary of Euna.

10. Upon information and belief, Defendant Michael Duffy is an individual who resides at 5340 North Lakewood Avenue, Chicago, Illinois 60640.

11. Upon information and belief, Defendant Christopher Lewis is an individual who resides at 1525 19th Avenue NW, Calgary, AB T2M 1A9.

12. Defendant Wonderware, Inc., d/b/a CORE Business Technologies, is a corporation organized and existing under the laws of Rhode Island, with its principal place of business at 950 Warren Avenue, Suite 400, East Providence, Rhode Island 02914.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert a claim against Defendants for violation of federal statutes—the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.* and the Computer Fraud and Abuse Act ("CFAA"), 28 U.S.C. ("CFAA") § 1030 *et seq.*

14.     Plaintiffs' related state-law claims fall within this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over Duffy pursuant to 28 U.S.C. § 1391 because he is a resident of Illinois, has transacted business in Illinois, has made or performed a contract with Plaintiffs substantially within Illinois, and has committed tortious acts within Illinois, including Duffy's unauthorized access to a protected computer.

16.     This Court has personal jurisdiction over Lewis pursuant to 28 U.S.C. § 1391 because Lewis has transacted business in Illinois, and committed tortious acts within Illinois. These tortious acts include, without limitation, misappropriating confidential information (and meeting with Duffy to plot their misappropriation of confidential information), breaching Lewis's fiduciary duties (including by stealing information and employees from a Chicago-based company), and tortiously interfering with Plaintiffs' contractual relations with Duffy and aiding and abetting Duffy's fiduciary breaches occurring in Illinois, harming a business located in Illinois.

17.     This Court has personal jurisdiction over CORE pursuant to 28 U.S.C. § 1391 because CORE has transacted business in Illinois (including, without limitation, by hiring Duffy, an Illinois resident) and committed tortious acts within Illinois, including, without limitation, by tortiously interfering with Plaintiffs' contractual relations with Duffy, an Illinois resident, inducing him to leave and compete against CityBase, a Chicago-based company, to solicit away and hire

CityBase employees, and inevitably to share CityBase secrets and steal CityBase customers, all thereby causing harm to a business located in Illinois.

18.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) because Defendants transact business in this district, and because certain of the transactions and occurrences out of which the causes of action arise occurred in, and/or related to, this district.

## STATEMENT OF FACTS

A.     **Euna's Acquisition of CityBase.**

19.     Euna is a leading provider of technology services to government entities across North America. Euna engages with government agencies in need of assistance with procurement, grants, budgeting, permitting, payments, and special education.

20.     In 2018, Euna acquired CityBase, a provider of payment solutions technology and services, which Euna sought to add to its suite of services for its public sector clients. Duffy had been CityBase's founder and Chief Executive Officer prior to the acquisition.

21.     Euna paid Duffy and his co-owners an enormous sum for CityBase—approximately $120 million—in a transaction entered into in September 2018 and that closed the following February.

22.     In connection with the signing of the CityBase acquisition, Euna offered Duffy continued executive roles pursuant to an offer letter dated September 12, 2018 (the "2018 Offer Letter," attached hereto as Exhibit 1). Specifically, Euna offered Duffy the continued role of Chief Executive Officer of CityBase, as well as Executive Vice President at Euna, and he would work out of CityBase's principal office in Chicago, Illinois. Serving in these roles, Duffy would receive substantial compensation from Euna, with an annual base salary of $300,000 and annual cash

bonus opportunity, alongside a generous equity package.[1]

23.     As a material condition of the 2018 Offer Letter—and in recognition of the trade secrets and vital business information that Duffy would access and the central relationship role he would play with customers and employees—Duffy executed a Fair Competition Agreement with Euna, its parents, subsidiaries, and affiliates (such affiliates necessarily including CityBase, and with all entities defined therein as the "Company") dated September 12, 2018 (the "Fair Competition Agreement," attached hereto as Exhibit 2).[2]

24.     Under the Fair Competition Agreement, Duffy agreed to an important set of covenants designed to protect the Company's vital interests in maintaining continuity and preserving the Company's valuable capital in the form of its trade secrets and other confidential information, as well as its employees and customers

25.     For example, Duffy agreed that he would "provide the Company with the following periods of prior notice [], in writing, depending on [his] title at the time of [his] resignation, of [his] intent to terminate [his] employment with the Company: President and Executive Vice Presidents – three (3) months; Senior Vice Presidents – two (2) months; and Vice Presidents and below – one (1) month." Ex. 2, § 6(a). Duffy further agreed that if he intended to or did contemplate alternative employment at the time he provided such notice, he would provide sufficient details, in writing, about

---

[1] In consideration of this equity, Duffy entered into an award agreement with Plaintiffs that contains additional restrictive covenants (which Duffy has also breached). The award agreement in question contains a Delaware exclusive forum provision, and is therefore not directly at issue in the present action.

[2] The Fair Competition Agreement provides for the resolution of any and all disputes arising thereunder to be resolved by final and binding arbitration before JAMS in New York, NY. See Ex. 2, § 21. However, the Fair Competition Agreement further provides that "the dispute resolution process set forth in paragraph 21 of this Agreement in no law [sic] limits the Company's right to obtain any preliminary, provision [sic] or permanent relief as may be necessary to protect the Company's rights and interests." Id. § 25. Plaintiffs bring this action against Duffy for injunctive relief, and are pursuing other relief against Duffy in separate arbitral proceedings.

such alternative employment in order to allow the Company to meaningfully exercise its rights. *Id.* § 6(b).

26.     Duffy also agreed to a perpetual obligation not to use or disclose the Company's Confidential Information and Customer Confidences (as defined in the Fair Competition Agreement) without the prior written consent of the Company, except as may be necessary in the good faith performance of his duties to the Company or as permitted by law. *See id.* § 11.

27.     Acknowledging that the Company is in a "highly competitive industry" and that Duffy "leaving the Company to join a competing business would jeopardize the Company's Customer Confidences, Confidential Information, Intellectual Property and Customer relationships," Duffy agreed that, for eighteen (18) months following the termination of his employment, he would not, "directly or indirectly, work for or with, own, invest in, render any service or advice to or otherwise assist (in each case, whether or not for compensation) or act as an officer, director, employee, partner or independent contractor for any Competitor[3] in the United States or any foreign country." *Id.* § 16(a). Duffy also agreed that if he considered working for any Competitor or arguably competing business at any time during the Non-Compete Period (as defined in the Fair Competition Agreement), he would provide the Company with at least two weeks' advance written notice of his intention to do so. *Id.*

28.     Duffy further acknowledged that, by virtue of his employment by the Company:

> *[He] ha[s] gained or will gain knowledge of the identity, characteristics and preferences of the Company's Customers, among other Customer Confidences and Confidential Information, and that [he] would inevitably have to draw on such*

---

[3] Defined in the Fair Competition Agreement as "a business enterprise that (A) engages in any activity, (B) proposes to engage in any activity or (C) owns or controls a significant interest in or is a subsidiary or affiliate of any entity, which, in either case, competes with or proposes to compete with any activity in which the Company is engaged, such as, without limitation, developing and licensing software for federal, state and local governments and governmental agencies." See Ex. 2, § 6(d) (emphasis added).

> *information if [he] were to solicit or service the Company's Customers on behalf*
> *of a Competitor.*

*Id.* § 17 (emphasis added). Accordingly, Duffy agreed that, during his employment by the Company and for twelve (12) months following the termination of that employment for any reason, (the "Restricted Period"), he would not, "on [his] own behalf or behalf of anyone else, directly or indirectly, solicit the business of, or direct tailored advertisements to, actual or prospective Customers of the Company (a) as to which [he] performed services or had direct contact, or (b) as to which [he] had access to Customer Confidences or Confidential Information during the course of [his] Employment by the Company." *Id.* Duffy further agreed that, during the Restricted Period, he would not:

> [P]rovide services that are the same as or similar to those provided by the Company
> or encourage or assist any person or entity in competition with the Company to
> solicit, service, or direct tailored advertisements to any actual or prospective
> Customer of the Company covered by the previous sentence of this section, or
> otherwise seek to encourage or induce any such Customer to cease doing business
> with, or reduce the extent of its business dealings with, the Company.

*Id.*

29.     Duffy also agreed that, during the Restricted Period, he would not:

> [D]irectly or indirectly, solicit, hire or seek to hire (whether on [his] own behalf or
> on behalf of some other person or entity) any person who is at that time (or was
> during the prior six (6) months) an employee, consultant, independent contractor,
> representative or other agent of the Company.

