## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GTY TECHNOLOGY HOLDINGS INC. d/b/a EUNA SOLUTIONS AND CITYBASE, INC.,

        Plaintiffs

    v.

WONDERWARE, INC. d/b/a CORE BUSINESS TECHNOLOGIES, *et al.*,

        Defendants

No. 24 CV 9069

Judge Jeremy C. Daniel

### MEMORANDUM OPINION AND ORDER

The plaintiffs, GTY Technology Holdings, Inc. d/b/a Euna Solutions ("Euna" or the "Company"[1]) and CityBase, Inc. ("CityBase") brought this lawsuit against CityBase's former CEO Michael Duffy; CityBase's former Senior Vice President of Engagement, Christopher Lewis; and Duffy's and Lewis' new employer, Wonderware, Inc., d/b/a Core Business Technologies ("CORE"). The plaintiffs bring claims for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and under the Illinois Trade Secrets Act ("ITSA"), 765 ILCS § 1065 *et seq.*, (Counts I and III); conduct in violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*, (Count II); breach of contract (Count IV); breach of fiduciary duty (Counts V and VII); aiding and abetting that breach of

---

[1] Certain documents highlighted by the parties refer to Euna as "the Company"; for the sake of consistency, the Court notes that when it refers to "Euna" or "the Company," it is one and the same.

fiduciary duty (Counts VI and VIII); conspiracy (Count IX); tortious interference with contractual relations (Count X); and concert of action liability (Count XI). (*See generally* R. 30.) Before the Court is the defendants' motion to dismiss all counts pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6), (R. 37), as well as defendant Lewis' motion to dismiss pursuant to Rule 12(b)(2), (R. 41.) For the reasons that follow, both motions to dismiss are denied.[2]

## BACKGROUND

### Acquisition of CityBase & Duffy's Employment

Euna is "a leading provider of technology services to government entities across North America." (R. 30 ¶ 19.)[3] In 2018, Euna "acquired CityBase, a provider of payment solutions technology and services[.]" (*Id.* ¶ 20.) It is now a wholly owned subsidiary of Euna. (*Id.* ¶ 9.) Duffy is CityBase's founder and its former Chief Executive Officer ("CEO"). (*Id.*) When Euna acquired CityBase, it offered Duffy the roles of CEO at CityBase, as well as Executive Vice President at Euna, which he took. (*Id.* ¶ 22.) In those roles, Duffy worked out of CityBase's "principal office" in Chicago, Illinois, where Euna was also located. (*Id.*; *see also id.* ¶¶ 8–9.) This was memorialized

---

[2] On the same day that they filed their motions to dismiss, the defendants also filed a motion for partial summary judgment. (R. 39.) The Court has already made some rulings with respect to that motion, (R. 66), and the parties have briefed, at the Court's direction, the argument that the "[p]laintiffs cannot establish that the Excel and the Deck actually contain trade secrets." (R. 66; *see also* R. 72; R. 78; R. 79; R. 80.) The Court will address these issues in a separate order.

[3] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate. For documents filed under seal, the Court cites the sealed version of the documents while attempting not to reveal any information that could be reasonably deemed confidential. Confidential information is discussed to the extent necessary to explain the path of the Court's reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

in an offer letter dated September 12, 2018 (the "2018 Offer Letter"). (R. 1-1 at 2.)[4] At the same time the 2018 Offer Letter was executed, so to was the Fair Competition Agreement ("FCA"), where "Duffy [allegedly] agreed to an important set of covenants designed to protect the Company's vital interests[.]" (R. 30 ¶¶ 23–24.) One such covenant was that Duffy would not "use or disclose the Company's Confidential Information and Customer Confidences[.]" (*Id.* ¶ 26.) The transaction to acquire CityBase closed in February 2019, (*id.* ¶ 21), and Duffy signed a second offer letter (the "2019 Offer Letter"), which was "substantively identical to the 2018 Offer Letter" and "supersed[ed] the 2018 [O]ffer [L]etter as the governing document of the [FCA][.]" (*Id.* ¶ 36.) "CityBase did not require Duffy to re-execute the [FCA] in 2019 and instead left the existing agreement in place." (*Id.*) The complaint alleges that "[i]n carrying out his responsibilities for Euna and CityBase, Duffy had access to, and regularly used, [the p]laintiffs' highly sensitive trade secrets and confidential business information[.]" (*Id.* ¶ 34.)

**Lewis' Employment with CityBase**

In 2023, Duffy "identified Lewis as a candidate for CityBase" to "help revolutionize its marketing strategies." (*Id.* ¶¶ 38, 40.) Lewis was hired to serve as

---

[4] Both parties refer to exhibits "attached" to the amended complaint, (*see, e.g.*, R. 37 at 11; R. 30 ¶ 22), "but those exhibits are not attached to the [ ] amended complaint," but rather to the original complaint. *LB Surgery Ctr., LLC v. Boeing Co.*, No. 17 C 282, 2017 WL 5171222, at *1 n. 1 (N.D. Ill. Nov. 8, 2017). "The Court assumes that [the parties] reference[ ] the same exhibits [the plaintiff] filed in conjunction with its initial complaint and so cites to those here." *Id.* That said, the Court "cautions [the plaintiff] that an amended complaint supersedes a prior complaint, meaning that all exhibits referenced in the [ ] amended complaint should have been filed with that complaint." *Id.* Further, documents attached to the complaint become part of it for "all purposes" on a motion to dismiss. *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (citing Fed. R. Civ. P. 10(c)).

CityBase's Senior Vice President of Engagement, which was memorialized via offer letter on August 2, 2023. (*Id.*) Lewis is a Canadian citizen and primarily worked for CityBase remotely from Canada. (*Id.* ¶ 39; R. 41-2 ¶ 1.) As part of his work schedule, Lewis "regularly visited the Chicago office to perform his duties," averaging about one week of each month in office. (R. 30 ¶ 39.) In addition, he reported directly to Duffy. (*Id.*) Like Duffy, Lewis allegedly "had access to, and regularly used, [the p]laintiff's highly sensitive and confidential business information[.]" (*Id.* ¶ 43.) As part of his employment, Lewis also "agree[d] that the Company acquires by virtue of the employment relationship all intellectual property rights, title and interest to all . . . intellectual property[.]" (*Id.* ¶ 66.)

## **Deterioration of Duffy's & Lewis' Relationship with Euna & CityBase**

Around September 2023, Euna's CEO Tommy Amburgey "approached Duffy about the ongoing plan to make CityBase a fully integrated part of Euna." (*Id.* ¶ 48.) While Amburgey represented that Euna "wanted Duffy to remain in his senior position as Euna and CityBase became more integrated," (*id.*), the complaint alleges that Duffy had different ideas. According to the plaintiffs, "Duffy frequently expressed a belief that CityBase and Euna were fundamentally different . . . and that he was worried staff would leave if the business became fully integrated." (*Id.* ¶ 49.) In addition, "Duffy worked with Lewis to actively foment resistance among CityBase's employees." (*Id.* ¶ 50.) This included a text exchange between the two on October 4, 2023, where Lewis told Duffy that "sales plans [were] being made without our input but with respect to our customers and products[.]" (*Id.*) "The conversation went on to

discuss how, in their view, Euna was carrying out a 'land grab,' and how their proposed plan for CityBase's future could make Euna feel 'threatened." (*Id.*)

The complaint details how Duffy "undertook substantial efforts to poison the well among the rank and file." (*Id.* ¶ 52.) Allegedly, Duffy disparaged Euna to CityBase employees. (*Id.*) In addition, the complaint describes how chats from the messaging app Slack show how Duffy and Lewis sought to "advance a goal directly at odds with the strategy chosen by Euna's senior leaders." (*Id.* ¶ 54.)