*Id.* § 18 (emphasis added). Duffy further promised that he would not, during the Restricted Period:

> [D]irectly or indirectly, on [his] own behalf or on behalf of any other person, entity
> or organization, induce or encourage any employee, consultant, independent
> contractor, representative or other agent of the Company to terminate or reduce his
> or her employment or other business relationship or affiliation with the Company.

*Id.* The Fair Competition Agreement also prohibits Duffy from directly or indirectly assisting any third party in doing what he himself is prohibited from doing under § 18—e.g., from soliciting,

hiring, or seeking to hire any of Plaintiffs' employees (or inducing them to terminate or reduce their relationship with Plaintiffs). *Id.*

30.     ~~The Fair Competition Agreement also provides that, "[i]n the event [Duffy] violates any provision of this Agreement, the Company shall be entitled to recover all costs and expenses of enforcement, including reasonable attorneys' fees." *Id.* § 25.~~ Duffy further agreed that if he violated any of the noncompetition, non-solicitation, or confidentiality provisions of the Fair Competition Agreement, "the time periods set forth in those sections shall be extended for the period of time [Duffy] remain[s] in violation of the provisions." *Id.* § 20.

31.     CityBase currently operates as wholly owned subsidiary of Euna. CityBase's clientele is comprised of approximately seventy (70) agencies, utilities, cities, and counties. Its clients include the New York City Department of Finance, the Alabama Power Company, the City of Austin, the City & County of Denver, the City & Utilities of Springfield, Missouri, and the City of Chicago.

32.     Duffy played an integral role in all aspects of CityBase. As the senior-most executive officer, Duffy had the greatest level of access to and insight into its daily operations and overarching strategies.

33.     In his capacity as Chief Executive Officer of CityBase and Executive Vice President of Euna, Duffy of course owed important fiduciary duties to both Euna and CityBase, including the duty of loyalty.

34.     In carrying out his responsibilities for Euna and CityBase, Duffy had access to, and regularly used, Plaintiffs' highly sensitive trade secrets and confidential business information, including but not limited to marketing and business strategies, pricing, contract terms, client

relationships, competitive vulnerabilities, and other confidential, proprietary, and trade secret information.

35.     Duffy's role as founder and long-time executive at CityBase (and Euna) also conferred on him uniquely strong relationships with their employees and customers. Even the "rank and file" members of CityBase spoke glowingly of Duffy in Slack chats, demonstrating the sway he held over much of CityBase's workforce. Moreover, Duffy was known for his "hands-on" leadership, frequently spearheading meetings with current and prospective clients and making substantial efforts to maintain personal relationships with Euna's and CityBase's customer contacts.

36.     In connection with the closing of the CityBase acquisition, Duffy signed another offer letter dated February 14, 2019 (the "2019 Offer Letter," attached hereto as Exhibit 3). The 2019 Offer Letter is substantively identical to the 2018 Offer Letter, and by superseding the 2018 offer letter as the governing document of the Fair Competition Agreement, it assumes the continued validity of the covenants therein.[4] CityBase did not require Duffy to re-execute the Fair Competition Agreement in 2019 and instead left the existing agreement in place.

37.     Duffy was aware of the Fair Competition Agreement throughout his employment and received benefits in conjunction with executing the Fair Competition Agreement. Indeed, the closing binder for the CityBase acquisition of Euna specifically identifies Duffy's Fair Competition Agreement as one of several "Mutual Closing Deliverables."

---

[4] The only substantive change was that the 2019 Offer Letter granted Duffy oversight as to CityBase's human resources function. Ex. 3 at Section 1.

B.    **Lewis's Employment with CityBase**

38.    Duffy identified Lewis as a candidate for CityBase in or around early 2023. Leveraging their personal relationship, Duffy spent months courting Lewis to join CityBase. Plaintiffs ultimately hired Lewis to serve as its Senior Vice President of Engagement pursuant to an offer letter dated August 2, 2023 (the "Lewis Offer Letter").

39.    Lewis primarily worked remotely but reported directly to Duffy in CityBase's Chicago office and regularly visited the Chicago office to perform his duties. In particular, he worked out of CityBase's Chicago office for approximately one week each month, and made at least seven (7) trips (totaling more than twenty (20) days) to CityBase's Chicago office for important meetings and events. During these meetings, Lewis was exposed to Plaintiffs' confidential, proprietary, and trade secret information.

40.    Lewis was brought to CityBase to help revolutionize its marketing strategies. He immediately set about developing new business strategies for CityBase to use in pursuit of new customers, ultimately developing a set of documents that were distributed to the Euna and CityBase sales teams for internal use only (described in greater detail below).

41.    Beyond just developing sales strategies, Lewis regularly put them to use on behalf of CityBase. Lewis was a key member of CityBase's delegations to critical client targets up through the very weeks before he left CityBase, and regularly interacted with current and prospective CityBase customers.

42.     In recognition of his significant duties and role within CityBase, Lewis received an annual base salary of $325,000 CAD and annual cash bonus opportunity, and was granted a substantial equity compensation package.[5]

43.     In carrying out his responsibilities, Lewis had access to, and regularly used, Plaintiffs' highly sensitive and confidential business information, including but not limited to marketing and business strategies, pricing, contract terms, client relationships, their competitive vulnerabilities, and other confidential, proprietary, and trade secret information. Lewis accessed and used Plaintiffs' confidential, proprietary, and trade secret information while in Chicago and while in Canada. Lewis regularly discussed the foregoing with senior leadership during in-person meetings in Chicago and remotely from Canada.

44.     And, like Duffy, as Senior Vice President of Engagement, Lewis owed important fiduciary duties to CityBase, including the duty of loyalty.

45.     Under the Lewis Offer Letter, Lewis agreed that:

All notes, data, tapes, reference items, sketches, drawings, memoranda, records, diskettes and other materials in any way relating to any of the Information or to the Company's business produced by [Lewis] or coming into [Lewis's] possession by or through [Lewis's] employment, shall belong exclusively to the Company and [Lewis] agree[s] to turn over to the Company all copies of any such materials in [Lewis's] possession or under [Lewis's] control, forthwith, at the request of the Company or, in the absence of a request, on the termination of [Lewis's] employment with the Company."

46.     Lewis's role as the de facto head of the sales function of CityBase's business caused him to develop close relationships not only with CityBase's customers, but its employees as well. For instance, he hand-picked Sara Fernandes ("Fernandes")—a former colleague from Lewis's

---

[5] In consideration of this equity, Lewis entered into an award agreement with Plaintiffs that contains additional restrictive covenants (which Lewis has also breached). The award agreement in question contains a Delaware exclusive forum requirement for disputes, and is therefore not directly at issue in the present action.

days at Paymentus Corporation—to join CityBase as the Director of Customer and Market Strategy.

47.     Through his role, Lewis was central to the all-important sales side of the organization and its employee and customer base.

**C.     Duffy Sabotages Euna and CityBase and Plots His Exit.**

48.     In or around September 2023, Euna Chief Executive Officer Tommy Amburgey, Jr. ("Amburgey") approached Duffy about the ongoing plan to make CityBase a fully integrated part of Euna. Amburgey repeatedly told Duffy that Euna viewed Duffy as a key member of the leadership team, and that Euna wanted Duffy to remain in his senior position as Euna and CityBase became more integrated. These conversations continued throughout 2023, with Amburgey offering to allow Duffy to help draft the integration plan.

49.     Instead of seizing the many opportunities presented to him to help integrate and grow Plaintiffs' business and provide better services to their customers, Duffy engaged in a pattern of insubordination that violated his fiduciary duties to Plaintiffs. Despite nominally committing to the integration process in conversation, Duffy's actions demonstrated his intent to resist integration and maintain the separation of CityBase and Euna. Duffy frequently expressed a belief that CityBase and Euna were fundamentally different (they are not), and that he was worried staff would leave if the businesses became fully integrated. Amburgey and the rest of the Euna leadership team emphasized to Duffy that this concern made it all the more important that Duffy stay with CityBase to facilitate the transition to a new era of the business.

50.     Instead of working to ease the concerns of staff regarding the integration, Duffy worked with Lewis to actively foment resistance among CityBase's employees. On October 4, 2023, Lewis messaged Duffy, villainizing Amburgey and other Euna executives, with a "heads up

that the GTM [Go-To-Market] presentation to Tom will need to be next week as Euna people are circling and it seems like sales plans are being made without our input but with respect to our customers and products"—ignoring the fact that Euna paid approximately $120 million for those customers and products. The conversation went on to discuss how, in their view, Euna was carrying out a "land grab," and how their proposed plan for CityBase's future could make Euna feel "threatened."

51.     Duffy's reliance on Lewis for help with the scheme to undermine the Euna-CityBase integration was clear from the start: in the October 4 conversation, Duffy asked Lewis, "what do you think I should do next" with regard to resisting Euna's integration efforts.