On January 21, 2024, Duffy emailed Amburgey and other Euna leadership and asserted that he had been "constructively" terminated. (*Id.* ¶ 57.) He refused to sign a separation agreement, and then, "without authorization from Euna leadership," informed CityBase employees that he was leaving the company, and his last day had been January 19. (*Id.* ¶ 59.) About a week later, on January 29, 2024, Lewis traveled to Chicago for meetings with the plaintiffs' senior leaders. (*Id.* ¶ 62.) The complaint alleges that during that week Lewis and Duffy met to discuss "their scheme to raid [the p]laintiff's confidential, proprietary, and trade secret information." (*Id.*) There are no other details about this meeting or what was actually discussed.

**Lewis Downloads CityBase Files & Duffy Erases Computer**

On February 4, 2024, "Lewis downloaded and sent two highly sensitive files to his personal email address." (*Id.*) The documents, titled "CityBase Go To Market" (the "Deck") and "CityBase OneCity Solution Selling.xlsx" (the "Excel") "contained information about CityBase's core business strategy and current and prospective customer information[.]" (*Id.* ¶ 63.) Lewis resigned shortly thereafter. (*Id.*) According

to the plaintiffs, these documents were "developed at substantial expense to [the p]laintiffs." (*Id.*) The Excel "serves as a template for assessing every one of [the p]laintiffs' customer or prospective customers." (*Id.* ¶ 65.) "[O]nly a select cadre of senior leadership have access to that information." (*Id.*) The plaintiffs allege that Lewis "was not authorized to download and send to his personal email address" either the Excel or the Deck. (*Id.* ¶ 66.) Indeed, the plaintiffs take several steps to protect confidential information, including having employees sign restrictive covenant agreements, require password protection, and have information be on a "need to know basis," to name a few. (Id. ¶¶ 67–68.)[5]

On about March 20, 2024, Duffy returned his company laptop to the plaintiffs. (*Id.* ¶ 73.) The plaintiffs assert Duffy did so four days after he started his new employment with CORE. (*Id.*) The plaintiffs allege that after a forensic examination of the laptop, it was determined that Duffy had "'wiped' his computer of *all* data and overwr[o]te the disk in order to conceal his wrongdoing." (*Id.* ¶ 74 (emphasis in original).)

**Duffy & Lewis Join CORE**

On about May 6, 2024, Duffy and Lewis updated their LinkedIn pages to reflect that they had joined CORE in the roles of CEO and Chief Operating Officer ("COO") respectively. (*Id.*) "However, according to LinkedIn, Duffy and Lewis ha[d] in fact

---

[5] In connection with their opposition to the motion to dismiss, the plaintiffs filed a declaration by Thomas Amburgey, which lays out in detail the types of trade secrets safeguarded and how they are safeguarded. (R. 47.) As discussed later, this is permissible.

been working for CORE for months, since at least March 15 or 16, 2024, for Duffy and March 1, 2024, for Lewis." (*Id.*)

The amended complaint alleges that CORE "is a direct competitor of Euna and CityBase." (*Id.* ¶ 76.) According to CORE's website, it too provides "payment processing solutions" in the government space. (*Id.*) "CORE, like [the p]laintiffs, also offers revenue management services for client use." (*Id.* ¶ 77.) Indeed, according to the amended complaint, while at CityBase and Euna, Duffy identified CORE as a competitor who had long been dominating the market. (*Id.*) In addition, "CORE and [the p]laintiffs have competed head-to-head for contracts with municipalities from Washington to North Carolina." (*Id.* ¶ 78.)

The complaint also alleges that CORE has "solicited and hired numerous senior CityBase employees[.]" (*Id.* ¶ 83.) All of these former employees started work with CORE in April 2024, after Duffy's and Lewis' alleged tenure began. (*Id.* ¶ 84.) The plaintiffs assert that "[g]iven their senior roles and their existing relationships, Lewis and Duffy undoubtedly played a role in soliciting the Former Employees to join CORE, likely before their departure from CityBase." (*Id.* ¶ 87.)

The plaintiffs contend that, on May 8, 2024, they demanded that the defendants cease and desist the activities associated with the misappropriation of trade secrets and breach of restrictive covenants; CORE declined. (*Id.* ¶¶ 90–92.) The initial complaint was then filed on September 27, 2024. (R. 1.)

## LEGAL STANDARD

Motions to dismiss under Rules 12(b)(1) and (b)(6) are meant to test the sufficiency of the complaint, not to decide the merits of the case. *Gociman v. Loyola*

*Univ. of Chi.*, 41 F.4th 873, 885 (7th Cir. 2022) (Rule 12(b)(6)); *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014) (Rule 12(b)(1)). In the context of either motion, the Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences" in the plaintiff's favor. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015)[6]; *Gociman*, 41 F.4th at 885. The complaint must provide enough factual information to state a claim to relief that is "plausible on its face" and raises a right to relief above the speculative level. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "When a motion to dismiss is based on a lack of subject matter jurisdiction pursuant to Rule 12(b)(1), as well as other Rule 12(b)(6) defenses, the court should consider the Rule 12(b)(1) challenge first. If the court dismisses . . . for lack of subject matter jurisdiction, the accompanying defenses become moot and need not be addressed." *Rizzi v. Calumet City*, 11 F. Supp. 2d 994, 995 (N.D. Ill. 1998).