52.     Duffy also undertook substantial efforts to poison the well among the rank and file. On November 28, 2023, Duffy separately messaged Heather Gonzalez (Manager of Operations) and Lucas Brictson (Senior DevOps Engineer). In conversations with both employees—neither of whom reported to Duffy—Duffy disparaged Euna and used militaristic rhetoric to describe Euna's efforts to properly integrate CityBase. To wit, he offered the following analogies to subvert and denigrate Euna's integration efforts:

- "The mass communications as dropping leaflets onto a city you intend to invade."

- "Forcing us to stare at the MS Teams announcement channels like seizing the TV and Radio stations."

- "Removing OGs as imprisoning or assassinating competition or opposition."

Duffy even asked Brictson, "The question is: strategically, what are the other moves we should anticipate? ***What would Machiavelli say?***" Duffy then offered: "***Maybe the best defensive strategy is offensive***."

53.     During this same period, Duffy continued to engage in lavish unapproved spending, which cost the Plaintiffs tens—if not hundreds—of thousands of dollars in unauthorized corporate expenses.

54.     Plaintiffs have uncovered Slack chats from December 15, 2023, wherein Duffy presented Lewis with a "messaging strategy" about the integration. Duffy sought to portray himself as an "empassioned [sic] entrepreneur, averse to change," with Lewis being an "experienced operator" and Duffy's "translator and proxy, implicitly the adult in the room." The purpose of this strategy was to advance a "[r]ationale for continued autonomy"—in other words, to advance a goal directly at odds with the strategy chosen by Euna's senior leaders.

55.     By January 2024, Amburgey felt it necessary to speak with Duffy to discuss Duffy's future with CityBase and Euna. Amburgey had for months discussed ways to collaborate to advance a more effective integration of CityBase and Euna, all the while ensuring a go-forward role for Duffy. But Duffy consistently ignored those efforts. In their January discussion, Amburgey again urged Duffy to work with him more cooperatively.

56.     By that time, it turns out, Duffy was planning his flight to a competitor, and his scheme to take with him valuable assets and employees that would help CORE—which competes head-to-head with Plaintiffs—and cripple Plaintiffs' business.

**D.      Duffy and Lewis Leave Euna and CityBase, Steal Company Trade Secrets, and Begin Working to Subvert CityBase by Joining a Direct Competitor.**

57.     On January 21, 2024, just days after his conversation with Amburgey, Duffy transmitted an email to Amburgey and other Euna leadership asserting a false narrative that Euna had "constructively" terminated him ("Duffy's January 21 Email," attached hereto as Exhibit 4). In conjunction with a proposed Separation Agreement, Plaintiffs offered to pay Duffy Non-

Compete Payments (as contemplated by the FCA) in the form of Cash Severance; however, Duffy rejected the payments and did not sign the Separation Agreement.

58.     In Duffy's January 21 Email, he suggested that "the deactivation process here for offboarding" take place after "the primary transition tasks."

59.     Then, without authorization from Euna leadership, Duffy took it upon himself to inform CityBase staff that he would be moving on from CityBase, and that his last day was January 19. Duffy's narrative to the employees was false; Plaintiffs had been in negotiations with Duffy about the future of the business when Duffy elected to leave and carry out his apparently long-planned scheme to raid CityBase.

60.     Despite having been included in conversations regarding the integration of CityBase and Euna in the preceding months—and being actively engaged in negotiations about what his role with Euna could be following Duffy's departure, negotiations in which Lewis enthusiastically participated—Lewis soon followed Duffy, submitting his resignation on February 27, 2024.

61.     Revealing Duffy's and Lewis's premeditated scheme to raid Plaintiffs' most critical and valuable business secrets and hand them to a key competitor that they were about to join, in the weeks prior to his resignation, Lewis began accessing and sending to his personal email address some of the Company's most sensitive business information. This sensitive business information was maintained by the Company in the United States and was accessed by Lewis during his regular business trips to Chicago.

61.62.  During the week of January 29, 2024, Lewis was in Chicago for a meeting with senior leaders for Plaintiffs. During the week of January 29, 2024, Duffy and Lewis met in Chicago to further their scheme to raid Plaintiffs' confidential, proprietary, and trade secret information.

Later that same week, on February 4, 2024, ~~prior to his abrupt resignation,~~ Lewis downloaded and sent two highly sensitive files to his personal email address. Lewis abruptly resigned shortly thereafter.

~~62.~~63.  These documents, titled "CityBase Go To Market" (the "Confidential Deck") and "CityBase OneCity Solution Selling.xlsx" (the "Confidential Excel" and, together with the Confidential Spreadsheet, the "Trade Secret Files") contained information about CityBase's core business strategy and current and prospective customer information, including (but not limited to) detailed market analyses, growth playbooks, and a complete list of Euna's target market leads—all trade secret information that would be invaluable to a competitor. The Trade Secret files were developed at substantial expense to Plaintiffs.

~~63.~~64.  Tasked with (and handsomely compensated for) revamping CityBase's sales strategies, Lewis led the creation of the Confidential Deck for CityBase, which was a go-to-market playbook chock full of competitively sensitive information about the sales and marketing strategies employed by CityBase and Euna. Even a cursory review of the Confidential Presentation Deck includes a detailed analysis of CityBase's service model, a core blueprint for its "Strategy . . . Tactics . . . Innovation . . . Decision Making" and all other key planning to achieve its growth targets "for 2024 and beyond." In Plaintiffs' hands, the Confidential Presentation is extremely valuable; to a competitor, it would be priceless.

~~64.~~65.  The stolen Confidential Spreadsheet is equally sensitive. Designed by Lewis for distribution to the Euna and CityBase sales teams, it serves as a template for assessing every one of Plaintiffs' customers or prospective customers. One of the tabs of the Confidential Spreadsheet contains the names of Euna's *existing customers* who are potential prospects of CityBase's new payments platform—that is, confidential Euna information that provides inside information about

vital potential sales leads for an adjacent business like CityBase, or a CityBase competitor. Indeed, the customers listed on that tab are the *best* prospect opportunities across *all* Euna customers. Other highly sensitive information in the Confidential Spreadsheet includes (and is in no way limited to) a tab listing Euna's *potential acquisition targets*. Euna's acquisition targets are not shared widely within the organization; only a select cadre of senior leadership have access to that information.

65.66. Of course, Lewis was not authorized to download and send to his personal email address the Trade Secret Files that at all times were—and remain—Plaintiffs' property. As set forth in the Lewis Offer Letter:

> [Lewis] agree[s] that the Company acquires by virtue of the employment relationship all intellectual property rights, title and interest to all writings, products, developments, ideas, concepts, trade secret information, copyrights, works of authorship, artistic works, algorithms, mask words, trademarks, inventions (including service inventions), discoveries, computer programs, designs, techniques, know-how, formulae, processes, methods, improvements, modifications and other intellectual property, in whatever form (the "Works") which you may make, conceive, discover or develop at any time while [Lewis is] employed by the Company, whether during working hours or at any other time, which relate to or are used or intended for use in connection with any business carried on by the Company.

66.67. The confidentiality obligations in the Lewis Offer Letter are designed to protect Plaintiffs' highly valuable trade secrets and confidential information. Plaintiffs take several other steps to protect their confidential information, including obligating U.S. employees (like Duffy) to enter into restrictive covenant agreements—all of which contain confidentiality protections akin to the Fair Competition Agreement as a material condition of their employment. Moreover, Euna's Acceptable Use Policy (the "Policy") imposes strict prohibitions on activities that might endanger Euna's confidential information. To wit, Euna's employees may not access Euna information and/or information systems "from an unauthorized device (a personal computer for example)"— precisely the activity engaged in by Lewis. The Policy also identifies "[d]ata that [Euna] generate[s] that contains un-sanitized and/or un-anonymized Customer Data or other sensitive

19

content" as confidential, proprietary information—again of the precise sort contained in the Trade Secret Files. All of Plaintiffs' employees are required to submit an annual acknowledgement that they have reviewed the Policy.

67.68.  Plaintiffs also safeguard their trade secrets and confidential information through computer security and premises security protocols. Plaintiffs' computer security protocols include password protection—to even access CityBase's computer/IT system, one must have been given an account, and, must for each use, have entered a password with certain verifications. Further, access to Plaintiffs' trade secrets is restricted to a limited number of people on a "need to know basis." In addition, Plaintiffs' systems employ technical controls and monitoring capabilities such that unauthorized activities can be forensically investigated, as in this case.

68.69.  Duffy and Lewis knew well the importance of protecting Plaintiffs' confidential information. As Lewis wrote to CityBase leadership in January 2024, "PCI [payment card industry] compliance is literally the most important aspect of our sales and liability to service." The strict regulatory requirements of the PCI industry renders maintaining data security and the protection of confidential information as Plaintiffs' top business directive. Lewis's decision to intentionally undermine Plaintiffs in this regard is particularly shocking given the nature of the industry.