"A motion to dismiss under Rule 12(b)(2) challenges the Court's jurisdiction over a party." *Walgreen Co. v. Peters*, No. 21 C 2522, 2024 WL 50379, at *3 (N.D. Ill. Jan. 4, 2024) (citations omitted). Complaints need not contain facts alleging personal jurisdiction; however, "once the defendant moves to dismiss the complaint under [ ] Rule 12(b)(2) . . . the plaintiff bears the burden of demonstrating the existence of

---

[6] When a party makes a facial challenge to subject matter jurisdiction, as the defendants have here, "the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Silha*, 807 F.3d at 169 (citing *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009)). This is separate from factual challenges to subject matter jurisdiction, which allow the court to look at evidence beyond the pleadings because the contention is that there "'is *in fact* no subject matter jurisdiction,' even if the pleadings are formally sufficient." *Id.* (quoting *Apex Dig.*, 572 F.3d at 443) (emphasis in original).

jurisdiction." *Liqui-Box Corp. v. Scholle IPN Corp.*, No. 19 C 4069, 2020 WL 5593755, at *3 (N.D. Ill. Sep. 18, 2020) (quoting *Curry v. Revolutions Labs., LLC*, 949 F.3d 385, 392 (7th Cir. 2020)). If the parties forego an evidentiary hearing on the issue, "the plaintiff need only make a *prima facie* case for personal jurisdiction." *Id.* (citing *Curry*, 949 F.3d at 393) (emphasis added). The court may consider affidavits submitted by the parties, *id.*, and the court will "accept[ ] as true any facts contained in the defendants' affidavits that remain unrefuted by the plaintiffs." *Richter v. INSTAR Enters. Intern., Inc.*, 594 F. Supp. 2d 1000, 1005 (N.D. Ill. 2009) (quoting *First Nat'l Bank v. El Camino Res., Ltd.*, 447 F. Supp. 2d 902, 905 (N.D. Ill. 2006)) (quotations omitted); *see also Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019) ("Where . . . the defendants submit evidence opposing the district court's exercise of personal jurisdiction, the plaintiffs must similarly submit affirmative evidence supporting the court's exercise of jurisdiction."). But the plaintiff "is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record," *Liqui-Box*, 2020 WL 5593755, at *3 (quoting *Curry*, 949 F.3d at 393) (quotations omitted), and the Court accepts all well-pleaded factual allegations as true. *Matlin*, 921 F.3d at 705.

## ANALYSIS

The Court begins with the threshold question of whether it has personal jurisdiction over Lewis. Then, it considers the many arguments raised by all defendants in support of their motion to dismiss under Rules 12(b)(1) and (6).

## I. LEWIS' MOTION TO DISMISS PURSUANT TO RULE 12(B)(2)

According to Lewis, the Court has "no basis" to exercise jurisdiction over him because he is a Canadian citizen, living and working in Canada, and the alleged acts of misappropriation by Lewis would therefore have taken place in Canada, not the United States. (R. 41 at 1.) The plaintiffs for their part, assert that there is "ample evidence" in the amended complaint that Lewis should have "reasonably anticipate[d] being haled into court here in Illinois." (R. 44 at 2.) The Court agrees with the plaintiffs.

When the Court's jurisdiction is based both on federal questions, 28 U.S.C. § 1331 (*see* R. 30 ¶ 13), and state law pendent jurisdiction, 28 U.S.C. § 1367 (*see also id.* ¶ 14), "the court has 'personal jurisdiction over the defendant if either federal law or the law of the state in which the court sits authorizes service of process to that defendant." *Liqui-Box*, 2020 WL 5593755, at *4. Neither party suggests that a federal law confers jurisdiction over Lewis; therefore, the Court may only exercise personal jurisdiction over Lewis if that jurisdiction is proper in an Illinois court. *Id.* Illinois' long-arm statute "permits the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause[.]" *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). The "key question is [ ] whether the defendants have sufficient 'minimum contacts' with Illinois such that the maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'" *Id.* at 700–701 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

### A.    The Minimum Contacts Analysis

There are two forms of jurisdiction: general and specific. *See Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017). The parties agree that general

jurisdiction does not apply in this case. (*See* R. 41 at 6; R. 44 at 3 (noting general jurisdiction only applies to those who are "'at home' in the forum").) "Specific jurisdiction 'refers to jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *Brook*, 873 F.3d at 552 (quoting *GCIU-Emp'r Ret. Fund. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009)). There are three requirements for specific jurisdiction:

> First, the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state. Second, the plaintiff's alleged injury must have arisen from the defendant's forum-related activities. [And t]hird, the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice.

*Liqui-Box*, 2020 WL 5593755, at *5 (quotations and citations omitted). Where, as relevant to Lewis, the claims at issue are torts, a defendant will have purposefully availed himself if there is "(1) intentional conduct; (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Lauras Int'l (USA) LLP v. Hensley Consulting LLC*, No. 24 C 00881, 2024 WL 5077768, at *8 (N.D. Ill. Dec. 10, 2024) (citing *Felland v. Clifton*, 682 F.3d 665, 674–75 (7th Cir. 2012)).

"The mere fact that a defendant's conduct affects a plaintiff with connections to the forum state is not sufficient to establish jurisdiction." *Brook*, 873 F.3d at 552 (citing *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014)). Rather, the "inquiry must focus on 'the relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)). It is not enough that the defendant had a relationship with the

plaintiff; the relationship "must arise out of contacts that the defendant *himself* creates with the forum State, and the defendant's contacts with the forum State itself." *Id.* at 552–553 (quoting *Walden*, 571 U.S. 274–75)) (quotations omitted) (emphasis in original). Further, the defendant's conduct with Illinois "must be 'suit-related.'" *Liqui-Box*, 2020 WL 5593755, at *5 (citing *Advanced Tactical*, 751 F.3d at 801). In other words, "there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Liqui-Box*, 2020 WL 5593755, at *5 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017)) (quotations omitted).

### 1. **Purposeful Availment and Forum-Related Activities**

The Court considers the first two elements together: "whether [Lewis'] activities can be characterized as purposefully directed at Illinois, and whether [Lewis'] forum-based activities are related to [the plaintiffs] claims." *Liqui-Box*, 2020 WL 5593755, at *5 (citing *Curry*, 949 F.3d at 398) (considering first two elements of personal jurisdiction analysis together). In their response brief, the plaintiffs identify the following activities of Lewis' that they assert are suit related: (1) that Lewis executed an offer letter with Euna that "makes clear that his role was U.S.-based"; (2) that Lewis reported directly to Duffy who was based in CityBase's Chicago headquarters; (3) that Lewis made "approximately seven trips to Chicago to work out of [p]laintiffs' office; (4) that Lewis "frequently accessed and used [p]laintiffs' confidential, proprietary and trade secret information while in Chicago and while in Canada"; (5) that Lewis "frequently discussed [p]laintiffs' confidential, proprietary,

and trade secret information with other senior leadership during in-person meetings in Chicago and remotely from Canada"; (6) that Lewis sent Duffy a message that villainiz[ed] Euna's executives"; (7) that during a trip to Chicago at the end of January 2024, Lewis and Duffy "met . . . to further their scheme to raid [p]laintiffs' confidential, proprietary, and trade secret information"; and (8) that Lewis "downloaded and sent two highly sensitive files . . . to his personal email address." (R. 44 at 5–7.)[7] The question is whether these activities "can be characterized as purposefully directed at Illinois, and whether [Lewis'] forum-based activities are related to [the plaintiffs'] claims." *Liqui-Box*, 2020 WL 5593755, at *5.

Some of these asserted activities are more significant than others. *See id.* at *7 (noting that certain contacts cited are "less significant" in the minimum contacts analysis than others). Nonetheless, though it is a close call, the Court concludes that at this stage, the plaintiffs have sufficiently alleged a *prima facie* showing of personal jurisdiction over Lewis.