69.70.  Based on their clear conspiracy to undermine CityBase and then abruptly leave, while poaching other employees, Lewis stole the trade secrets discussed herein, and likely others, and, upon information and belief, with the full knowledge and support of Duffy.

70.71.  Indeed, Defendants acknowledged, through their counsel, that they remain in possession of a CityBase "Solution Selling" spreadsheet and a detailed PowerPoint slide deck, though they claim not to know if these are the precise files that were stolen from Plaintiffs.

Defendants also volunteered that Lewis claimed he "brought with him" some portion of the documents from prior employers dating back to 2010, but did not explain (i) whether Lewis had approval to take files from his prior employers; (ii) why a pattern of misappropriation supported his defense in any way; and (iii) why taking documents from previous employers is at all relevant to the *CityBase* and *Euna* confidential information that appears in these files and could not have been taken from prior employers.

71.72.  On information and belief, Duffy and Lewis have taken and retained other trade secrets and confidential information belonging to Plaintiffs—including by virtue of their intimate knowledge of their business, which they cannot unlearn—and intend to use these trade secrets to benefit CORE and harm Plaintiffs. Indeed, Duffy used personal devices, including his personal computer, for professional purposes—contrary to Plaintiffs' policies that he was supposed to enforce—and Plaintiffs' forensic analysis has already revealed that Duffy accessed Euna systems from his personal iPhone, without authorization and against Plaintiffs' policies, on January 30, 2024—*nine* days *after* Duffy submitted his resignation.

72.73.  On or about March 20, 2024—two months after his resignation—Duffy finally returned his company-issued laptop. On information and belief, Duffy started working for CORE no later than March 16—days before he returned his company-issued laptop.

73.74.  Plaintiffs retained a reputable digital forensics consultant, Crowe LLP, to analyze Duffy's work computer for signs of intellectual property theft or data exfiltration and provide a written report of its findings (the "Crowe Report"). The Crowe Report reveals that, prior to returning his computer but after transmitting his January 21 Email, Duffy "wiped" his computer of *all* data and overwrote the disk in order to conceal his wrongdoing. The Crowe Report describes the several purposeful steps that Duffy must have taken to wipe his company-issued computer and

erase evidence of his wrongdoing, including (1) Duffy first booting the computer into Recovery settings and (2) then navigating to the erase tool in the Disk Utility program. On or around May 6, 2024, both Duffy and Lewis updated their LinkedIn profiles to declare that they had joined CORE as the Chief Executive Officer and Chief Operating Officer, respectively. This coincided with CORE's announcement of their positions. However, according to LinkedIn, Duffy and Lewis have in fact been working for CORE for *months*, since at least March 15 or 16, 2024, for Duffy and March 1, 2024, for Lewis.

74.75.  Duffy's and Lewis's concealment of their association with CORE was purposeful, designed to prevent (or at least delay) Plaintiffs from seeking immediate injunctive relief. Duffy's failure to notify Plaintiffs is particularly egregious, as the Fair Competition Agreement required him to provide at least two weeks' advance written notice of his intent to work for any competitor or arguably competing business. *See* Ex. 2, § 25.

75.76.  CORE is a direct competitor of Euna and CityBase. According to its website, CORE provides "payment processing solutions" in the government, health care, and higher education fields. These "solutions" include online portals, cashier software, and online payment services. Plaintiffs note that CORE offers one line of business that does not compete with CityBase: service to health care clients.

76.77.  CORE, like Plaintiffs, also offers revenue management services for client use. As Duffy and Lewis know well, Plaintiffs have spent years developing and implementing a new payments platform that presently serves as an essential element of Plaintiffs' business. In a PowerPoint on CityBase's competitive landscape that Duffy presented to Euna leadership in March 2023, he even identified this market as one that has "[l]ong been dominated by iNovah (Harris) *and CORE*." The fact that Duffy and Lewis are now working for—indeed, are now

running—one of Plaintiffs' most significant competitors in this space has the potential to irreparably harm Plaintiffs' competitive standing and strategic planning.

77.78. The nature of their overlapping product offerings causes Plaintiffs and CORE to compete for government contracts across the country. Indeed, CORE and Plaintiffs have competed head-to-head for contracts with municipalities from Washington to North Carolina.

78.79. The nature of both of their senior positions at CORE—which are substantially similar (in Duffy's case, identical) to their prior positions at CityBase—renders it inevitable that Duffy and Lewis will utilize and/or disclose Plaintiffs' confidential information and trade secrets in the course of their employment with CORE. Indeed, their covert theft of the Plaintiffs' trade secrets before their departure makes Duffy's and Lewis's wrongful intentions abundantly clear.

79.80. The immediate irreparable harm to the Plaintiffs' business interests is particularly acute given that, at the time of their departures, Duffy and Lewis were actively involved in presenting to several prospective customers that, on information and belief, CORE also seeks to service. These customers include the cities of Oakland, California; Chicago, Illinois; New York; New York; and San Francisco, California.

80.81. Indeed, Duffy and Lewis were responsible for revamping the *entirety* of CityBase's strategic approach from August 2023 up until their abrupt and unannounced departures.

81.82. Their immediate side-switching to a direct competitor in the development and licensing of software for state and local governments and government agencies has the potential to harm Plaintiffs' business in incalculable ways.

E.    **Duffy and Lewis Have Commenced a Raid of Plaintiffs' Employees.**

82.83. In the short time since Lewis and Duffy joined CORE, CORE has solicited and hired numerous senior CityBase employees: Fernandes, former Software Technical Lead James

Gates ("Gates"), former Director of Customer Support Jennifer Hill ("Hill"), Director of Solution Engineering Matt Johnson ("Johnson"), Director of Site Reliability Engineering Lucas Brictson ("Brictson"), Product Manager Greg Bunker ("Bunker"), Senior Manager of Sales Operations Heather Gonzalez ("Gonzalez"), Senior Project Manager Arielle Gottlieb ("Gottlieb"), Senior Site Reliability Engineer Logan Tran ("Tran"), Senior Site Reliability Engineer Michael August ("August"), and Senior Proposal Writer Layla Bastar ("Bastar") (together, the "Former Employees").

83.84. Many of the Former Employees resigned on April 1 or 2, 2024. All of the Former Employees started working for CORE in the month of April, and many started within a week of their resignation. The Former Employees' respective start dates at CORE are identified below.

| Name | Date |
| --- | --- |
| Lucas Brictson | April 1, 2024 |
| Jennifer Hill | April 1, 2024 |
| Michael August | April 2, 2024 |
| Jamie Gates | April 2, 2024 |
| Logan Tran | April 2, 2024 |
| Layla Bastar | April 5, 2024 |
| Matt Johnson | April 8, 2024 |
| Heather Gonzales | April 9, 2024 |
| Sara Fernandes | April 12, 2024 |
| Greg Bunker | April 22, 2024 |
| Arielle Gottlieb | April 24, 2024 |

84.85.  Collectively, the Former Employees represent more than forty-five years of institutional knowledge accumulated at CityBase. Hill was one of CityBase's longest tenured employees, spending over eight years there prior to Lewis's and Duffy's unlawful solicitation. She was the key contact for all customers and led efforts around customer success and support. Gates was also a tenured, key employee, leading CityBase's software department for over five years. His position necessitated a deep understanding of all product development. Fernandes had followed Lewis to CityBase shortly after he was hired, having worked together at Paymentus Corporation for nearly two years. Notably, Fernandes had been directly involved in pitching Oakland, California on Plaintiffs' business (along with Lewis) immediately prior to her departure. Johnson worked in CityBase's Solutions Engineering department for over eight years. Brictson worked in CityBase's Solutions Engineering department for over five years. Bunker worked at CityBase for over two years. Gonzalez worked in CityBase's Sales Operations department for over two years. Gottlieb worked at CityBase for more than three years. Tran worked at CityBase in its Site Reliability Engineer department for over four years. August worked at CityBase for more than five years. Bastar worked for CityBase for more than one year.

85.86.  The terms of the Former Employees' employment with CityBase included, as with Duffy and Lewis, restrictive covenants relating to non-competition, non-solicitation, and non-disclosure of confidential information.

86.87.  Given their senior roles and their existing relationships, Lewis and Duffy undoubtedly played a role in soliciting the Former Employees to join CORE, likely before their departure from CityBase. Moreover, the no-hire provisions of the Fair Competition Agreement render Defendants liable for CORE's hiring of these individuals, particularly given that the Fair Competition Agreement prohibits Duffy from *directly or indirectly assisting any third party* in

soliciting or hiring the Company's employees (or from inducing them to terminate or reduce their relationship with the Company). *See* Ex. 2, § 18 (emphasis added).