Beginning with the contacts the Court finds carry more significance: first, Lewis "reported directly to Duffy in CityBase's Chicago headquarters." (R. 44 at 6 (citing R. 30 ¶ 39).) Duffy recruited Lewis to CityBase, and Lewis was hired as the Senior Vice President of Engagement. (R. 30 ¶ 38.) Illustrating their work

---

[7] In Lewis' motion, he noted that one of the alleged connections between himself and Illinois was that he was involved in "poaching" the plaintiffs' employees. (R. 41 at 7.) The plaintiffs do not respond to this argument. "Failure to respond to an argument [on a motion to dismiss] . . . results in waiver." *Servs. Corp. Int'l v. Stericycle, Inc.*, No. 20 C 838, 2021 WL 2433704, at *4 (N.D. Ill. June 15, 2021) (quoting *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)) (quotations omitted). However, the plaintiffs' waiver on this issue does not change the overall outcome of the personal jurisdiction analysis based on the additional facts alleged supporting jurisdiction.

relationship, the plaintiffs point to a specific example where Lewis reached out to Duffy to discuss work-related information. (*Id.* ¶ 50.) While the fact that Lewis's supervisor worked in Illinois "does not itself reflect purposeful contacts that [Lewis] had with Illinois," the fact that "[Lewis] communicated with [Duffy] in Illinois as part of his ordinary work duties establishes a connection between [Lewis's] employment and the state of Illinois." *Liqui-Box*, 2020 WL 5593755, at *6; *see also Lauras Int'l*, 2024 WL 5077768, at *9 ("Where [d]efendants report to supervisors in Illinois and occasionally work in the forum state, however, the issue is whether those contacts are related enough to the plaintiffs' suits." (quotations and citations omitted)).

Second, though Lewis is undoubtedly a Canadian citizen who worked primarily remotely in Canada (*see, e.g.*, R. 41-2), in connection with his employment, he traveled to Illinois seven times over the course of the approximately six to seven months he was employed by the plaintiffs. (*Id.* ¶ 6; R. 44 at 6); *see Liqui-Box*, 2020 WL 5593755, at *6 (finding relevant to the *prima facie* showing that defendant travelled to Illinois "several times in connection with his employment" over the course of three years). In a footnote to his motion to dismiss, Lewis suggests that the fact that he visited Illinois in connection with his work is insufficient to confer jurisdiction. (R. 41 at 9, n.5 (distinguishing *Liqui-Box* on the basis of, among other things, the fact that Lewis took "fewer trips" to Illinois).) But the defendant in *Liqui-Box* made twenty-six trips totaling around sixty-five or sixty-eight days over approximately three and a half years, whereas Lewis took seven trips spanning twenty-two days over the course of approximately six to seven months. (*Id.*, *see also* R. 41-2 ¶ 6.) Effectively, Lewis was

14

traveling to Illinois at the same rate as the defendant in *Liqui-Box*; Lewis' employment term was merely shorter. Therefore, the Court does not find this particular distinction persuasive.

Perhaps the allegation that most toes the personal jurisdiction line is the offer letter made to Lewis. The plaintiffs assert that the offer letter Lewis executed with Euna "makes clear that his role was U.S. based" because of the United States Visa Application sponsorship section. (R. 44 at 5; R. 41-2 at 9) But Lewis never filed a visa application. (R. 63 at 3.) The parties do not cite to any cases holding that "potential contacts," such as the possibility that Lewis might seek a United States visa, are enough to establish personal jurisdiction, (*see id.*), nor is the Court aware of any case with such a holding. Furthermore, the offer letter itself states that Lewis will "work remotely from [his] home office located in Canada," would be paid in Canadian dollars, that Lewis could resign if Euna required Lewis to move to a different city, and that the agreement would be governed by Alberta law. (*See* R. 41-2 at 8, 13, 17.) While these facts support the possible conclusion that Lewis' position was based in Canada, it does not mean, especially in concert with the other allegations, that he is free from the Court's jurisdiction. The amended complaint alleges that both Euna and CityBase are incorporated in the United States with principal places of business in Chicago, Illinois. (R. 30 ¶¶ 8–9.) Lewis was courted by CityBase and hired in an executive role, where he performed work, particularly related to marketing strategies, with other executives based in Chicago. (*Id.* ¶¶ 38–40.) The Court must draw all reasonable inferences in the plaintiffs' favor; it is reasonable to think that at

the time Lewis was hired, he understood that he was working for an American company in Chicago and would have a role in making decisions that would influence how business was conducted in the United States. Therefore, the Court does not find that the offer letter prevents it from exercising personal jurisdiction.

The plaintiffs also allege that Lewis "frequently discussed [p]laintiffs' confidential, proprietary, and trade secret information with other senior leadership during in-person meetings in Chicago and remotely from Canada." (R. 44 at 6 (citing R. 30 ¶ 43).) Given that the amended complaint alleges that Lewis traveled to Chicago for work and also engaged in discussions of work with at least Duffy, the Court can draw the reasonable inference that Lewis was having discussions about CityBase and Euna that involved plaintiffs' confidential information. This is particularly true given that it is alleged that Lewis was deeply involved with CityBase strategy. (*See, e.g.*, R. 30 ¶¶ 40–41.) Taken together with the other facts supporting personal jurisdiction, this can be considered a purposeful contact with Illinois.

There are some less persuasive indicators of minimum contacts that would suggest that the Court could not exercise jurisdiction over Lewis, if they stood alone. These include the allegations that Lewis "frequently accessed and used [p]laintiffs' confidential, proprietary, and trade secret information while in Chicago and while in Canada." (R. 44 at 6 (citing R. 30 ¶ 43).) There is no allegation that Lewis knew that the servers he was pulling the alleged information from were in Illinois. *See Liqui-Box*, 2020 WL 5593755, at *7 ("[M]ost courts conclude that accessing a sever constitutes a contact for purposes of personal jurisdiction only if the defendant knew

16

the server was in the forum state."). According to Lewis, he did not know the servers' locations, (R. 41-2 ¶¶ 10–11), and the plaintiffs do not attempt to rebut this statement. Therefore, this is less persuasive as a purposeful contact with the state of Illinois.

The same is true for the allegation that Lewis' downloads of the Deck and Excel constitute purposeful contacts for jurisdictional purposes. Though Lewis admitted that he downloaded the documents to do work for CityBase, (R. 41-2 ¶ 12), "[w]ithout, at the very least, evidence that [Lewis] knew that [the defendants'] servers were located in Illinois, his remote use of . . . data stored on those servers is not properly considered a purposeful contact with the state of Illinois." *Liqui-Box*, 2020 WL 5593755, at *7.

Further, the allegation that Lewis met with Duffy in Chicago to "further their scheme to raid [p]laintiffs' confidential, proprietary, and trade secret information" fails to meet *Twombly*'s pleading standards. There are no details about the meeting, or about the information purportedly discussed. Even construing the facts in the plaintiffs' favor, this allegation does not pass muster and cannot be used as a purposeful contact.