87.88.  Plaintiffs face the serious, continuing threat that this unlawful poaching will extend beyond the Former Employees and could decimate Plaintiffs' business if not enjoined.

**F.**     **CORE and Lewis Knowingly Participated in Duffy's Breaches of His Obligations to Plaintiffs and Tortiously Interfered with the Fair Competition Agreement.**

88.89.  Duffy knew full well that his obligations to Plaintiffs were still in effect at the time that he joined CORE (and remain in effect today). Duffy was also contractually required to notify CORE of those obligations. *See* Ex. 2, § 22. Either Duffy failed to do so, or CORE chose to ignore Plaintiffs' rights.

89.90.  Plaintiffs also took it upon themselves to ensure that CORE was well aware of this unlawful conduct prior to bringing this action. Plaintiffs sent a letter to Duffy on May 8, 2024, outlining the breaches of his restrictive covenant obligations and demanding that he cease and desist from such violations. CORE was copied on this letter.

90.91.  Plaintiffs sent a similar letter to Lewis on May 8, 2024, outlining the breaches of his obligations to Euna, and demanding that he cease and desist from such violations. CORE was copied on this letter as well.

91.92.  Plaintiffs also sent a letter directly to Stephen Davis, CORE's President, on May 8, 2024, addressing Duffy's and Lewis's clear violations of their legal obligations to Plaintiffs and CORE's potentially unlawful involvement in such actions. Plaintiffs demanded that CORE cease and desist such conduct. CORE declined.

92.93.  Duffy's contractual obligations to Plaintiffs were still in effect at the time that he joined CORE and remain in effect today. CORE was made aware of those continuing contractual obligations, and helped to facilitate a breach of those obligations, as outlined below. Lewis was

likewise aware of such covenants (including because his own contract included similar restrictions), and his role in soliciting and/or hiring Plaintiffs' employees with Duffy interfered with Duffy's contractual commitments.

93.94. Despite Plaintiffs' efforts to convince CORE to address its employees' unlawful conduct, CORE has continued to facilitate and support these egregious acts, hiring at least three key Former Employees in the weeks since receiving Plaintiffs' letters.[6] Absent intervention from the Court, Defendants will continue their Machiavellian efforts to unlawfully poach Plaintiffs' key employees and undermine Plaintiffs' business.

94.95. In all, Defendants' actions have placed Plaintiffs in an impossible position. Former CityBase executives have taken substantially similar—if not identical—positions at a direct competitor of the Plaintiffs. Duffy and Lewis have already stolen and will inevitably rely on Plaintiffs' confidential information and trade secrets (which, beyond being known to Duffy and Lewis, remains tangibly in Lewis's possession) to help CORE unfairly compete with Plaintiffs, which will cause substantial harm to Plaintiffs' business. Plaintiffs have already suffered damages from Defendants' ongoing employee raiding efforts, and such damages will continue to accrue. Plaintiffs now seek the relief to which they are entitled under contract and at law.

## COUNT I

**Misappropriation of Trade Secrets and Confidential Information under the Defend Trade Secrets Act, 18 U.S.C. 1836 *et seq.* (Against Duffy, Lewis, and CORE)**

95.96. Plaintiffs incorporate the foregoing allegations by reference.

---

[6] Plaintiffs' inference as to timing is drawn from the dates on which the Former Employees shared on LinkedIn that they had joined CORE; it remains possible that the Defendants' improper solicitation and hiring of the Former Employees took place even earlier.

96.97.  Plaintiffs are in possession of formulas, patterns, devices, and compilations of information that are used in their business and provide Plaintiffs with actual and potential economic value as a result of not being generally known to other persons.

97.98.  Plaintiffs have undertaken significant efforts to prevent their trade secrets and confidential information from being known outside of Plaintiffs, including but not limited to communicating confidentiality obligations to all employees in their offer letters, and implementing company-wide policies governing confidential information.

98.99.  Plaintiffs' trade secrets and confidential information are highly valuable and have been developed at great expense of time and money.

99.100.    Plaintiffs' trade secrets are related to their products and services used in, or intended to be used in, interstate or foreign commerce.

100.101.    Plaintiffs' trade secrets are protected by the Defend Trade Secrets Act ("the DTSA"), 18 U.S.C. 1836 *et seq.*

101.102.    At Duffy's direction and for Duffy's, Lewis's, and CORE's benefit, Duffy and Lewis on behalf of CORE improperly acquired Plaintiffs' trade secrets through Lewis's downloading copies of the trade secrets and transmitting them to his personal email.

102.103.    CORE, Duffy, and Lewis are in possession of Plaintiffs' trade secrets through Duffy's and Lewis's improper and unlawful extraction thereof from Plaintiffs' systems.

103.104.    By nature of their senior roles when employed by Plaintiffs, Duffy and Lewis had access to, were exposed to, and took part in developing Plaintiffs' trade secrets and confidential information, including with regard to Plaintiffs' business strategy, development plans, products, and customers.

104.105.    Duffy's and Lewis's employment with CORE, a direct competitor of Plaintiffs—in substantially the same positions they held while employed by Plaintiffs—places them in a position where they will inevitably use Plaintiffs' trade secrets and confidential information for their and CORE's benefit, and to Plaintiffs' detriment.

105.106.    Defendants acted willfully and maliciously, entitling Plaintiffs to their reasonable attorney's fees from Lewis and CORE under the DTSA.

106.107.    As a consequence of this misappropriation of Plaintiffs' trade secrets and confidential information, Plaintiffs have suffered, and will continue to suffer, irreparable harm, among other harms and losses. The misappropriation of trade secrets is willful and malicious.

107.108.    WHEREFORE, Plaintiffs respectfully request that the Court issue the following relief on Count I:

      i.    grant the preliminary relief;

      ii.    order Defendants to identify and return any of Plaintiffs' confidential information and trade secrets in their possession;

      iii.    enjoin Defendants from using or disclosing any of Plaintiffs' confidential information and trade secrets in their possession;

      iv.    as to Lewis and CORE, award reasonable attorney's fees and costs incurred by Plaintiffs in enforcing their rights, and as provided under the DTSA, as well as exemplary damages;

      v.    award compensatory damages against Defendants Lewis and CORE in an amount to be proven at trial, including pre- and post-judgment interest thereon; and

      vi.    order such further and additional relief as this Court may deem just, proper, and equitable, excluding damages against Duffy.

## COUNT II

### Computer Fraud and Abuse Act, 18 U.S.C. 1030 *et seq.* (Against Duffy)

~~108.~~109.     Plaintiffs incorporate the foregoing allegations by reference.

~~109.~~110.     Plaintiffs' computers are protected computers for purposes of the Computer Fraud and Abuse Act (the "CFAA"), 18 U.S.C. 1030 *et seq.*, because they are used in or affect interstate commerce.

~~110.~~111.     Duffy was subject to, and committed to compliance with, his Fair Competition Agreement, as a matter of contract.

~~111.~~112.     Duffy's Fair Competition Agreement provides that he is "prohibited from searching for, accessing, viewing, printing, transferring and/or using documents, e-mails, and any other data stored on *any of the Company's computer systems* in the absence of a legitimate business need or Company objective, and any such actions or use will be considered unauthorized." *See* Ex. 2, § 12 (emphasis added).

~~112.~~113.     Duffy was aware that upon his resignation, his authorization for access to Plaintiffs' computer systems was limited to tasks required for off-boarding.

~~113.~~114.     Duffy exceeded his authorization when, nine days after he submitted his resignation, he accessed Euna's systems from his personal phone.

~~114.~~115.     Duffy exceeded his authorization when he accessed his company-issued computer after his resignation and wiped it of *all* data and overwrote the disk in order to conceal his wrongdoing.

~~115.~~116.     As a direct and proximate cause of Duffy's unlawful conduct, Plaintiffs have suffered damages in excess of $5,000.00, including the costs of the expenditures that have been necessary to investigate, assess, and attempt to remedy Duffy's violations of this statute.

117.    However, as a direct and proximate result of Duffy's unlawful conduct, Plaintiffs have also suffered and will continue to suffer incalculable financial losses, imminent and permanent irreparable harm, loss of confidentiality of their trade secrets, and other continuing harm.

~~116.~~118.    Duffy's actions violate 18 U.S.C. 1030(c)(4)(A)(i)(I).

~~117.~~119.    The losses and harm to Plaintiffs are ongoing and cannot be remedied by damages alone.