The heart of this dispute is the allegation that the defendants have stolen and misused the plaintiffs' trade secrets. (*See, e.g.*, R. 30 ¶ 1.) Though the Court acknowledges that some of the purported contacts, without more, do not suffice to establish personal jurisdiction, the key at this stage is that the plaintiffs "need only make a *prima facie* showing that personal jurisdiction over [the defendant] is

appropriate in Illinois." *Liqui-Box*, 2020 WL 5593755, at *7 (citing *Curry*, 949 F.3d at 401) (emphasis added). Taken together, the plaintiffs have demonstrated that Lewis' "remote employment was closely tied to Illinois and that he obtained the information at the heart of this dispute from his Illinois-based employment." *See id.* (citing *Experian Info. Sols., Inc. v. I-Centrix LLC*, No. 4 C 4437, 2004 WL 2643459, at *3 (N.D. Ill. Nov. 19, 2004)). These allegations are sufficient for the Court to exercise personal jurisdiction over Lewis.

### 2.    Fair Play & Substantial Justice

The end of the minimum contacts analysis requires the Court to ensure that its exercise of personal jurisdiction won't offend "traditional notions of fair play and substantial justice." *Curry*, 949 F.3d at 402 (quoting *Int'l Shoe*, 326 U.S. at 316) (quotations omitted). The Court will consider "[t]he burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of [the underlying dispute], and the shared interest of the several States in furthering fundamental substantive social policies." *Id.* (quoting *Purdue Rsch. Found. v. Sanofi-Sythelabo, S.A.*, 338 F.3d 773, 781 (7th Cir. 2003)). Lewis does not address any of these elements in his briefing, so any such arguments are waived. *G&S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012). Regardless, given that "much of litigation activity occurs remotely" the Court does not see how litigating in Illinois would be burdensome on Lewis, particularly when the underlying dispute is being litigated in this forum, Lewis traveled to Chicago in connection with his employment, and the plaintiffs are located here. *Liqui-Box*, 2020

18

WL 5593755, at *8. Therefore, Lewis has not met his burden to defeat personal jurisdiction; his motion to dismiss for lack of personal jurisdiction is denied.

## II.   THE DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(B)(1) AND (B)(6)

### A.   DTSA (Count I) and ITSA (Count III)

The defendants move to dismiss the plaintiffs' DTSA claim (Count I) and ITSA claim (Count III) against all defendants on both jurisdictional and substantive grounds. "Courts often analyze motions to dismiss DTSA and ITSA claims together because 'the pertinent definitions of the two acts overlap.'" *Aon PLC v. Infinite Equity, Inc.*, 19 C 7504, 18 C 2306, 2021 WL 4192072, at *9 (N.D. Ill. Sept. 15, 2021) (quoting *Inmar, Inc. v. Vargas*, 2018 WL 6716701, at *4 (N.D. Ill. Dec. 21, 2018)).

#### 1.   Jurisdictional Arguments

The defendants make two jurisdictional arguments for why Counts I and III should be dismissed. First, as to Lewis specifically, the defendants assert that the DTSA does not apply to his conduct because he was based in Canada. (R. 37 at 4.) Second, the defendants argue that the plaintiffs lack standing to pursue these claims because they have failed to allege that they are the owner or licensee of the purported trade secrets. (*Id.* at 35.) The Court considers each argument in turn.

##### a.   Applicability of the DTSA to Foreign Conduct

Section 1837 of the DTSA states that the statute applies to "conduct occurring outside the United States if . . . (1) the offender is a natural person who is a citizen or permanent resident alien of the United States . . . or (2) an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837(1)–(2). As a Canadian

19

citizen, the first section of the statute cannot apply to Lewis. (R. 37 at 4; R. 41-2 at 2, ¶ 1.) Therefore, the plaintiff must demonstrate that an act in furtherance of the offense—*i.e.*, the misappropriation of trade secrets—was committed in the United States. *See Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 483 (7th Cir. 2024) ("The offense, in the context of the DTSA private cause of action, is the misappropriation of a trade secret.") (citations omitted).

Both parties rely on *Motorola* to support their respective arguments, drawing different meaning from the opinion's discussion of what "in furtherance" means for the purposes of Section 1837(2). (*See* R. 37 at 4–5; R. 48 at 3–6.) Specifically, both parties rely on the following language in *Motorola*:

> Applied to the DTSA . . . the act in furtherance of the offense of trade secret misappropriation need not be the offense itself or any element of the offense, but it must manifest that the [offense] is at work and is not simply a project [. . .] in the minds of the offenders or a fully completed operation. Put another way, an act that occurs before the operation is underway or after it is fully completed is not an act in furtherance of the offense.

*Motorola*, 108 F.4th at 487 (citations and quotations omitted). To the defendants, the key portion of this quote is that "an act that occurs before the operation is underway or after it is fully completed is not an act in furtherance of the offense." (R. 37 at 5.) The Court understands the defendants' argument to be that if Lewis' downloading of the Deck and Excel were the acts of misappropriation, any communication that occurred prior to that download is insufficient for application of Section 1837(2). (*Id.* (relying on *Soelect, Inc. v. Hyundai Motor Co.*, No. 23 C 05405-CRB, 2024 WL 4293911, at *12–13 (N.D. Ca. Sep. 24, 2024).)

20

The plaintiffs, for their part, direct the Court's attention to the sentence in *Motorola* directly preceding the one the defendants rely on: that an "act in furtherance of the offense of trade secret misappropriation need not be the offense itself or any element of the offense, but it must manifest that the offense is at work and is not simply a project." (R. 48 at 4.) The plaintiffs argue that Lewis' misappropriation was "at work" in the months leading up to his departure from CityBase. (R. 48 at 4–5.) The Court agrees with the plaintiff. The amended complaint alleges that Lewis regularly accessed and used highly confidential and sensitive business information, and that Lewis discussed this information when he was in Chicago. (R. 30 ¶ 43.) It also alleges that Lewis communicated with Duffy, who was based in Chicago, about Euna's purported plans that were allegedly made without CityBase input. (*Id.* ¶ 50.) There are also allegations that, prior to Lewis' departure from CityBase, he accessed and sent information to his personal email address with "some of the Company's most sensitive business information." (*Id.* ¶ 61.) And Lewis allegedly downloaded the Deck and Excel shortly before his resignation. (*Id.* ¶ 62.) Reading these allegations in the light most favorable to plaintiffs, it can be inferred that Lewis was "at work" when he took steps to take the defendants' trade secrets to his next place of employment. Given the tensions brewing between Lewis, Duffy, and defendants' leadership, it is not a stretch to view these allegations about Lewis' conduct as steps taken to steal supposedly confidential business information. And because these steps were directed at the Chicago-based Euna and CityBase, and/or occurred in Chicago, the DTSA applies to Lewis' conduct.