~~118.~~120.    WHEREFORE, Plaintiffs respectfully request that the Court issue the following relief on Count II:

    i.    grant the preliminary relief;

    ii.    order Duffy to identify and return any of Plaintiffs' confidential information and trade secrets in his possession;

    iii.    enjoin Duffy from using or disclosing any of Plaintiffs' confidential information and trade secrets in his possession; and

    ~~iv.    award compensatory damages against Duffy in an amount to be proven at trial, including pre- and post-judgment interest thereon;~~

    ~~v.~~iv.    ~~award reasonable attorney's fees and costs incurred by Plaintiffs in enforcing their rights, as contractually agreed by Duffy in the Fair Competition Agreement and as provided under the CFAA; and~~

    ~~vi.~~v.    order such further and additional relief as this Court may deem just, proper, and equitable, excluding damages against Duffy.

## COUNT III

**Misappropriation of Trade Secrets and Confidential Information under the
Illinois Trade Secrets Act, 765 ILCS 1065 *et seq.* (Against Duffy, Lewis, and CORE)**

119.121.    Plaintiffs incorporate the foregoing allegations by reference.

120.122.    Plaintiffs are in possession of formulas, patterns, devices, and compilations of information that are used in their business and provide Plaintiffs with actual and potential economic value as a result of not being generally known to other persons.

121.123.    Plaintiffs have undertaken significant efforts to prevent their trade secrets and confidential information from being known outside of Plaintiffs, including but not limited to communicating confidentiality obligations to all employees in their offer letters, and implementing company-wide policies governing confidential information.

122.124.    Plaintiffs' trade secrets and confidential information are highly valuable and have been developed at great expense of time and money.

123.125.    Plaintiffs' trade secrets are protected by the Illinois Trade Secrets Act ("the ITSA"), 765 ILCS 1065/1 *et seq.*

124.126.    At Duffy's direction and for Duffy's, Lewis's, and CORE's benefit, Duffy and Lewis improperly acquired Plaintiffs' trade secrets through Lewis's downloading copies of the trade secrets and transmitting them to his personal email.

125.127.    CORE, Duffy, and Lewis are in possession of Plaintiffs' trade secrets through Duffy's and Lewis's improper and unlawful extraction thereof from Plaintiffs' systems.

126.128.    By nature of their senior roles when employed by Plaintiffs, Duffy and Lewis had access to, were exposed to, and took part in developing Plaintiffs' trade secrets and confidential information, including with regard to Plaintiffs' business strategy, development plans, products, and customers.

127.129.    Duffy's and Lewis's employment with CORE, a direct competitor of Plaintiffs—in substantially the same positions they held while employed by Plaintiffs—places

32

them in a position where they will inevitably use Plaintiffs' trade secrets and confidential information for their and CORE's benefit, and to Plaintiffs' detriment.

128.130.     Defendants acted willfully and maliciously, entitling Plaintiffs to their reasonable attorney's fees from Lewis and CORE under the ITSA.

129.131.     As a consequence of this misappropriation of Plaintiffs' trade secrets and confidential information, Plaintiffs have suffered, and will continue to suffer, irreparable harm, among other harms and losses. The misappropriation of trade secrets is willful and malicious.

130.132.     WHEREFORE, Plaintiffs respectfully request that the Court issue the following relief on Count III:

    i.    grant the preliminary relief;

    ii.    order Defendants to identify and return any of Plaintiffs' confidential information and trade secrets in their possession;

    iii.    enjoin Defendants from using or disclosing any of Plaintiffs' confidential information and trade secrets in their possession;

    iv.    as to Lewis and CORE, award reasonable attorney's fees and costs incurred by Plaintiffs in enforcing their rights, as provided under the ITSA; and

    v.    award compensatory damages against Defendants Lewis and CORE in an amount to be proven at trial, including pre- and post-judgment interest thereon, and exemplary damages; and

    v.vi.    order such further and additional relief as this Court may deem just, proper, and equitable, excluding damages against Duffy.

## COUNT IV

### Breach of Contract (Against Duffy)

131.133.     Plaintiffs incorporate the foregoing allegations by reference.

132.134.     The Fair Competition Agreement is a valid and enforceable contract.

133.135.     Plaintiffs performed their obligations to Duffy under the Fair Competition Agreement.

134.136.     Duffy breached his obligations to Plaintiffs under the Fair Competition Agreement by (i) failing to notify Plaintiffs of his potential employment with CORE, a Competitor under the Fair Competition Agreement; (ii) accepting employment with CORE during the Restricted Period; (iii) soliciting and then hiring Lewis and the Former Employees to join CORE; and (iv) misappropriating, and not returning, Plaintiffs' confidential information.

135.137.     As a consequence of Duffy's breaches of the Fair Competition Agreement, Plaintiffs have suffered, and will continue to suffer, irreparable harm, among other harms and losses.

136.138.     WHEREFORE, Plaintiffs respectfully request that the Court issue the following relief on Count IV:

     i.     grant the preliminary relief;

     ii.     order Duffy to identify and return any of Plaintiffs' confidential information and trade secrets in his possession;

     iii.     enjoin Duffy from using or disclosing any of Plaintiffs' confidential information and trade secrets in his possession;

     iv.     enjoin Duffy, for a period of 12 months, in the event he maintains employment with CORE, from working on any CORE business line that competes with Plaintiffs (*i.e.*, government and education business lines, but excluding non-competing business lines like CORE's health care-focused offerings);

v.      enjoin Duffy, for a period of 12 months, from soliciting, directly or indirectly, the business of any of Plaintiffs' actual or prospective customers;

vi.      enjoin Duffy, for a period of 12 months, from soliciting, directly or indirectly, hiring, or seeking to hire any of Plaintiffs' employees, contractors, consultants, or agents (including anyone who served in the foregoing capacities for the past six months), or inducing such persons to terminate or reduce their employment or other business relationship with Plaintiffs; and

vii.      ~~award reasonable attorney's fees and costs incurred by Plaintiffs in enforcing their rights, as contractually agreed by Duffy in the Fair Competition Agreement; and~~

viii.      order such further and additional relief as this Court may deem just, proper, and equitable, excluding damages against Duffy.

## COUNT V

### Breach of Fiduciary Duty (Against Duffy)

~~137.~~139.      Plaintiffs incorporate the foregoing allegations by reference.

~~138.~~140.      As an officer of CityBase, a Delaware corporation, and Euna, a Massachusetts corporation, Duffy owed fiduciary duties to CityBase and Euna.

~~139.~~141.      Duffy breached his fiduciary duties to Plaintiffs by (i) actively resisting corporate strategy to integrate Euna and CityBase, and instructing others, including Lewis, to do so, (ii) misusing corporate resources, including by using Plaintiffs' funds to engage in lavish unapproved spending, (iii) planning and executing a scheme with Lewis to misappropriate Plaintiffs' trade secrets and use them in their new employment at CORE, and (iv) soliciting Plaintiffs' employees to join him at CORE.

140.142.    As a consequence of Duffy's breaches of his fiduciary duties to Plaintiffs, the effects and impact of which are continuing, Plaintiffs have suffered, and will continue to suffer, irreparable harm, among other harms and losses.

141.143.    WHEREFORE, Plaintiffs respectfully request that the Court issue the following relief on Count V:

i.     Grant preliminary relief;

ii.    order Duffy to identify and return any of Plaintiffs' confidential information and trade secrets in his possession;

iii.   enjoin Duffy from using or disclosing any of Plaintiffs' confidential information and trade secrets in his possession;

iv.    enjoin Duffy, for a period of 12 months, in the event he maintains employment with CORE, from working on any CORE business line that competes with Plaintiffs (*i.e.*, government and education business lines, but excluding non-competing business lines like CORE's health care-focused offerings);

v.     enjoin Duffy, for a period of 12 months, from soliciting, directly or indirectly, the business of any of Plaintiffs' actual or prospective customers;

vi.    enjoin Duffy, for a period of 12 months, from soliciting, directly or indirectly, hiring, or seeking to hire any of Plaintiffs' employees, contractors, consultants, or agents (including anyone who served in the foregoing capacities for the past six months), or inducing such persons to terminate or reduce their employment or other business relationship with Plaintiffs; and

vii.   award reasonable attorney's fees and costs incurred by Plaintiffs in enforcing their rights, as contractually agreed by Duffy in the Fair Competition Agreement; and

~~viii.~~vii. order such further and additional relief as this Court may deem just, proper, and equitable, excluding damages against Duffy.

<b><u>COUNT VI</u></b>

<b>Aiding and Abetting Breach of Fiduciary Duty (Against Lewis)</b>

~~142.~~144.        Plaintiffs incorporate the foregoing allegations by reference.

~~143.~~145.        As an officer of CityBase, a Delaware corporation, and Euna, a Massachusetts corporation, Duffy owed fiduciary duties to CityBase and Euna.