### b. Whether the Plaintiffs' Have Standing to Pursue their DTSA & ITSA Claims

The defendants' second jurisdictional argument is that the plaintiffs lack standing because they have not alleged that they are the "owner" or "licensee" of the trade secrets, specifically the Deck and Excel. (R. 37 at 5–6.) Under the DTSA, an owner is "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed[.]" 18 U.S.C. § 1839(4).[8] The plaintiffs have alleged that they had a legal right to the trade secret information that was purportedly misappropriated. Lewis signed an employment agreement that made clear that the "Company acquires by virtue of the employment relationship all intellectual property rights, title and interest to all writings[.]" (R. 30 ¶ 66.) Further, CityBase is a wholly owned subsidiary of Euna. (*Id.* ¶ 9.) "A wholly owned subsidiary is, by definition, wholly owned by its parent, so it is natural to attribute its assets to the parent." *United States v. White*, 882 F.2d 250, 253 (7th Cir. 1989). The plaintiffs have adequately pled that they were the owners of the trade secrets, and therefore the defendants' standing argument is rejected.

---

[8] The defendants only reference the ITSA in this section of their brief in a footnote, where they argue that CityBase and Euna are "separate legal entities with distinct legal rights[,]" such that they cannot both be the owner or license of the trade secrets. But the case relied upon for this argument, *Arris Grp. Inc. v. CyberPower Sys. (USA), Inc.*, 192 N.E.3d 86, 98–99 (Ill. App. Ct. 2021) does not support this proposition; that case considered the possible liability in a principal/agent relationship under a corporate supply agreement, and noted, in that instance, that the "mere fact of a parent-subsidiary relationship, without a great deal more, does not give rise to *liability*." *Id.* at 99 (emphasis added). This does not mean that the plaintiffs lack standing under the ITSA.

## 2.  Substantive Arguments

"To state a cognizable misappropriation of trade secrets claim under the DTSA, [the plaintiffs] must allege: '(1) existence of a trade secret; (2) that a [d]efendant misappropriated; and (3) used in the [d]efendant's business.'" *Walgreen Co.*, 2024 WL 50379, at *11 (quoting *Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 613 (N.D. Ill. 2023)). The ITSA is similar; it requires a plaintiff to show "that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner." *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1111 (N.D. Ill. 2016) (citing *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 925 (Ill. 2005)).

> Under federal law, information qualifies as a 'trade secret' if (1) 'the owner thereof has taken reasonable measures to keep such information secret' and (2) 'the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'

*Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021) (quoting § 1839(3)). "Illinois's definition is materially identical." *Id.* (citing 765 ILCS 1065/2(d)). Both the DTSA and the ITSA require plaintiffs to "take reasonable efforts to secure and maintain the secrecy of the alleged trade secrets." *Sonrai*, 658 F. Supp. 3d at 615. If it fails to do so, plaintiffs "can forfeit protection if it fails to take adequate precautions." *Walgreen Co.*, 2024 WL 50379 at *11 (quoting *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 177 (7th Cir. 1991)).

The defendants argue that the plaintiffs have failed to allege facts to support the proposition that the Deck, Excel, and other information are trade secrets. (R. 37

at 6.) Specifically, they argue that (1) the plaintiffs have not alleged that they took reasonable protective measures (*id.*); (2) the plaintiffs have not pled facts showing that "any information" is valuable to the them because it was "not known in the industry" (*id.* at 7); (3) the plaintiffs have not alleged that CORE or Duffy misappropriated trade secrets (*id.* at 9); and (4) that any inevitable disclosure claim should be dismissed (*id.*) The Court addresses each argument in turn.

### a. Reasonable Protective Measures

The defendants argue that the measures the plaintiffs took to protect information were insufficient. They focus on the Deck and Excel, and how there are "no allegations" about the measures taken to protect these two documents. (*Id.* at 7.) But the allegedly stolen trade secret information is not limited to solely the Deck and Excel; the plaintiffs also allege that Duffy and Lewis "have taken and retained other secrets and confidential information[.]" (*See* R. 30 ¶ 72.)

In any event, the Court does not find it appropriate to resolve this issue at the motion to dismiss stage. "[C]ourts generally acknowledge that determining the reasonableness of a given confidentiality measure requires a fact-based inquiry dependent on the specific circumstances." *Walgreen Co.*, 2024 WL 50379, at \*11 (quoting *Sonrai*, 658 F. Supp. 3d at 615) (quotations omitted). "Indeed, 'only in an extreme case can what is a reasonable precaution be determined as a matter of law, because the answer depends on a balancing of costs and benefits that will vary from case to case." *Sonrai*, 658 F. Supp. 3d at 615 (quoting *Learning Curve Toys, Inc.* v. *PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003)). The question the Court must

answer for today "remains focused on the pleading standard: Has [the plaintiff] alleged that it employed reasonable confidentiality measures to protect its alleged trade secrets?" *Id.* at 616. In the Court's view, the answer is yes.

In the amended complaint, the plaintiffs outlined several measures they took to keep their alleged trade secret information safe. These include "obligating U.S. employees . . . to enter into restrictive covenant agreements[,]" prohibiting Euna employees from accessing "Euna information and/or information systems 'from an unauthorized device[,]" relying on "computer security and premises security protocols" which includes password protection and having an account. (R. 30 ¶¶ 67–68.) Access to the plaintiffs' trade secrets is also "restricted to a limited number of people on a 'need to know basis.'" (*Id.* ¶ 68.) The plaintiffs further detailed the safety measures taken in their Trade Secret Declaration. (*See* R. 47.)[9] Reading the complaint in the light most favorable to the plaintiffs, these are sufficient allegations that the plaintiffs took reasonable measures to protect their alleged trade secrets.

### b. Valuable Information

Next, the defendants argue that the plaintiffs have failed to demonstrate that the alleged trade secrets were valuable to the plaintiffs. Relying again on the Deck and Excel as the key trade secrets, the defendants assert that the plaintiffs do "not allege information that is valuable because" of the secrecy of these documents. (R. 37

---

[9] A party opposing a motion to dismiss "may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove" so long as they are consistent with the allegations of the complaint. *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1067 (N.D. Ill. 2020) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). The declaration fits squarely within these parameters, and therefore the Court may consider it.

at 8.) They also contend that the information contained in the Excel is publicly available, and therefore not a trade secret. (*Id.*)

The plaintiffs disagree. Relying on both the amended complaint and the Trade Secret Declaration, the plaintiffs argue that they "specified . . .the value they derive from their trade secrets." (R. 48 at 8.) The Court agrees that the amended complaint does specify the value of these alleged secrets. Both the Deck and the Excel "contained information about CityBase's core business strategy and current and prospective customer information[.]" (R. 30 ¶ 63.) The Deck also includes an analysis of CityBase's service model, and the Excel "serves as a template for assessing every one of [the plaintiff's] customers or prospective customers." (*Id.* ¶¶ 64–65.) The Trade Secret Declaration includes additional details about the types of customer information and supplier information, and the value the plaintiffs derive therefrom. (R. 47 ¶¶ 11–29.) This information goes beyond a list of customer names. (R. 37 at 8.) And "courts have regularly held that 'customer-specific information' . . . may warrant trade secret protection." *Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, No. 17 C 5826, 2023 WL 5334638, at *15 (N.D. Ill. Aug. 18, 2023). At this stage, the Court finds that the plaintiffs have adequately demonstrated how the purported trade secrets are of value.