~~144.~~146.        Duffy breached his fiduciary duties to Plaintiffs by (i) actively resisting corporate strategy to integrate Euna and CityBase, and instructing others, including Lewis, to do so, (ii) misusing corporate resources, including by using Plaintiffs' funds to engage in lavish unapproved spending, (iii) planning and executing a scheme with Lewis to misappropriate Plaintiffs' trade secrets and use them in their new employment at CORE, and (iv) soliciting Plaintiffs' employees to join him at CORE.

~~145.~~147.        Lewis knowingly participated in Duffy's breaches of fiduciary duty. Lewis knew that it was improper and not in Plaintiffs' best interests, and was instead in Duffy's interests, to fight the directive to integrate Euna and CityBase, to plan and execute a scheme to misappropriate trade secrets for Duffy's and Lewis's use at their new employer, CORE, and to solicit other of Plaintiffs' employees to leave CityBase for employment with CORE.

~~146.~~148.        As a consequence of Lewis's aiding and abetting of Duffy's breaches of his fiduciary duties, the effects and impacts of which are continuing, Plaintiffs have suffered, and will continue to suffer, irreparable harm, among other harms and losses.

~~147.~~149.        WHEREFORE, Plaintiffs respectfully request that the Court issue the following relief on Count VI:

   i.  direct Lewis to identify and return any of Plaintiffs' confidential information and trade secrets in his possession;

   ii.  enjoin Lewis, for a period of 12 months, in the event he maintains employment with CORE, from working on any CORE business line that competes with Plaintiffs (*i.e.*, government and education business lines, but excluding non-competing business lines like CORE's health care-focused offerings);

   iii.  enjoin Lewis, for a period of twelve (12) months, from soliciting, directly or indirectly, the business of any of Plaintiffs' actual or prospective customers;

   iv.  enjoin Lewis, for a period of twelve (12) months, from soliciting, directly, or indirectly, hiring, or seeking to hire any of Plaintiffs' employees, contractors, consultants, or agents (including anyone who served in the foregoing capacities for the past six months), or inducing such persons to terminate or reduce their employment or other business relationship with Plaintiffs;

   v.  award reasonable attorney's fees and costs incurred by Plaintiffs in enforcing their rights~~, as contractually agreed by Duffy in the Fair Competition Agreement~~;

   vi.  award compensatory damages in favor of Plaintiffs against Lewis in an amount to be proven at trial, including pre- and post-judgment interest thereon; and

   vii.  order such further and additional relief as this Court may deem just, proper, and equitable.

## <u>COUNT VII</u>

### **Breach of Fiduciary Duty (Against Lewis)**

~~148.~~150.  Plaintiffs incorporate the foregoing allegations by reference.

149.151.    As an officer of CityBase, a Delaware corporation, Lewis owed fiduciary duties to CityBase.

150.152.    Lewis breached his fiduciary duties to Plaintiffs by (i) actively resisting corporate strategy to integrate Euna and CityBase, and instructing others to do so, (ii) planning and executing a scheme with Duffy to misappropriate Plaintiffs' trade secrets and use them in their new employment at CORE, and (iii) soliciting Plaintiffs' employees to join him at CORE.

151.153.    As a consequence of Lewis's breaches of his fiduciary duties to Plaintiffs, the effects and impacts of which are still continuing, Plaintiffs have suffered, and will continue to suffer, irreparable harm, among other harms and losses.

152.154.    WHEREFORE, Plaintiffs respectfully request that the Court issue the following relief on Count VII:

 i. grant preliminary relief;

 ii. direct Lewis to identify and return any of Plaintiffs' confidential information and trade secrets in their possession;

 iii. enjoin Lewis, for a period of 12 months, in the event he maintains employment with CORE, from working on any CORE business line that competes with Plaintiffs (*i.e.*, government and education business lines, but excluding non-competing business lines like CORE's health care-focused offerings);

 iv. enjoin Lewis, for a period of twelve (12) months, from soliciting, directly or indirectly, the business of any of Plaintiffs' actual or prospective customers;

 v. enjoin Lewis, for a period of twelve (12) months, from soliciting, directly, or indirectly, hiring, or seeking to hire any of Plaintiffs' employees, contractors, consultants, or agents (including anyone who served in the foregoing capacities for the past six months), or

inducing such persons to terminate or reduce their employment or other business relationship with Plaintiffs;

vi.      award reasonable attorney's fees and costs incurred by Plaintiffs in enforcing their rights, as contractually agreed by Duffy in the Fair Competition Agreement;

vii.      award compensatory damages in favor of Plaintiffs against Lewis in an amount to be proven at trial, including pre- and post-judgment interest thereon; and

viii.      order such further and additional relief as this Court may deem just, proper, and equitable.

## COUNT VIII

### Aiding and Abetting Breach of Fiduciary Duty (Against Duffy)

153.155.      Plaintiffs incorporate the foregoing allegations by reference.

154.156.      As an officer of CityBase, a Delaware corporation, Lewis owed fiduciary duties to CityBase.

155.157.      Lewis breached his fiduciary duties to Plaintiffs by (i) actively resisting corporate strategy to integrate Euna and CityBase, and instructing others to do so, (ii) planning and executing a scheme with Duffy to misappropriate Plaintiffs' trade secrets and use them in their new employment at CORE, and (iii) soliciting Plaintiffs' employees to join him at CORE.

156.158.      Duffy knowingly participated in Lewis's breaches of fiduciary duty. Duffy knew that it was improper and not in Plaintiffs' best interests, and was instead in Lewis's interests, to fight the directive to integrate Euna and CityBase, to plan and execute a scheme to misappropriate trade secrets for Duffy's and Lewis's use at their new employer, CORE, and to solicit other of Plaintiffs' employees to leave CityBase for employment with CORE.

157.159.          As a consequence of Duffy's aiding and abetting of Lewis's breaches of his fiduciary duties, the effects and impacts of which are still continuing, Plaintiffs have suffered substantial monetary damages and irreparable harm.

158.160.          WHEREFORE, Plaintiffs respectfully request that the Court issue the following relief on Count VIII:

      i.          grant preliminary relief;

      ii.          order Duffy to identify and return any of Plaintiffs' confidential information and trade secrets in his possession;

      iii.          enjoin Duffy from using or disclosing any of Plaintiffs' confidential information and trade secrets in his possession;

      iv.          enjoin Duffy, for a period of 12 months, in the event he maintains employment with CORE, from working on any CORE business line that competes with Plaintiffs (*i.e.*, government and education business lines, but excluding non-competing business lines like CORE's health care-focused offerings);

      v.          enjoin Duffy, for a period of 12 months, from soliciting, directly or indirectly, the business of any of Plaintiffs' actual or prospective customers;

      vi.          enjoin Duffy, for a period of 12 months, from soliciting, directly or indirectly, hiring, or seeking to hire any of Plaintiffs' employees, contractors, consultants, or agents (including anyone who served in the foregoing capacities for the past six months), or inducing such persons to terminate or reduce their employment or other business relationship with Plaintiffs;

vii.    as to Lewis and CORE, award reasonable attorney's fees and costs incurred by Plaintiffs in enforcing their rights, as contractually agreed by Duffy in the Fair Competition Agreement; and

viii.   order such further and additional relief as this Court may deem just, proper, and equitable, excluding damages against Duffy.

## COUNT IX

### Conspiracy (Against All Defendants)

159.161.    Plaintiffs incorporate the foregoing allegations by reference.

160.162.    Duffy, Lewis, and CORE conspired with each other to misappropriate Plaintiffs' trade secret information and use it to give CORE an unfair competitive advantage over Plaintiffs. They also conspired to work together to unlawfully solicit and hire away Plaintiffs' employees to gain further competitive advantage over Plaintiffs.

161.163.    Duffy performed overt acts in furtherance of this scheme: he directed Lewis to download the Trade Secret Files, without Plaintiffs' authorization, and send them to Lewis's personal email address. Duffy also solicited and hired Lewis to join CORE, knowing full well that Lewis's position at CORE would inevitably lead him to disclose Plaintiffs' confidential information to CORE. Moreover, Duffy himself joined CORE knowing full well that *he* would inevitably disclose Plaintiffs' confidential information to CORE, in addition to breaching his obligations to Plaintiffs.

162.164.    Duffy's overt acts advanced the scheme by enabling Lewis, Duffy, and CORE to gain an unfair competitive advantage over Plaintiffs.

163.165.    Lewis performed overt acts in furtherance of this scheme: he downloaded the Trade Secret Files, without Plaintiffs' authorization, and sent them to his personal email

address. Lewis also joined CORE, knowing full well that his position at CORE would inevitably lead him to disclose Plaintiffs' confidential information to CORE.