### c.     Alleged Misappropriation by CORE & Duffy

In two short sentences, the defendants assert that the plaintiffs failed to allege "any specific action taken by either CORE or Duffy" and that they do not "allege use by CORE or Duffy." (R. 37 at 9.) But as the plaintiffs correctly point out, courts have "repeatedly recognized that plaintiffs in trade secret cases can rarely prove

misappropriation by convincing direct evidence." *Lumenate Tech., LP v. Integrated Data Storage, LLC*, No. 13 C 3767, 2013 WL 5974731, at *5 (N.D. Ill. Nov. 11, 2013). "In most cases, plaintiffs . . . must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what the plaintiffs allege did in fact take place." *Id.* (citations and quotations omitted). For example, a defendant's attempt to "cover his tracks" could be considered in determining whether a defendant misappropriated trade secrets. *Id.* The plaintiffs alleged that Duffy "wiped" his computer "of all data and overwrote the disk in order to conceal his wrongdoing." (R. 30 ¶ 74.) They also allege that shortly after Duffy wiped his computer and left the company, he became the CEO of CORE. (*Id.*) Likewise, Lewis downloaded documents before he too left CityBase to work for CORE. (*Id.* ¶ 62.) CORE is a "direct competitor" of Euna and CityBase. (*Id.* ¶ 75.) These allegations tie the alleged misappropriation to both Duffy and CORE and are sufficient at the motion to dismiss stage.

### d. Inevitable Disclosure

Finally, the defendants argue that Counts I and III should be dismissed because the plaintiffs have not stated a claim for inevitable disclosure. Under Illinois law, "the 'inevitable disclosure doctrine' allows a plaintiff to 'prove a claim of trade secret misappropriation by demonstrating that the defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets.'" *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 832 (N.D. Ill. 2019) (quoting *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, at *5 (N.D. Ill. May

27

11, 2017)). When evaluating whether the disclosure of trade secrets is inevitable, the Court will consider "(1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." *CZS Holdings LLC v. Kolbe*, 2021 WL 1837385, at \*4 (N.D. Ill. May 7, 2021) (quoting *Uptake*, 394 F. Supp. 3d at 833) (quotations omitted).

Here, the plaintiffs allege that CORE is one of their direct competitors. (R. 30 ¶ 76.) CORE's website states that it "provides 'payment processing solutions' as well as revenue management services. (*Id.* ¶ 77.) So too do the plaintiffs. Indeed, the plaintiffs allege that in a presentation made by Duffy to Euna leadership in March 2023, he highlighted that the shared market was "dominated" by CORE. (*Id.*) These allegations are sufficient to demonstrate that there is a high level of competition between the parties.

Further, Duffy was the CEO of CityBase and an executive at Euna. (*Id.* ¶ 22.) He is now the CEO is CORE. (*Id.* ¶ 74.) Likewise, Lewis served as the Senior Vice President of Engagement for CityBase. (*Id.* ¶ 38.) At CORE, he is the COO. (*Id.* ¶ 74.) Duffy's and Lewis' new positions are comparable to those they previously held with the plaintiffs.

Finally, as to whether CORE has taken steps to prevent Duffy and Lewis from using the alleged trade secrets, it appears there are none, at least in the amended

complaint. But that is not surprising at this stage. *See Uptake*, 394 F. Supp. 3d at 833 (noting that at the motion to dismiss stage, it is "unsurprising[ ]" that the record is "silent" as to what steps were taken by the new employer to prevent disclosure of trade secrets). The amended complaint does allege that the plaintiffs took steps to stop CORE—as well as Duffy and Lewis—from using the purported trade secrets. (R. 30 ¶¶ 90–94.) The plaintiffs allege that despite their demand that "CORE cease and desist such conduct[,] CORE declined." (*Id.* ¶ 92.) "In short, the amended complaint alleges an ITSA claim under the inevitable disclosure doctrine." *Uptake*, 394 F. Supp. 3d at 833.[10]

In sum, the defendants' jurisdictional and substantive arguments as to why the Court should dismiss Counts I and III are unavailing. For the reasons articulated, the motion to dismiss these Counts pursuant to Rules 12(b)(1) and (b)(6) is denied.

## B. CFAA (Count II)

The defendants next argue that Count II should be dismissed pursuant to either Rule 12(b)(1) or (b)(6). As to 12(b)(1), the defendants assert that, in addition to not specifying which plaintiff incurred the statutorily mandated $5,000 in damages, it is not clear "why any money damages could confer standing given that [the p]laintiffs amended their complaint to disclaim any monetary [relief]." (R. 37 at 10.)

---

[10] The defendants argue in a single sentence that "[t]he DTSA, by contrast, does not allow the Court to enjoin an employment relationship." (R. 37 at 9.) The Court does not understand what this means, and whether this is an argument for or against an inevitable disclosure claim under the DTSA. Nonetheless, to the extent one is alleged, the Court declines to dismiss it. "Consistent with other courts in this district, this Court finds that a DTSA claim based on inevitable disclosure may survive a motion to dismiss." *Uptake*, 394 F. Supp. 3d at 834 (collecting cases).

With respect to 12(b)(6), the defendants argue that because damages for a violation of Section (c)(4)(A)(i)(I) are limited to economic damages, the plaintiffs' requested injunctive relief is not available. (*Id.*)

Neither of these arguments are persuasive. Though the CFAA is "primarily a criminal anti-hacking statute," "subsection 1030(g) provides a civil remedy for CFAA violations." *Block Elec. Co. Inc., v. Jozsa*, No. 23 C 795, 2023 WL 4106073, at *2 (N.D. Ill. June 21, 2023) (citing *Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016)). Under this provision, "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). Civil actions brought pursuant to Subsection (c)(4)(A)(i)(I) require an allegation of an injury of at least $5,000. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citing § 1030(c)(4)(A)(i)(I), (g)). The plaintiffs have made that allegation. (*See, e.g.*, R. 30 ¶ 116.) Furthermore, the statute does not indicate that economic damages are the only available remedy for a violation of Section (c)(4)(A)(i)(I). To be sure, the statute makes clear that, in the event a party is seeking *damages* for a violation of that section, they are "limited to economic damages." § 1030(g). In other words, if a plaintiff was seeking compensatory damages, as opposed to injunctive relief or some other equitable relief, *id.*, then that plaintiff would be limited to solely economic damages and nothing more that could fall into the overarching category of compensatory damages. As noted, the statute makes both compensatory damages *and* injunctive relief available. The plaintiffs are seeking

injunctive relief in their CFAA claim against Duffy. This is permissible and does not mean that the plaintiffs lack standing to bring this claim, nor that they failed to state a claim. As such, the defendants' motion to dismiss Count II is denied.

## C. Breach of Contract (Count IV) and Tortious Interference (Count X)

Next, the Court considers the defendants' arguments that Count IV (Breach of Contract against Duffy) and Count X (Tortious Interference against Lewis and CORE) should be dismissed. Essentially, the defendants assert that the restrictive covenants in the FCA executed on September 12, 2018 "never took effect" because the 2019 Offer Letter "superseded all prior agreements." (R. 37 at 11). In support, the defendants direct the Court's attention to paragraph twelve of the 2019 Offer Letter, which states that "[t]his offer letter supersedes in its entirety that certain offer letter between you and the Company dated as of September 12, 2018." (R. 1-3 at 8, ¶ 12.) In the defendants' view, this means that the 2019 Offer Letter is the only agreement to which Duffy is bound, and therefore there can be no breach of contract claim.