164.166.    Lewis's overt act advanced the scheme by enabling Lewis, Duffy, and CORE to gain an unfair competitive advantage over Plaintiffs.

165.167.    CORE performed overt acts in furtherance of this scheme: CORE hired Duffy and Lewis, knowing full well the obligations they owed to Plaintiffs and the fact that they would inevitably disclose Plaintiffs' confidential information to CORE. CORE also worked with Duffy and Lewis to solicit and hire additional employees from Plaintiffs.

166.168.    CORE's overt acts advanced the scheme by enabling Lewis, Duffy, and CORE to gain an unfair competitive advantage over Plaintiffs.

167.169.    As a direct consequence this conspiracy, Plaintiffs have suffered substantial monetary damages and irreparable harm.

168.170.    WHEREFORE, Plaintiffs respectfully request that the Court issue the following relief on Count IX:

      i.     grant preliminary relief;

      ii.    direct all Defendants to identify and return any of Plaintiffs' confidential information and trade secrets in their possession;

      iii.   enjoin Duffy and Lewis, for a period of 12 months, in the event they maintain employment with CORE, from working on any CORE business line that competes with Plaintiffs (*i.e.*, government and education business lines, but excluding non-competing business lines like CORE's health care-focused offerings);

      iv.   enjoin Duffy and Lewis, for a period of twelve (12) months, from soliciting, directly or indirectly, the business of any of Plaintiffs' actual or prospective customers;

v.      enjoin Duffy and Lewis, for a period of twelve (12) months, from soliciting, directly, or indirectly, hiring, or seeking to hire any of Plaintiffs' employees, contractors, consultants, or agents (including anyone who served in the foregoing capacities for the past six months), or inducing such persons to terminate or reduce their employment or other business relationship with Plaintiffs;

vi.      as to Lewis and CORE, award reasonable attorney's fees and costs incurred by Plaintiffs in enforcing their rights, as contractually agreed by Duffy in the Fair Competition Agreement;

vii.      award compensatory damages in favor of Plaintiffs against Defendants CORE and Lewis in an amount to be proven at trial, including pre- and post-judgment interest thereon; and

viii.      order such further and additional relief as this Court may deem just, proper, and equitable, excluding damages against Duffy.

## COUNT X

**Tortious Interference with Contractual Relations (Against CORE & Lewis)**

~~169.~~171.      Plaintiffs incorporate the foregoing allegations by reference.

~~170.~~172.      CORE and Lewis were aware of Duffy's continuing confidentiality, noncompetition, customer non-solicitation, and employee non-solicitation and no-hire obligations to Plaintiffs under the Fair Competition Agreement. *See* Ex. 2, §§ 16–18.

~~171.~~173.      CORE and Lewis intentionally and unjustifiably interfered with Plaintiffs' contractual relationship with Duffy by inducing him to join a direct competitor with whom he would inevitably disclose Plaintiffs' confidential information, and CORE and further intentionally

and unjustifiably induced a breach of Duffy's employee non-solicitation and no-hire obligations by aiding and abetting him in hiring Lewis, Gates, Hill, and Fernandes.

172.174.    As a direct and proximate result of CORE's and Lewis's actions, Plaintiffs have suffered substantial monetary damages and irreparable harm.

173.175.    WHEREFORE, Plaintiffs respectfully request that the Court issue the following relief on Count X:

    i.    grant the preliminary relief;

    ii.    enjoin Duffy and Lewis, for a period of 12 months, in the event they maintain employment with CORE, from working on any CORE business line that competes with Plaintiffs (*i.e.*, government and education business lines, but excluding non-competing business lines like CORE's health care-focused offerings);

    iii.    enjoin Lewis, for 12 months, from soliciting, directly or indirectly, the business of any of Plaintiffs' actual or prospective customers;

    iv.    enjoin CORE and Lewis, for 12 months, from in any way inducing Duffy to solicit, directly or indirectly, the business of any of Plaintiffs' actual or prospective customers;

    v.    enjoin CORE and Lewis, for 12 months, from in any way inducing Duffy to solicit, directly or indirectly, hire, or seek to hire any of Plaintiffs' employees, contractors, consultants, or agents (including anyone who served in the foregoing capacities for the past six months), or inducing such persons to terminate or reduce their employment or other business relationship with Plaintiffs;

    vi.    enjoin CORE and Lewis, for 12 months, from soliciting, directly or indirectly, hiring, or seeking to hire any of Plaintiffs' employees, contractors, consultants, or agents (including anyone who served in the foregoing capacities for the past six months), or

inducing such persons to terminate or reduce their employment or other business relationship with Plaintiffs;

vii.     award compensatory damages in favor of Plaintiffs against Defendants CORE and Lewis in an amount to be proven at trial, including pre- and post-judgment interest thereon; and

viii.     order such further and additional relief as this Court may deem just, proper, and equitable, excluding damages against Duffy.

## COUNT XI

### Concert of Action Liability (Against All Defendants)

~~174.~~176.     Plaintiffs incorporate the foregoing allegations by reference.

~~175.~~177.     Defendants committed tortious acts in concert with each other pursuant to a common design, namely, misappropriation of Plaintiffs' trade secrets, breaches of Duffy's and Lewis's fiduciary duties owed to Plaintiffs, and tortious interference with Plaintiffs' contract with Duffy.

~~176.~~178.     CORE and Lewis knew that Duffy's conduct constituted a breach of his contractual duties, namely his non-solicitation and non-disclosure obligations, and gave substantial assistance and encouragement to Duffy to breach such obligations by misappropriating Plaintiffs' trade secrets and participating in solicitation and hiring of Plaintiffs' employees to work for CORE.

~~177.~~179.     Duffy gave substantial assistance to Lewis in misappropriating Plaintiffs' trade secrets by planning with Lewis and directing him to exfiltrate Plaintiffs' Trade Secret Files, which, separately considered, breached his own contractual duties to Plaintiffs as to non-disclosure and non-use of Plaintiffs' confidential information in Section 11 of his Fair Competition Agreement.

~~178.~~180.　　　As a direct and proximate result of Defendants' actions, Plaintiffs have suffered substantial monetary damages and irreparable harm.

~~179.~~181.　　　WHEREFORE, Plaintiffs respectfully request that the Court issue the following relief on Count XI:

　　　i.　　　grant preliminary relief;

　　　ii.　　　order all Defendants to identify and return any of Plaintiffs' confidential information and trade secrets in their possession;

　　　iii.　　　enjoin Duffy and Lewis, for a period of 12 months, in the event they maintain employment with CORE, from working on any CORE business line that competes with Plaintiffs (*i.e.*, government and education business lines, but excluding non-competing business lines like CORE's health care-focused offerings);

　　　iv.　　　enjoin Duffy and Lewis, for a period of twelve (12) months, from soliciting, directly or indirectly, the business of any of Plaintiffs' actual or prospective customers;

　　　v.　　　enjoin Duffy and Lewis, for a period of twelve (12) months, from soliciting, directly, or indirectly, hiring, or seeking to hire any of Plaintiffs' employees, contractors, consultants, or agents (including anyone who served in the foregoing capacities for the past six months), or inducing such persons to terminate or reduce their employment or other business relationship with Plaintiffs;

　　　vi.　　　as to Lewis and CORE, award reasonable attorney's fees and costs incurred by Plaintiffs in enforcing their rights~~, as contractually agreed by Duffy in the Fair Competition Agreement~~;

vii.    award compensatory damages in favor of Plaintiffs against Defendants CORE and Lewis in an amount to be proven at trial, including pre- and post-judgment interest thereon; and

viii.    order such further and additional relief as this Court may deem just, proper, and equitable, excluding damages against Duffy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

i.      grant the preliminary relief;

ii.     order all Defendants to identify and return any of Plaintiffs' confidential information and trade secrets in their possession;

iii.    enter judgement in favor of Plaintiffs on all counts;

iv.     order the relief sought in the foregoing counts; and

v.      order such further and additional relief as this Court may deem just, proper, and equitable, excluding damages against Duffy.

48

Dated: December 5, 2024          Respectfully submitted,

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**

*/s/ Brady C. McMillin*
Christine Bestor Townsend, Esq. (IL ID 6299096)
Brady C. McMillin, Esq. (IL ID 6341846)
155 North Wacker Drive, Suite 4300
Chicago, IL 60606
Phone: (312) 558-1237
Fax: (312) 807-3619
*christine.townsend@ogletree.com*
*brady.mcmillin@ogletree.com*

Daniel P. O'Meara, Esq.
1735 Market Street, Suite 3000
Philadelphia, PA 19103
Phone: (215) 995-2833
Fax: (215) 995-2801
*dan.omeara@ogletree.com*
*Attorneys for Plaintiffs*