The plaintiffs claim that this is "revisionist history." (R. 48 at 12.) They assert that the "[d]efendants' argument that the 2019 Offer Letter's language 'supersed[es]' all prior agreements makes no sense," given the other language in the very same section of the 2019 Offer Letter the defendants rely on—paragraph twelve. (*Id.* at 13.) Specifically, the plaintiffs point to the portion of paragraph twelve which states that "[t]his offer letter, *together* with the Incentive Plan, any equity award agreements referenced herein *and* the Fair Competition Agreement, constitutes the entire agreement and understanding between the parties[.]" (R. 1-3 at 8, ¶ 12 (emphasis

31

added).) In other words, the 2019 Offer Letter is but one part of a collection of agreements that governed Duffy's employment with the plaintiffs. (*See* R. 48 at 13.)

The Court agrees with the plaintiffs. The primary objective of contract interpretation under Illinois law is to "give effect to the intention of the parties." *Full Circle Villagebrook GP, LLC v. Protech 2004-D, LLC*, 119 F.4th 522, 526 (7th Cir. 2024) (quoting *Thompson v. Gordon*, 948 N.E.3d 39, 47 (Ill. 2011)) (quotations omitted). Duffy signed the 2019 Offer Letter, intending to be bound by its terms. (*See, e.g.*, R. 1-3 at 9; R. 37 at 11 ("Duffy's employment was governed by a 2019 Offer Letter.").) The 2019 Offer Letter contains a section entitled "Fair Competition Agreement," which states that Duffy agrees to "execute and comply with the Fair Competition Agreement[.]" (R. 1-3 at 5, ¶ 7.) As noted, paragraph twelve indicated that the FCA was a portion of the 2019 Offer Letter and collective understanding between the parties as to Duffy's employment; it was not a document that was superseded by any other document. (*Id.* at 8, ¶ 12.) Paragraph twelve also makes clear that "[a]ny disputes arising out of or related to this offer letter or [Duffy's] employment with the Company will be subject to the dispute resolution provisions in the [FCA.]" (*Id.*) The plain language of the contract does not indicate that the FCA, though signed in 2018, was somehow superseded by the 2019 Offer Letter.

Further, the plaintiffs alleged that "CityBase did not require Duffy to re-execute the [FCA] in 2019 and instead left the existing agreement in place" because the 2018 [O]ffer [L]etter was "substantially identical" to the 2019 Offer Letter." (R. 30 ¶ 36.) The Court can draw the reasonable inference from this allegation that,

32

having already signed the FCA in 2018, the plaintiffs did not require Duffy to re-sign the same document in 2019, on the understanding that the already executed FCA continued to govern, as indicated in the 2019 Offer Letter. Therefore, the Court denies the defendants' motion to dismiss the breach of contract claim. Because the defendants argued that Count X hinged on Count IV, (*see* R. 37 at 11 (noting that without a "valid restrictive covenant [ ] for Duffy to breach" there is no agreement "for Lewis or Core to tortiously interfere with.")), the Court likewise denies the motion to dismiss with respect to tortious interference, Count X.

### D. Breach of Fiduciary Duty (Counts V & VII) & Aiding and Abetting Breach of Fiduciary Duty (Counts VI & VIII)

The defendants also move to dismiss the plaintiffs' claims of breach of fiduciary duty and aiding and abetting that breach, as against Duffy and Lewis. (R. 37 at 14.) The thrust of the defendants' argument is that the plaintiffs' allegations are insufficient. The Court disagrees.[11] Illinois law requires three elements for a breach of fiduciary duty claim: "(1) that a fiduciary duty exists, (2) that the fiduciary duty was breached, and (3) that such breach proximately caused the injury of which the plaintiff complains." *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 720 (N.D. Ill. 2014) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006) (quotations omitted). Further, "[e]mployees owe a duty of loyalty to their employer." *Id.* (citing *Lawlor v. N. Am. Corp. of Ill.*, 983 N.3.2d 414, 433 (Ill.

---

[11] The defendants cite to *Robinson v. Caster*, 356 F.2d 924, 925 (7th Cir. 1966), for the proposition that Rule 9(b)'s pleading standard applies here because the plaintiffs are relying on "schemes." (R. 37 at 14.) But the schemes that *Robinson* refers to are those to defraud—specifically, a scheme to prevent the plaintiff from exercising his stock option, which is not applicable here. *Id.*

2012)). While it is true that the ITSA "preempts civil claims predicated on the misuse of secret information," when the allegations underlying the breach of fiduciary duty claims "do not, however, rest solely on the allegation" that confidential information was shared, the claim is not preempted. *Id.*

Here, a fiduciary exists because Duffy and Lewis were employed by CityBase. (*See, e.g.*, R. 30 ¶¶ 22, 31, 38.) The duty was breached not solely because Duffy and Lewis allegedly "execut[ed] a scheme . . . to misappropriate [the p]laintiffs' trade secrets and use them in their new employment at CORE," (*id.* ¶¶ 141, 152), but also because they instructed others to resist efforts to integrate CityBase and Euna, (*see, e.g., id.* ¶ 49–52, 54, 141), and allegedly poached former employees of the plaintiffs' to work at CORE, (*see, e.g., id.* ¶¶ 83–85.) These allegations survive the defendants' motion to dismiss.[12]

Because the breach of fiduciary claims, Count V and VII, remain, the aiding and abetting claims, Counts VI and VIII, survive. (*See* R. 37 at 15 (arguing that Count VI and VIII should be dismissed only if Count V and VII are dismissed).)

### E.     Conspiracy (Count IX) & Concert of Action (Count XI)

Last, the defendants move for dismissal of the conspiracy and concert of action claims. The only argument the defendants raise in support of this request is that

---

[12] In Count V, the plaintiffs also allege that Duffy misused corporate resources to engage in "lavish" unapproved spending. (R. 30 ¶ 141.) The only allegation in the complaint about this spending is at paragraph 53, which states that "Duffy continued to engage in lavish unapproved spending which cost the [p]laintiffs tens—if not hundreds—of thousands of dollars in unauthorized corporate expenses." (*Id.* ¶ 53.) This is a conclusory allegation with insufficient detail from which the Court could draw a reasonable inference of a breach of fiduciary duty. To the extent Count V is predicated on this allegation, it is disregarded.

"[c]ivil conspiracy and in concert liability require independent torts. Since the other claims must be dismissed, Counts IX and XI must also be dismissed." (*Id.* at 15 (citations omitted).) Seeing as the Court has not dismissed any of the tort claims in the complaint, this argument fails, and Counts IX and XI stand.

## CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss [22, 39] are denied. The defendants shall answer the amended complaint on or before June 12, 2025.

Date: May 21, 2025

_____
JEREMY C. DANIEL
United States District Judge